No. 24-34

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SAMANTHA ALARIO, HEATHER DIROCCO, CARLY ANN GODDARD,
ALICE HELD, and DALE STOUT,

*Plaintiffs-Appellees,*

and

TIKTOK INC.,

*Consolidated Plaintiff-Appellee,*

v.

AUSTIN KNUDSEN, in his official capacity as Attorney General
of the State of Montana

*Defendant-Appellant.*

Appeal from the United States District Court for the District of Montana
Case Nos. CV 23-56-DWM and CV 23-61-DWM
Hon. Donald W. Molloy, Senior District Judge

## APPELLANT'S OPENING BRIEF

AUSTIN KNUDSEN
  *Attorney General of Montana*

CHRISTIAN B. CORRIGAN
  *Solicitor General*

PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*

Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406)-444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..............................................................iii

INTRODUCTION...........................................................................1

STATEMENT OF JURISDICTION ...................................................2

ISSUES PRESENTED FOR REVIEW ...............................................3

STATEMENT OF THE CASE ..........................................................3

 I. Montana's Consumer Protection Interests ....................................3

 II. Extensive Public Reporting Shows that TikTok's U.S. User Data is Likely Subject to At-Will CCP Access.....................5

 III. The Montana Legislature Enacts SB419 to Safeguard Montanans' Data Privacy. ............................................13

 IV. The District Court Enjoins SB419's Effective Date...................14

STANDARD OF REVIEW..............................................................16

SUMMARY OF THE ARGUMENT ...................................................18

ARGUMENT................................................................................24

 I. Plaintiffs are unlikely to succeed on the merits. ...........................24

  A. SB419 is a valid exercise of Montana's police power that doesn't implicate First Amendment rights............................24

   1. SB419 permissibly exercises Montana's police power to ban TikTok's harmful conduct. ...................................24

   2. If SB419 implicates First Amendment rights, it passes scrutiny under *O'Brien* .......................................39

   3. SB419 is neither a content- nor viewpoint-based restriction on speech.............................................39

    i. SB419 passes intermediate scrutiny................................42

  B. SB419 isn't preempted by federal law. ..................................47

i

1. SB419 isn't preempted under the foreign affairs doctrine. 47

2. SB419 isn't preempted by the DPA....................................60

C. SB419 doesn't violate the Commerce Clause.........................64

II. The remaining preliminary injunction factors do not weigh in Plaintiffs' favor...................................................................67

A. Plaintiffs haven't shown irreparable harm to support preliminary relief. .............................................................67

B. The balance of the equities and public interest favor Montana...........................................................................69

CONCLUSION ..........................................................................69

CERTIFICATE OF COMPLIANCE ................................................71

ii

T<span style="font-size:smaller">ABLE OF</span> A<span style="font-size:smaller">UTHORITIES</span>

## Cases

*303 Creative LLC v. Elenis,*
    143 S. Ct. 2298 (2023) ................................................................ 38

*Aargon Agency, Inc. v. O'Laughlin,*
    2022 WL 377784 (D. Nev. Feb. 7, 2022) ............................................. 4

*Aguayo v. U.S. Bank,*
    653 F.3d 912 (9th Cir. 2011) ................................................... *passim*

*All. for the Wild Rockies v. Petrick,*
    68 F.4th 475 (9th Cir. 2023) ................................................... 17, 18

*Am. Beverage Ass'n v. City & Cnty. of S.F.,*
    916 F.3d 749 (9th Cir. 2019) ........................................................ 16

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) ................................................................. 49

*Arcara v. Cloud Books, Inc.,*
    478 U.S. 697 (1986) ........................................................... *passim*

*Arizona v. United States,*
    567 U.S. 387 (2012) ......................................................... 48, 49, 57

*Baird v. Bonta,*
    81 F.4th 1036 (9th Cir. 2023) ............................................. 17, 67, 69

*Barnes v. Glen Theatre,*
    501 U.S. 560 (1991) ......................................................... 35-36, 37

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) ......................................................... 16-17

*Bibb v. Navajo Freight Lines,*
    Inc., 359 U.S. 520 (1959) ........................................................... 66

iii

*Boy Scouts of Am. v. Dale,*
530 U.S. 640 (2000) ................................................ 37-38

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
476 U.S. 573 (1986) .............................................. 64, 65

*Cal. Chamber of Commerce v. Council for Educ. & Rsch. on Toxics,*
29 F.4th 468 (9th Cir. 2022) ......................................... 16

*California v. ARC Am. Corp.,*
490 U.S. 93 (1989) ................................................. 24

*Chamber of Commerce of the U.S. v. Bonta,*
62 F.4th 473 (9th Cir. 2023) .................................... 47, 48

*City of Erie v. Pap's A.M.,*
529 U.S. 277 (2000) ................................................ 36

*City of L.A. v. Taxpayers for Vincent,*
466 U.S. 789 (1984) ............................................ 20, 45

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994) ................................................ 46

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ............................................ 48, 63

*Doe v. Harris,*
772 F.3d 563 (9th Cir. 2014) ....................................... 33

*Foti v. City of Menlo Park,*
146 F.3d 629 (9th Cir. 1998) ....................................... 40

*Geier v. Am. Honda Motor Co.,*
529 U.S. 861 (2000) ............................................ 60, 62

*Granholm v. Heald,*
544 U.S. 460 (2005) ................................................ 64

*hiQ v. LinkedIn,*
31 F.4th 1180 (9th Cir. 2022) ................................... 17, 69

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
515 U.S. 557 (1995) ............................................ 29, 31

iv

*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020) .......................................................... 38

*Jacobs v. Clark Cnty. Sch. Dist.*,
   526 F.3d 419 (9th Cir. 2008) .................................................. *passim*

*Kansas v. Garcia*,
   140 S. Ct. 791 (2020) ........................................................................ 47

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
   508 U.S. 384 (1993) .......................................................................... 41

*Leathers v. Medlock*,
   499 U.S. 439 (1991) ................................................................... 32, 41

*Lone Star Sec. & Video, Inc. v. City of L.A.*,
   827 F.3d 1192 (9th Cir. 2016) .................................................. 39, 40

*Los Angeles v. Alameda Books, Inc.*,
   535 U.S. 425 (2002) .......................................................................... 53

*Martin v. City of Struthers*,
   319 U.S. 141 (1943) ..................................................................... 45-46

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
   584 U.S. 617 (2018) .......................................................................... 36

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ................................................................... 16, 54

*Metro. Life Ins. Co. v. Massachusetts*,
   471 U.S. 724 (1985) ............................................................................ 3

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974) ................................................................... 29, 30

*Minn. Star & Trib. Co. v. Minn. Comm'r of Rev.*,
   460 U.S. 575 (1983) .......................................................................... 29

*Moody v. NetChoice, LLC*,
   No. 22-277 (U.S. Sept. 23, 2023) .................................................... 32

*Moorman Mfg. Co. v. Bair*,
   437 U.S. 267 (1978) .......................................................................... 66

*Movsesian, v. Victoria Versicherung AG*,
  670 F.3d 1067 (9th Cir. 2012) .................................................. *passim*

*Nat'l Pork Producers Council*,
  143 S. Ct. 1154 (2023) ................................................................. 66

*Negrete v. Allianz Life Ins. Co.*,
  523 F.3d 1091 (9th Cir. 2008) .......................................... 16

*NetChoice, LLC v. Paxton*,
  49 F.4th 439 (5th Cir. 2023) .......................................... 30, 31, 32, 55

*NetChoice, LLC v. Paxton*,
  No. 22-555 (U.S. Sept. 23, 2023) ........................................ 32

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................... 17

*Norbert v. City & Cnty. of S.F.*,
  10 F.4th 918 (9th Cir. 2021) .................................................. 16, 54, 68

*O'Connor v. Denver*,
  894 F.2d 1210 (10th Cir. 1990) ........................................... 28

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
  460 U.S. 37 (1983) ................................................................... 42

*Pike v. Bruce Church, Inc.*
  397 U.S. 137 (1970) ................................................................. 65, 66

*Police Dep't of Chi. v. Mosley*,
  408 U.S. 92 (1972) ................................................................... 25

*Pom Wonderful LLC v. Hubbard*,
  775 F.3d 1118 (9th Cir. 2014) ........................................... 18

*Purris v. TikTok Inc.*,
  No. 1:24-cv-00944 (S.D.N.Y. Feb. 8, 2024) ........................................ 11

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992) ................................................................... 41

*Raymond Motor Transp., Inc. v. Rice*,
  434 U.S. 429 (1978) .................................................................. 66

vi

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ........................................................ 39

*Republican Party v. Torrez,*
    2023 WL 5310645 (D.N.M. Aug. 17, 2023) ...................................... 53

*Renton v. Playtime Theatres,*
    475 U.S. 41 (1986) ................................................... 36, 54

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ................................................. 40-41

*S. Bay United Pentecostal Church v. Newsom,*
    985 F.3d 1128 (9th Cir. 2021) ........................................... 18

*S. Pac. Co. v. Arizona,*
    325 U.S. 761 (1945) ..................................................... 64

*S.O.C., Inc. v. Cnty. of Clark,*
    152 F.3d 1136 (9th Cir. 1998) ......................................... 39-40

*Schad v. Borough of Mount Ephraim,*
    452 U.S. 61 (1981) ..................................................... 45

*SPGGC, LLC v. Blumenthal,*
    505 F.3d 183 (2d Cir. 2007) ............................................. 67

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
    538 U.S. 408 (2003) ..................................................... 24

*Talk of the Town v. Dep't of Fin. & Bus. Servs.,*
    343 F.3d 1063 (9th Cir. 2003) ........................................... 25

*TikTok Inc. v. CFIUS,*
    No. 20-1444 (D.C. Cir. Nov. 10, 2020) ........................... 21, 62, 63, 64

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994) ............................................. *passim*

*United States v. Carrillo-Lopez,*
    68 F.4th 1133 (9th Cir. 2023) ......................................... 54-55

*United States v. O'Brien,*
    391 U.S. 367 (1968) ............................................. *passim*

*Von Saher v. Norton Simon Museum of Art,*
    592 F.3d 954 (9th Cir. 2010) ............................................................ 59

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .................................................. 36-37, 39, 40

*Wash. Post v. McManus,*
    944 F.3d 506 (4th Cir. 2019) ...................................................... 46

*Where Do We Go Berkeley v. Cal. Dep't of Transp.,*
    32 F.4th 852 (9th Cir. 2022) .............................. 17-18, 31-32

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................ 16, 17, 18, 68

*Wright v. City of St. Petersburg,*
    833 F.3d 1291 (11th Cir. 2016) ................................................ 33

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ............................................ 60, 61, 62-63

*Zschernig v. Miller,*
    389 U.S. 429 (1968) ................................................... 49, 59

## OTHER AUTHORITIES

### United States Code

28 U.S.C. § 1292(a)(1) ............................................................ 3

28 U.S.C. § 1331 .................................................................... 2

28 U.S.C. § 1343(a) ................................................................ 2

50 U.S.C. § 2170(a)(3) ........................................................... 61

50 U.S.C. § 4502(a)(1) ........................................................... 61

50 U.S.C. § 4502(a)(4) ........................................................... 61

50 U.S.C. § 4565(b)(1)(A) ....................................................... 61

50 U.S.C. § 4565(b)(2)(A) .................................................. 21, 61

**Code of Federal Regulation**

15 C.F.R. § 7.4(a)(1) ................................................... *passim*

**Federal Register**

Pres. Procl. No. 10061, 85 Fed. Reg. 51297 (Aug. 14, 2020) .......... 62

Exec. Order 14034, 86 Fed. Reg. 31423 (June 9, 2021) ........... 50, 57

**Montana Code Annotated**

§§ 30-14-101 *et seq.* .................................................. 35, 50

§ 30-14-103 ......................................................... 3-4

§§ 30-14-208–210 .................................................. 4

§§ 30-14-1401–1414 ................................................ 4

§ 30-14-2103(1)(c) ................................................. 4

**Montana Senate Bills**

SB384, 2023 Sess., 68th. Leg. (Mont. 2023) ...................... 4, 5, 46-47

SB419, 2023 Sess., 68th Leg. (Mont. 2023) ........................... *passim*

## OTHER PUBLICATIONS

Ashley Gold, *Exclusive: Senator's TikTok whistleblower alleges data abuses*, AXIOS (Mar. 8, 2023).............................................7

*Biden signs TikTok ban for government devices, setting up a chaotic 2023 for the app*, NBCNEWS (Dec. 30, 2022) ..............................22

Clare Duffy*, Former TikTok executive sues the company for Alleged gender and age discrimination*, CNN BUSINESS (Feb. 9, 2024) ...................................................11-12

David Shepardson, *ByteDance finds employees obtained TikTok user data of two journalists*, REUTERS (Dec. 22, 2022) ............................7

David Shepardson, *State AGs demand TikTok comply with US consumer protection investigations*, REUTERS (Mar. 6, 2023).................22

ix

*Deputy attorney general warns against using TikTok, citing data privacy*, ABCNEWS (Feb. 16, 2023) ................................. 22

Drew Harwell, *A former TikTok employee tells Congress the app is lying Chinese spying*, WASH. POST (Mar. 10, 2023) ...................... 7-8, 12

Emily Baker-White, *Leaked Audio from 80 Internal TikTok Meetings Shows That US User Data Has Been Repeatedly Accessed From China*, BUZZFEEDNEWS (June 17, 2022) ................... 6, 11

Emily Baker-White, *Exclusive: TikTok Spied on Forbes Journalists*, Forbes (Dec. 22, 2022), perma.cc/8HSX-R74Q; David Shepardson, *ByteDance finds employees obtained TikTok user data of two journalists*, REUTERS (Dec. 22, 2022) ........................................ 7

*Hearing on Social Media's Impact on Homeland Security Before the H.R. Comm. on Homeland Sec. & Governmental Affs.*, 117th Cong. (Sept. 14, 2022) (written testimony of Geoffrey Cain, Senior Fellow for Critical Emerging Techs., Lincoln Network) ....... 10, 22

Justine McDaniel, *Indiana sues TikTok, claiming it exposes children to harmful content*, WASH. POST (Dec. 7, 2022) ....................... 22

Letter from TikTok Inc. to Senators Blumenthal and Blackburn (June 16, 2023) ......................................... 22

Press Release, Senator Ed Markey, *Amid Calls to Ban TikTok, Senator Markey Calls for Immediate Action on Privacy Protections for Children and Teens Online* (Mar. 22, 2023) ................... 22

Richard Nieva, *TikTok's In-App Browser Includes Code That Can Monitor Your Keystrokes, Researcher Says*, FORBES (Aug. 18, 2022) ......................................... 6

Sapna Maheshwari & Ryan Mac, *Driver's Licenses, Addresses, Photos: Inside How TikTok Shares User Data*, N.Y. TIMES (May 24, 2023) ......................................... 8-9

Sapna Maheshwari, *After Montana Banned TikTok, Users Sued. TikTok Is Footing Their Bill*, N.Y. TIMES (June 27, 2023) ........... 14

Thomas Fuller & Sapna Maheshwari, *Ex-ByteDance Executive Accuses Company of "Lawlessness,"* N.Y. TIMES (May 12, 2023)..............8

*TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms, House Energy & Commerce*, 118th Cong. (Mar. 23, 2023)................................22

Zach Kessel, *Crenshaw, Gottheimer Urge Commerce Department to Block TikTok from Transferring U.S. Data to CCP-Linked Parent Company*, NAT'L REV. (Feb. 8, 2024) ..........................................12

Zen Soo, *Former exec at TikTok's parent company says Communist Party members had a 'god credential' that let them access Americans' data*, BUSINESS INSIDER (June 7, 2023)..............9

## INTRODUCTION

In enacting Montana Senate Bill 419 ("SB419"), the Montana Legislature responded to serious, widespread concerns about TikTok Inc.'s data-privacy practices and its failure to safeguard U.S. user data from members of the Chinese Communist Party ("CCP"). TikTok characterizes these legitimate concerns as "unconfirmed allegations" and "unfounded speculation," despite a mountain of publicly available reporting about its data-privacy shortcomings and ties to the CCP.

State and federal government officials across the political spectrum have sounded the alarm. Congress and 33 other states have banned TikTok on all government devices, and several countries have either banned TikTok entirely (*e.g.*, India) or on government devices (*e.g.*, Australia, Canada, France, Norway, Taiwan, United Kingdom). Beyond that, the United States Department of Justice, the Trump and Biden Administrations, former TikTok employees, and security experts have all joined the chorus. And at its core, SB419 is a common sense consumer protection regulation designed to eliminate the threat of a known bad actor obtaining and misusing Montanans' data.

But rather than crediting Montana's common sense consumer protection purpose for enacting SB419, the district court imputed a "pervasive undertone of anti-Chinese sentiment" to the Montana Legislature. ER-26. And the district court repeatedly failed to hold Plaintiffs to their evidentiary burden, instead shifting that burden to Montana. *See* ER-30, 37, 40, 42–43, 47, 48–49. Aided by these errors, the district court erroneously concluded that Plaintiffs were likely to prevail on their constitutional claims.

## STATEMENT OF JURISDICTION

Consolidated Plaintiff-Appellee ("TikTok") and Plaintiffs-Appellees ("Users")[1] challenge the constitutionality of SB419 under the First and Fourteenth Amendment to the U.S. Constitution, the Supremacy Clause (art. I, § 8, cl.3), and the Commerce Clause (art. IV), so the district court had subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1343(a) (civil rights).

On November 30, 2023, the district court issued a preliminary injunction enjoining SB419. ER-3–50. Montana filed its notice of appeal

---

[1] This brief uses "Plaintiffs" when referring to TikTok and the Users collectively, and "Montana" when referring to Defendant-Appellant, unless the context requires otherwise.

2

on January 2, 2024, *see* ER-86–88, which is timely under Fed. R. App. P. 3(a)(1), 4(a)(1)(B), and 26(a)(1)(A)-(C), so this Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) (interlocutory orders granting preliminary injunctions).

## ISSUES PRESENTED FOR REVIEW

(1) Did the district court err in concluding that TikTok and the Users were likely to prevail on the merits of their First Amendment, Supremacy Clause, and Commerce Clause challenges to SB419?

(2) Did the district court err in its application of the remaining preliminary injunction factors?

## STATEMENT OF THE CASE

### I. Montana's Consumer Protection Interests.

"The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (cleaned up). Montana is no exception. Vast parts of the Montana Code protect Montanans from unscrupulous actors.

Take the Montana Unfair Trade Practices and Consumer Protection Act. It bans all "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont.

3

Code Ann. ("MCA") § 30-14-103. Neighboring sections prevent unfair competition in sales and purchasing and proscribe selling goods at less than their cost. *See id.* §§ 30-14-208 to -210. Still others regulate interstate actors in industries subject to the United States Code and to potentially conflicting laws in other states. *See, e.g.*, Montana Telemarketing Registration and Fraud Prevention Act, *codified at* MCA §§ 30-14-1401 to 1414. Montana even bans certain business activities altogether; as one example, debt settlement providers "may not" "make loans or offer credit" in Montana, despite those activities' expressive content. *Id.* § 30-14-2103(1)(c); *see Aargon Agency, Inc. v. O'Laughlin*, 2:21-cv-1202, 2022 WL 377784, at \*18 (D. Nev. Feb. 7, 2022) (states have a "substantial interest in protecting [their] citizens" by regulating debt collection).

And in May 2023, Montana did more to protect Montana consumers, enacting the Consumer Data Privacy Act ("CDPA"), which establishes a framework for controlling and processing consumer personal data in the state. SB384, 2023 Sess., 68th. Leg. (Mont. 2023), https://perma.cc/GTC6-Z2Q. The CDPA, which goes into effect on October 1, 2024, applies to any person doing business in Montana or who produces products and services targeted to state consumers and, subject to

4

certain limits, "controls or processes" personal data.  *Id.* § 3, § 14.  The CDPA also confers several rights on consumers, including the right to access and obtain copies of their personal data, to request deletion of their data, and to opt out of the sale of their data.  *Id.* § 5.  Under the CDPA, data controllers must respond to consumer requests within a reasonable time and must justify any denied requests and explain how to appeal those decisions.  *Id.*  The CDPA provides no private right of action, instead granting the Attorney General exclusive enforcement authority. *Id.* § 12.

## II. Extensive Public Reporting Shows that TikTok's U.S. User Data is Likely Subject to At-Will CCP Access.

Given the Legislature's interest in protecting Montanans from potentially harmful actors and practices, it's no surprise TikTok caught the Legislature's attention.  Over the last two years, a tidal wave of news stories revealed many ways that TikTok could harm Montanans.  One report said that "leaked audio from more than 80 internal TikTok meetings" established that "China-based employees of ByteDance"—TikTok's "parent company," which "is located" in China—"have repeatedly

accessed nonpublic data about US TikTok users."[2] "'Everything is seen in China,' said a member of TikTok's Trust and Safety department in a September 2021 meeting," and in another meeting, "a director referred to one Beijing-based engineer as a 'Master Admin' who 'has access to everything.'"[3] A third reported that "[w]hen TikTok users enter a website through a link on the app, TikTok inserts code that can monitor much of their activity on those outside websites, including their keystrokes and whatever they tap on the page"—so "TikTok [could] capture a user's credit card information or password."[4] The researcher who discovered that code described this as "'a non-trivial engineering task'" that "'does not happen by mistake.'"[5] Late last year, two articles reported how

---

[2] Emily Baker-White, *Leaked Audio from 80 Internal TikTok Meetings Shows That US User Data Has Been Repeatedly Accessed From China*, BUZZFEEDNEWS (June 17, 2022), perma.cc/LAM2-PL6K.

[3] *Id.*

[4] Richard Nieva, *TikTok's In-App Browser Includes Code That Can Monitor Your Keystrokes, Researcher Says*, FORBES (Aug. 18, 2022), perma.cc/M578-4X29.

[5] *Id.*

ByteDance accessed TikTok user data from two U.S. journalists to try to identify the source of a leak about internal TikTok information.[6]

Things only got worse for TikTok from there. In March 2023, a whistleblower told a U.S. Senator that "TikTok's access controls on U.S. user data are much weaker than the company says" and that "TikTok overstates its separation from its China-based owner ByteDance, relies on proprietary Chinese software that could have backdoors, and uses tools that allow employees to easily toggle between U.S. and Chinese user data."[7] A *second* whistleblower told congressional investigators and the *Washington Post* that TikTok's "plan for protecting United States user data is deeply flawed," that "issues could leave data from TikTok's more than 100 million U.S. users exposed to China-based employees of its parent company ByteDance," and "that a truly leakproof arrangement for

---

[6] Emily Baker-White, *Exclusive: TikTok Spied on Forbes Journalists*, FORBES (Dec. 22, 2022), perma.cc/8HSX-R74Q; David Shepardson, *ByteDance finds employees obtained TikTok user data of two journalists*, REUTERS (Dec. 22, 2022), perma.cc/YH2U-RLA8.

[7] Ashley Gold, *Exclusive: Senator's TikTok whistleblower alleges data abuses*, AXIOS (Mar. 8, 2023), https://www.axios.com/2023/03/08/senators-tiktok-whistleblower-alleges-data-abuses.

Americans' data would require a 'complete re-engineering' of how TikTok is run."[8]

Two months later, the former head of engineering for ByteDance in the U.S. sued ByteDance; he alleged that "ByteDance offices in Beijing had a special unit of [CCP] members sometimes referred to as the Committee," which "'maintained supreme access to all the company data, even data stored in the United States.'"[9]  Indeed, "[d]uring his tenure at the company, he said, certain engineers had 'backdoor' access to user data."[10]  A few weeks later, the *New York Times* reported on TikTok's "internal messaging and collaboration tool called Lark"—a tool "used every day by thousands of employees of the app's Chinese owner, ByteDance, including by those in China"—that "has been used for handling individual TikTok account issues and sharing documents that

---

[8] Drew Harwell, *A former TikTok employee tells Congress the app is lying Chinese spying*, WASH. POST (Mar. 10, 2023), perma.cc/997H-9GLY.

[9] Thomas Fuller & Sapna Maheshwari*, Ex-ByteDance Executive Accuses Company of "Lawlessness*," N.Y. TIMES (May 12, 2023), perma.cc/DE96-KD7G.

[10] *Id.*

contain personally identifiable information since at least 2019."[11]   The director of Stanford University's Internet Observatory said "'Lark shows you that all the back-end processes are overseen by ByteDance.'"[12]   Most recently, the former ByteDance executive suing ByteDance alleged that "some members of the ruling Communist Party" had "access to U.S. user data" through a "'superuser' credential—also known as a god credential— that enabled a special committee of CCP members stationed at the company to view all data collected by ByteDance including those of U.S. users."[13]   He alleged that "[t]he credential acted as a 'backdoor to any barrier ByteDance had supposedly installed to protected data from the CCP's surveillance."[14]

TikTok concedes that it is owned by ByteDance, Ltd., a shell corporation registered in the Cayman Islands.[15]   Congressional testimony

---

[11] Sapna Maheshwari & Ryan Mac, *Driver's Licenses, Addresses, Photos: Inside How TikTok Shares User Data*, N.Y. Times (May 24, 2023), perma.cc/2KBM-WSAZ.

[12] *Id.*

[13] Zen Soo, *Former exec at TikTok's parent company says Communist Party members had a 'god credential' that let them access Americans' data*, Business Insider (June 7, 2023), perma.cc/5QXY-5GBE.

[14] *Id.*

[15] *See* ER-80–81, ¶ 20.

establishes other key facts (unrebutted by TikTok) concerning TikTok's ownership. First, ByteDance's key subsidiary in China is called Beijing ByteDance Technology, and the Chinese government owns a 1% stake in that subsidiary and has installed a director on its Board.[16] Second, according to ByteDance's Cayman corporate registry, the director in charge of the shell corporation is also listed as the CEO of the ByteDance corporation registered under Chinese Law.[17] Third, under Chinese law, the CCP can force ByteDance to turnover TikTok's U.S. user data and manipulate content displayed on the app.[18] Fourth, and finally, the lack of transparency makes it difficult to determine whether such a request has taken place.[19]

The Legislature reasonably viewed all this reporting as confirming "the reality that Chinese companies are subject to the whims of the authoritarian [CCP]," raising the "risk" that the Chinese "government could

---

[16] *Hearing on Social Media's Impact on Homeland Security Before the H.R. Comm. on Homeland Sec. & Governmental Affs.*, 117th Cong. (Sept. 14, 2022) (written testimony of Geoffrey Cain, Senior Fellow for Critical Emerging Techs., Lincoln Network), at 7, https://perma.cc/L3V6-MKE8.

[17] *Id.* at 6.

[18] *See id.* at 7-8.

[19] *See id.* at 7.

force ByteDance to collect and turn over information" on Americans "as a form of 'data espionage.'" *Leaked Audio*, *supra* n.2.  That risk isn't speculative; the Secretary of Commerce designated the "People's Republic of China" a "foreign adversary" after determining that China has "engaged in a long-term pattern or serious instances of conduct significantly adverse to the national security of the United States or security and safety of United States persons."  15 C.F.R. § 7.4(a)(1).

And TikTok's troubles continue.  Just last month, in February 2024, a former TikTok executive sued over age- and gender-based discrimination.[20]  The former executive alleges that after Shou Chew took over as TikTok's chief executive in May 2021, "control of at least one key department"—the Global Business Solutions team—"remained with ByteDance leadership."[21]  That unit, which the former executive was a

---

[20] Clare Duffy, *Former TikTok executive sues the company for alleged gender and age discrimination*, CNN BUSINESS (Feb. 9, 2024), https://perma.cc/PKP3-RPYJ; *see also Purris v. TikTok Inc*, No. 1:24-cv-00944 (S.D.N.Y. Feb. 8, 2024), ECF No. 1, ¶ 20 ("Despite its attempts to appear independent, TikTok's day-to-day management and business decisions came directly from ByteDance's top-level management in China.").

[21] Duffy, *supra* n.20.

part of, controlled TikTok ad revenues and ad placements, and it "continued to report up to a senior ByteDance executive in China."[22]

Around the same time, Representatives Dan Crenshaw (R-TX) and Josh Gottheimer (D-NJ) led a bipartisan group of lawmakers in urging Commerce Secretary Gina Raimondo to add ByteDance to the Bureau of Industry Security's ("BIS") Entity List, which restricts U.S. exports of goods, software, and technology to the listed entities.[23]  Crenshaw and Gottheimer highlighted the "serious issues with access to U.S. user data, and the relationship between ByteDance and the [CCP]," and added that "TikTok's software engineering personnel ultimately report to ByteDance leadership in the People's Republic of China."[24]  Even TikTok's alleged fix to its data security concerns—"Project Texas"—has been plagued with credible allegations of fraud and CCP influence.[25]

---

[22] *Id.*

[23] Zach Kessel, *Crenshaw, Gottheimer Urge Commerce Department to Block TikTok from Transferring U.S. Data to CCP-Linked Parent Company*, NAT'L REV. (Feb. 8, 2024), https://perma.cc/AU82-U45P.

[24] *Id.*

[25] *See* Harwell, *supra* n.8.

### III. The Montana Legislature Enacts SB419 to Safeguard Montanans' Data Privacy.

Given that tsunami of reporting, Montana enacted SB419, which prohibits TikTok from operating within Montana and mobile application stores from making TikTok's app downloadable in Montana. SB419, 2023 Sess., 68th Leg., § 1 (Mont. 2023) (ER-62–67). And SB419 is "void if TikTok is acquired by or sold to a company that is not incorporated in any other country designated as a foreign adversary in 15 C.F.R. § 7.4." ER-65 (cleaned up).

Despite Plaintiffs' and the district court's arguments to the contrary, Montana's consumer protection purpose was prevalent throughout the legislative hearings on SB419. For example, at the first hearing on SB419, Senator Vance, who carried the bill, explained that "TikTok's parent company, ByteDance, is operating as a surveillance arm of the [CCP] and gathers information about Americans against their will or unknown to them," and "[o]nce downloaded, TikTok has access to the most sensitive information on your device." ER-71. Attorney General Knudsen explained that "TikTok is a tool of the [CCP]," "owned by a Chinese company," and "if [the CCP] request[s] that data," "[TikTok would be] required to turn it over." ER-72. Eric Tarr, the Information Security

13

Officer in Montana's Department of Justice, explained that TikTok's privacy policy "tells you it will scan things more than what's just on the app"—"it will scan everything on your device, including your computer files, and any other data."  ER-75.

## IV. The District Court Enjoins SB419's Effective Date.

TikTok and the Users—funded by TikTok—challenged SB419 immediately.[26]  The parties completed briefing on Plaintiffs' preliminary injunction motions in September 2023, the district court held a hearing on the motions on October 12, 2023, and the district court issued the challenged opinion and order on November 30, 2023.  ER-104, 107.

The district court found that Plaintiffs were likely to succeed on the merits of each of their constitutional claims—First Amendment, Supremacy Clause, and Commerce Clause.  ER-4–5.  It explained that the "crux" of the arguments rested on "Montana's purpose in enacting SB419," and it concluded that Plaintiffs' were likely to prevail because "the current record leaves little doubt that Montana's legislature and Attorney General were more interested in China's ostensible role in TikTok than with

---

[26] Sapna Maheshwari, *After Montana Banned TikTok, Users Sued. TikTok Is Footing Their Bill*, N.Y. Times (June 27, 2023), perma.cc/R2EK-69PX.

14

protecting Montana consumers." ER-4–5. So rather than crediting Montana's asserted consumer protection interest, the district court found pretext lurking behind every corner, in effect assuming that because SB419 mentions China it has a national security or foreign affairs purpose. *See* ER-25–28, 35–40.

Turning to Plaintiffs' specific claims, the district court first found that Plaintiffs claims triggered First Amendment scrutiny as "time, place or manner" restrictions, and SB419 failed to satisfy intermediate scrutiny because it burdens substantially more speech than necessary and fails to leave open ample alternative channels for communication. ER-17–22, 28–33. It next found that the "foreign affairs field preemption" doctrine and the Defense Production Act ("DPA") likely preempted SB419. ER-33–43. And finally, it found that SB419 likely violated the Commerce Clause because it facially discriminates against commerce with China and unduly burdens interstate commerce. ER-45–47. But in evaluating these claims, the district court improperly shifted Plaintiffs' evidentiary burden at the preliminary injunction stage to Montana. *See* ER-30, 37, 40, 42–43, 47, 48–49.

15

### STANDARD OF REVIEW

This Court reviews "the district court's decision to grant … a preliminary injunction for an abuse of discretion." *Cal. Chamber of Commerce v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022) (internal quotations omitted). But its interpretation of the underlying legal principles is subject to de novo review. *Id.* A district court abuses its discretion if it relies on "an erroneous legal standard" or on "clearly erroneous factual findings." *Id.* (quoting *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc)). And a district court uses an "erroneous legal standard" if it "misapprehend[s] the law" or fails to apply the "appropriate legal standards that govern the issuance of a preliminary injunction." *Id.* (quoting *Negrete v. Allianz Life Ins. Co.*, 523 F.3d 1091, 1096 (9th Cir. 2008)).

A preliminary injunction is a drastic remedy "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). It may only issue when the movant "*by a clear showing*, carries the burden of persuasion." *Norbert v. City & Cnty. of S.F.*, 10 F.4th 918, 927 (9th Cir. 2021) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *Benisek v. Lamone*, 138 S. Ct. 1942, 1943-44 (2018)

16

(preliminary relief "does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits"). So Plaintiffs must carry their heavy burden of showing that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury without a preliminary injunction; (3) their threatened injury outweighs whatever harm the proposed injunction would cause their opponent; and (4) if issued, the injunction is in the public's interest. *Winter*, 555 U.S. at 20. The first *Winters* factor "is a threshold inquiry and is the most important factor." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (internal quotations omitted). When the nonmovant is the government, the last two *Winters* factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Under this Circuit's "serious questions" test, a plaintiff can meet its burden by showing "serious questions going to the merits," but only when "the balance of hardships tips *sharply* in the plaintiff's favor." *hiQ v. LinkedIn*, 31 F.4th 1180, 1188 (9th Cir. 2022) (emphasis added). But a "serious question" doesn't exist when a plaintiff's claim is "merely plausible" or simply "because there are legal questions not directly answered by past precedent." *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023); *see also Where Do We Go Berkeley v. Cal. Dep't of Transp.*,

17

32 F.4th 852, 863 (9th Cir. 2022) ("Nor can the district court forgo legal analysis just because it has not identified precedent that places the question beyond debate.").[27]

A district court also abuses its discretion if it "rests its decision on a clearly erroneous finding of fact." *S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1139 (9th Cir. 2021) (quoting *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014)). And the district court commits clear error if its factual findings are "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id.* (cleaned up).

## SUMMARY OF THE ARGUMENT

SB419 doesn't trigger First Amendment scrutiny because it neither targets "conduct with a significant expressive element" nor "has the"

---

[27] The district court cited Ninth Circuit authority applying the "serious questions" test, *see* ER-12 (quoting *Where Do We Go Berkeley*, 32 F.4th at 859), but it didn't expressly rely on that test in granting Plaintiffs' injunctive relief. Even if the district court had relied on the "serious questions" test, it still had to find that Plaintiffs established a likelihood of success on the merits and irreparable harm in the absence of injunctive relief. *Petrick*, 68 F.4th at 490-91. Nor does that test "erase the Supreme Court's admonition that an injunction 'may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief.'" *Id.* (quoting *Winter*, 555 U.S. at 22) (emphasis added).

inevitable effect of singling out those engaged in expressive activity." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706-07 (1986). Instead, it regulates conduct within "an area that is traditionally within the state's police powers." *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011).

If SB419 triggers First Amendment scrutiny, this Court should apply *United States v. O'Brien*, 391 U.S. 367 (1968), which addresses regulated nonspeech conduct with a speech element. Short of that, this Court should adopt the district court's conclusion that SB419 is like a content- and viewpoint-neutral "time, place, or manner" restriction. *See* ER-21. Either way, this Court applies a nearly identical form of intermediate scrutiny analysis. *See Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 428 n.23 (9th Cir. 2008) (explaining that "[i]ntermediate scrutiny's precise contours vary slightly depending" on whether the "O'Brien test" or the "time, place and manner test" applies, but "confirming that the two tests are, in essence, identical").

The district court erred in finding that SB419 wasn't narrowly tailored. While it "[assumed] for the sake of … argument" that Montana "may have at least an important interest" in SB419, ER-24, the district court essentially rejected Montana's asserted consumer protection

19

interest and recast it as a foreign policy and child-protection interest. ER-24–28. To do that, it misread SB419's text and preamble, attributed "pervasive … anti-Chinese sentiment" to Montana, and faulted Montana for not producing affidavits to support its asserted interest. ER-25–27. Even so, SB419 is narrowly drawn. It "eliminate[s] the exact source of the evil it sought to remedy," *see City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984), and like the school-uniform policy in *Jacobs*, it regulates one channel of internet expression but leaves all others untouched, *see* 526 F.3d 437.

Next, the district court erred in concluding that SB419 is likely preempted under the "foreign affairs field preemption" doctrine and the DPA. ER-35, 43. Starting with "foreign affairs field preemption," it found that SB419 "has no serious claim to be addressing a traditional state responsibility" and "intrudes on the federal government's foreign affairs power." ER-35 (quoting *Movsesian, v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc)). But SB419 is a "consumer-protection law[]" that falls "within the state's police powers." *Aguayo*, 653 F.3d at 917. And neither SB419's text nor its legislative history support the district court's conclusion that SB419's true purpose

20

was "to make a foreign affairs statement." *See* ER-35–41. Resting on the back of its erroneous conclusion about Montana's interest, the district court found that SB419 intrudes on the federal government's foreign affairs power. ER-39–41. But it failed to identify anything resembling the kinds of direct impacts on foreign relations that courts have held sufficient to establish preemption. *E.g.*, *Movsesian*, 670 F.3d at 1076.

Turning to conflict preemption under the DPA, the district court found that because TikTok's parent company, ByteDance, and the United States are engaged in negotiations under the DPA, SB419 is likely preempted by the DPA. ER-42–43. But § 721 of the DPA applies only to a "covered transaction," 50 U.S.C. § 4565(b)(2)(A), and the district court failed to point to any transaction at issue, let alone a "covered transaction" under § 721. And even if it relied on the negotiations in *TikTok Inc. v. CFIUS*, No. 20-1444, Doc. # 1870778 (D.C. Cir. Nov. 10, 2020), SB419 doesn't interfere with these ongoing negotiations because they don't involve TikTok's technology or business. Even so, these negotiations are under seal, so there's no way the court could find an actual conflict.

The district court also erred in finding that Plaintiffs were likely to prevail on their Commerce Clause claims. First, it found that SB419

facially discriminates against commerce with China. ER-47. But SB419 addresses harms to Montana consumers caused by a domestic corporation's harmful data practices, it doesn't discriminate against commerce with China. The district court also found that SB419 likely violates the dormant Commerce Clause because it unduly burdens interstate commerce. *See* ER-45–47. The district court dismissed SB419's local benefits because Montana didn't provide "evidentiary support," ER-47, but it ignored the mountains of public reports showing the harms TikTok poses to users.[28] *See supra* nn.2-14.

---

[28] *See* Letter from TikTok Inc. to Senators Blumenthal and Blackburn (June 16, 2023), perma.cc/4WXM-VR24; *TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms, House Energy & Commerce*, 118th Cong. (Mar. 23, 2023), perma.cc/JTE9-5GLK; *Hearing on Social Media's Impact on Homeland Security*, *supra* n.16; *Biden signs TikTok ban for government devices, setting up a chaotic 2023 for the app*, NBCNews (Dec. 30, 2022), perma.cc/4J7S-LGQS; *Deputy attorney general warns against using TikTok, citing data privacy*, ABCNews (Feb. 16, 2023), perma.cc/GKK7-BX9D; *see also, e.g.*, Press Release, Senator Ed Markey, *Amid Calls to Ban TikTok, Senator Markey Calls for Immediate Action on Privacy Protections for Children and Teens Online* (Mar. 22, 2023), https://perma.cc/QTR7-HTGU; David Shepardson, *State AGs demand TikTok comply with US consumer protection investigations*, Reuters (Mar. 6, 2023), perma.cc/9NL6-2VPW; Justine McDaniel, *Indiana sues TikTok, claiming it exposes children to harmful content*, Wash. Post (Dec. 7, 2022), perma.cc/V2RV-AU3P.

22

Because Plaintiffs are unlikely to prevail on the merits of any of their constitutional claims, they necessarily fail to show irreparable harm. Even if Plaintiffs show that they are likely to prevail on one of their constitutional claims, their asserted economic harms fail to establish irreparable harm. The district court was not persuaded by TikTok's economic harms argument, but it found irreparable harm because Montana failed to rebut it. ER-48–49. But that improperly shifts Plaintiffs' evidentiary burden to Montana. And the Users' economic harms are speculative because they fail to show the monetary harm they would suffer if they had to use a different online platform.

The balance of equities favors Montana. The federal government designated China as a "foreign adversary," and the concerns with TikTok are well documented. Because SB419 protects the public from the harms inseparable from TikTok's operation, it furthers the public interest.

23

ARGUMENT

## I. Plaintiffs are unlikely to succeed on the merits.[29]

### A. SB419 is a valid exercise of Montana's police power that doesn't implicate First Amendment rights.

#### 1. SB419 permissibly exercises Montana's police power to ban TikTok's harmful conduct.

Montana is free to "make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).  Consumer protection laws, in particular, "fall in an area that is traditionally within the state's police powers to protect its own citizens." *Aguayo*, 653 F.3d at 917; *see also California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) ("unfair business practices" are within "an area traditionally regulated by the States").  Montana's police power thus comfortably lets it regulate (up to the point of banning) products or practices that, in Montana's judgment, impose unjustifiable consumer harms.

SB419 only triggers First Amendment scrutiny if it targets "conduct with a significant expressive element" or, if "based on a nonexpressive

---

[29] The district court held that Plaintiffs were unlikely to succeed on the merits of their prior restraint and International Emergency Economic Powers Act preemption claims, *see* ER-22-23, 41, 43–44, and it didn't address Plaintiffs' First Amendment overbreadth claims at all.  But

24

activity," it "has the inevitable effect of singling out those engaged in expressive activity." *Arcara*, 478 U.S. at 706-07; *see also Talk of the Town v. Dep't of Fin. & Bus. Servs.*, 343 F.3d 1063, 1069 (9th Cir. 2003). SB419 does neither. Rather, it fits comfortably within Montana's traditional police powers. It does not, as Plaintiffs claim, "restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). SB419 restricts TikTok's operation in Montana to protect Montanans' data privacy from a hostile foreign power. And for good reason. As a condition of using its product, TikTok captures reams of personal, private data from every Montana TikTok user. And CCP members embedded in ByteDance can use a "god credential" to access those data at any time—*without asking TikTok. See supra* nn.13-14. No other social media app conditions its use on making Montanans' digital privacy subject to data harvesting with at-will CCP access. In this respect, TikTok stands alone. SB419's targeted regulation singles out TikTok for its unique data-harvesting practices, not for any expressive activity.

---

Plaintiffs didn't cross-appeal on any of these claims, so they are not before this Court.

Even so, the district court distinguished *Arcara* on two grounds. First, it found *Arcara* inapposite because SB419 "implicates traditional First Amendment speech" and thus constitutes expressive conduct. Second, it found that, unlike the public nuisance statute in *Arcara*, SB419 targets a single entity—TikTok Inc.—and thus isn't generally applicable. ER-16. Both distinctions fail.

**Expressive Conduct.** For the first distinction, the relevant inquiry is not whether SB419 "implicates traditional First Amendment speech," but whether it targets "conduct with a significant expressive element." *See Arcara*, 478 U.S. at 706. SB419 targets a hostile foreign government's massive data-harvesting efforts intentionally directed at Montanans. That's the "nonexpressive conduct" SB419 targets, even if TikTok harvests Montanans' data while transmitting expressive videos to them. *See id.* at 705, 707 (rejecting attempts to use First Amendment protected activities, like bookselling, "as a cloak for obviously unlawful … conduct by … attributing protected expressive attributes to that conduct"). Just as books didn't override prostitution laws in *Arcara*, TikTok's short-form videos (from TikTok itself or any other user) "do[] not confer First Amendment coverage to defeat a valid statute aimed at"

26

protecting Montanans from forced data-harvesting subject to at-will CCP access. *Id.* at 707.

Were it otherwise, Montana would be powerless to ban a cancer-causing radio just because that radio also transmitted protected speech, or to ban sports-betting apps just because those apps also shared informative videos teaching their users the intricacies of sports gambling or allowed users to communicate with each other. The targeted harms—preventing cancer, illegal gambling, or data-gathering by a hostile foreign state—are inherently nonexpressive and thus subject to Montana's plenary police power. Overlaying them with expressive conduct—communications or instructive videos—doesn't change that calculus. *See id.* at 705-07.

The district court evaded *Arcara* using the following syllogism: (1) "nonspeech" conduct can be regulated without triggering First Amendment scrutiny; (2) regulated conduct is only "nonspeech" conduct if it has "absolutely no connection to any expressive activity"; (3) a statute that "implicates" First Amendment rights regulates "expressive" conduct; and (4) SB419 "implicates" the Users' and TikTok's First Amendment rights, so *Arcara* doesn't apply here. *See* ER-16–17.

27

But the district court's tidy syllogism crumbles on closer examination. *Arcara* rejected the premise that conduct is "nonexpressive" only if there is no connection to expressive activity. There, in responding to the bookstore's argument that the "statutory closure remedy impermissibly burden[ed] its First Amendment protected bookselling activities," the Court found that "this argument proves too much, since every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities." *Arcara*, 478 U.S. at 705-06; *see also O'Connor v. Denver*, 894 F.2d 1210, 1218 (10th Cir. 1990) ("[N]otion[s] of 'incidental burden' should not be used to elevate non-*First Amendment* conduct solely because it occurs at the location of or simultaneous with protected expression."). So the pertinent question is not whether SB419 "implicates" First Amendment rights, but whether it targets "conduct with a significant expressive element." *See Arcara*, 478 U.S. at 706. As shown above, it doesn't. And in any event, SB419 doesn't "implicate" the Users' or TikTok's First Amendment rights.

Starting with the Users, the district court found that SB419 "implicated" their First Amendment rights because it banned their "preferred means of speech" and "a 'means of expression' used by over 300,000

28

Montanans." ER-16 (citing *Minn. Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 582-83 (1983)). But SB419 regulates TikTok's conduct—its forced data harvesting with at-will CCP access—it doesn't regulate the Users' conduct at all. ER-64, § 1(5). For that reason, the district court's reliance on *Minnesota Star* to find the Users' First Amendment rights were "implicated" is puzzling. *See* ER-16. *Minnesota Star* found that a tax imposed *on the newspapers*' purchases of large quantities of newsprint and ink—nonexpressive conduct—triggered First Amendment scrutiny because it had the inevitable effect of singling out those engaged in expressive activity. *See* 460 U.S. at 582-83. But unlike the tax in *Minnesota Star*, which was imposed on the newspapers, *see id.* at 578-79, SB419 cannot be enforced against the Users and thus doesn't "implicate" the Users' First Amendment rights.

Turning to TikTok, the district court found that SB419 "implicated" TikTok's First Amendment rights to "select, curate, and arrange content" on its platform. ER-16–17 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 570 (1995) and citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)) (cleaned up). But SB419 targets TikTok's forced data-harvesting subject to at-will CCP access, not its

29

editorial control and judgment over its platform, so it doesn't "implicate" TikTok's First Amendment rights. Even so, the district court erred in concluding, without a shred of legal analysis, that TikTok has a First Amendment right to "select, curate, and arrange content" on its platform, *see* ER-17—or in *Miami Herald*'s terms, a First Amendment right to exercise "editorial control and judgment," *see* 418 U.S. at 258.

To date, the Supreme Court hasn't "recognized 'editorial discretion' as a freestanding category of First-Amendment-protected expression." *NetChoice, LLC v. Paxton*, 49 F.4th 439, 465 (5th Cir. 2023), *cert. granted* No. 22-555 (Sept. 23, 2023). Rather, it is "one relevant consideration when deciding whether a challenged regulation impermissibly compels or restricts protected speech." *Id.*

The district court's reliance on *Miami Herald* and *Hurley* for this freestanding right is dubious at best. Unlike newspapers, which print "a curated set of material selected by its editors, [making] everything it publishes, in a sense, the newspaper's own speech," *Id.* at 456 (quoting *Miami Herald*, 418 U.S. at 256), TikTok relies extensively on an automated moderation system (with some human involvement) to filter out harmful videos and to implement parental controls. *See* ER-82–85, ¶¶ 45-50. It's

30

less clear how TikTok exercises any "editorial discretion" in promoting or censoring short-form videos that its users see on the platform, so TikTok likely exercises little "editorial control or judgment" over the content it hosts. *See Paxton*, 49 F.4th at 459.

Nor does TikTok "carefully curate users' speech the way a parade sponsor or 'composer selects expressive units from potential participants'" that would "suggest that they are 'intimately connected with the communication' they host. *Id.* at 461 (quoting *Hurley*, 515 U.S. at 568, 576). If TikTok censors or promotes a user's post, "the expressive quality of that [decision] arises only from [TikTok's] *speech* … stating that [it] chose to censor [or promote] the speech and explaining how [that decision] expresses [its] views." *Id.* With these limits in mind, TikTok has failed to establish any First Amendment violation, and the district court erred in finding, without any analysis, that TikTok has a protected right to "editorial control and judgment." *See* ER-17; *see also Where Do We Go Berkeley*, 32 F.4th at 863 (district court can't "forgo legal analysis just

because it has not identified precedent that places the question beyond debate.").[30]

**General Applicability.** For the second distinction, the district court found that the analogy to *Arcara* failed because, unlike public nuisance statute reviewed there, SB419 targets a single entity—TikTok, Inc.—and thus isn't generally applicable. ER-16. But a regulation targeted at specific entities "does not implicate the First Amendment" unless it "is directed at, or presents the danger of suppressing, particular ideas." *See Leathers v. Medlock*, 499 U.S. 439, 453 (1991); *see also Paxton*, 49 F.4th at 481-82 (regulation singling out "subset of firms" constitutionally permissible because it wasn't "directed at *suppressing* particular ideas or viewpoints"); *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 660-61 (1994) ("heightened scrutiny is unwarranted when the differential treatment is justified by some special characteristic of the particular medium

---

[30] The Supreme Court is set to resolve, to some degree, the contours of social media platforms' First Amendment rights this term. *See NetChoice, LLC v. Paxton*, No. 22-555 (U.S. Sept. 23, 2023); *Moody v. NetChoice, LLC*, No. 22-277 (U.S. Sept. 23, 2023). The Court heard oral argument on the *NetChoice* cases on February 26, 2024, and a decision should issue before July 2024. If the decision is published after briefing, Montana will either file a Rule 28(j) letter or seek permission to file a short supplemental brief.

being regulated" (internal quotations omitted; emphasis added)). SB419 singles out TikTok, not because of its ideas or viewpoints, but because of its unique data harvesting practices and ties to a hostile foreign power. While the district court stopped short of holding that SB419 is content- and viewpoint-neutral, *see* ER-18–22, and thus not directed at suppressing ideas or viewpoints, it conceded that Montana's arguments were "closer to the legal mark," *see* ER-18.

To be sure, some cases that apply *Arcara* emphasize that the public nuisance statute there was generally applicable. *E.g.*, *Wright v. City of St. Petersburg*, 833 F.3d 1291, 1296-97 (11th Cir. 2016); *Doe v. Harris*, 772 F.3d 563, 572-73 (9th Cir. 2014). But even *Arcara* recognized that the general applicability requirement helped determine whether a statutory distinction was "drawn … [to] single out [those] engaged in First Amendment protected activities for the imposition of its burden,"[31] *see*

---

[31] Even though they note that *Arcara* involved a generally applicable statute, *Wright* and *Doe* both zero in on whether the statute targets speech for suppression. *Wright*, 833 F.3d at 1297 (observing that the challenged ordinance didn't have the inevitable effect of singling out anyone engaged in expressive activity); *Doe*, 772 F.3d at 573 ("[T]he CASE Act directly and exclusively burdens speech, and a substantial amount of that speech is clearly protected under the First Amendment." (emphasis added)). At a minimum, *Wright* and *Doe* suggest that general applicability serves as

478 U.S. at 705—that is, whether the statute's operation warrants an inference that suppression of speech was the statute's real aim. *See Turner Broad.*, 512 U.S. at 660 (explaining that in the tax cases—*Minnesota Star* and *Arkansas Writers Project*—the structure of the regulation "raised suspicions that [the government] objective was, in fact, the suppression of certain ideas"). Nothing in the record suggests that SB419 singles out TikTok as a pretext to suppress its First Amendment protected activities. *E.g.*, ER-72–73, 75. Rather, the concerns animating SB419—concerns shared across the political spectrum, across state and federal government agencies, across state lines, and across the pond—were TikTok's data-harvesting practices and ties to the CCP.

### 2. If SB419 implicates First Amendment rights, it passes scrutiny under *O'Brien*.

Even if SB419 implicates the First Amendment, the Supreme Court has rejected the view that every person who engages in regulated conduct also "intends thereby to express an idea." *O'Brien*, 391 U.S. at 376. If regulated nonspeech conduct also contains a speech element, the Court applies a four-part test to assess the law's constitutionality. *Id.* at 377.

---

a proxy for determining whether a facially neutral statute really intends to suppress speech.

34

That test considers whether the government regulation (1) "is within the [government's] constitutional power"; (2) "furthers an important or substantial governmental interest" that is (3) "unrelated to the suppression of free expression"; and (4) burdens "alleged First Amendment freedoms … no greater than is essential to the furtherance of that interest." *Id.* SB419 satisfies this standard.

As to the first two elements, SB419's consumer-protection function falls within Montana's "constitutional authority" and furthers Montana's "substantial interests" in consumer protection. *Id.*; *see, e.g.*, MCA §§ 30-14-101 *et seq.* The district court conceded that consumer protection laws fall comfortably within Montana's traditional police powers, ER-14 (citing *Aguayo*, 653 F.3d at 917), and, if truly enacted to further a consumer protection interest, would constitute an "important government interest," *see* ER-27–28.

Third, the consumer-protection interest here is "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377. SB419 prohibits using TikTok *without respect to* the messages it conveys. Rather, the "perceived evil" SB419 targets is TikTok's data harvesting with at-will access for the CCP—harms that would justify regulating TikTok were it

35

a video app, dating app, or gaming app. *Barnes v. Glen Theatre*, 501 U.S. 560, 571 (1991); *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 664 (2018) (Thomas, J., concurring in part and concurring in the judgment) (O'Brien applies if "the [State] would have punished the [nonexpressive] conduct regardless of its expressive component."). Montana's stated purpose of protecting consumer data controls, regardless of Plaintiffs' allegations of "illicit motive[s]." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 292 (2000) (plurality op.) ("[T]his Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive."). So this Court should reject the district court's conclusion that Montana's *real purpose* was a "foreign policy purpose" driven by "anti-Chinese sentiment." *See* ER-25–26. And because a "predominate" purpose of SB419 is to control harmful "secondary effects" from TikTok's data-harvesting practices, Montana's consumer-protection interest is necessarily "unrelated to the suppression of free expression." *Renton v. Playtime Theatres*, 475 U.S. 41, 47-48 (1986).

Fourth, and finally, SB419's restrictions are "no greater than is essential" to furthering Montana's interest in protecting Montanans' data privacy. *O'Brien*, 391 U.S. at 377. SB419 "need not be the least

36

restrictive or least intrusive means of" furthering that interest to survive intermediate scrutiny. *See Ward v. Rock Against Racism*, 491 U.S. 781, 797-98 (1989). Applying that standard, the Ninth Circuit rejected a claim that mandatory school uniforms violated intermediate scrutiny because they limited students' self-expression through clothing choices, holding that the students retained "'ample alternative channels' for student communication." *Jacobs*, 526 F.3d at 437. Even though that policy limited expression, students could "'express themselves through other and traditional methods of communication throughout the school day,'" including through "verbal conversations with other students, publish[ing] articles in school newspapers, and join[ing] student clubs."[32] *Id.*

The district court erroneously disputes *O'Brien*'s application here, relying on *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000), which it

---

[32] SB419 survives intermediate scrutiny for the same reason. *See infra* Sect.I.A.3.i. It's like the school's uniform policy—limiting Montanans' abilities to express themselves on TikTok—but Montanans "may continue to express themselves through other and traditional methods of communication" by sharing videos, memes, and *every other* kind of expressive content on *every other* internet-based video or social-media platform. Properly understood, SB419 is less restrictive than the uniform policy. Because SB419 doesn't affect any other app or part of the internet, it's equivalent to proscribing only ripped jeans. Thus, SB419 is "not a means to some greater end, but an end in itself." *Barnes*, 501 U.S. at 572; *see supra* nn.2-14, 28.

claims holds that when a law "'directly and immediately affects' First Amendment rights, '*O'Brien* is inapplicable.'" ER-19–20 (quoting *Boy Scouts*, 530 U.S. at 659). In *Boy Scouts*, the Court found that New Jersey's public accommodation law, which required Boy Scouts to retain scoutmasters who opposed its views on homosexual conduct, imposed a "significant[] burden [on] the organization's right to oppose or disfavor homosexual conduct." 530 U.S. at 659. And because that "severe intrusion on the Boy Scouts' right of expressive association" "directly and immediately affect[ed] associational rights"—rather than a "governmental regulation that has only an incidental effect on protected speech"—the Court found that *O'Brien* was inapplicable. *Id.* But here, the burden on TikTok, and especially the Users, is "incidental"—even if "the burden on [their] expression [i]s substantial"—"because it [i]s ancillary to a regulation that did not aim at expression." *See 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2338 (2023) (Sotomayor, J., dissenting) (quoting *O'Brien*, 391 U.S. at 377); *cf. IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020) (law's burdens "not merely incidental" when it imposes content- or speaker-based restrictions (quotations omitted)). SB419 targets TikTok's conduct, not its expression. That it happens to burden TikTok's

38

and the Users' expression—to whatever degree—does not alter the conclusion that SB419 imposes only an "incidental" burden. So if First Amendment scrutiny is required at all, *O'Brien* applies.

### 3. SB419 is neither a content- nor viewpoint-based restriction on speech.

Plaintiffs attack SB419 as a content- and viewpoint-based speech restriction. Those claims fail. The "content-based" inquiry first asks whether the regulation is "content neutral on its face." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015). If so, the pertinent question "is whether the government has adopted a regulation of speech *because* of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (emphasis added). Any such regulations are subject to strict scrutiny. *Reed*, 576 U.S. at 165. But "a regulation that serves purposes unrelated to the content of expression is deemed neutral," *Ward*, 491 U.S. at 791, and need only satisfy intermediate scrutiny, *Turner Broad.*, 512 U.S. at 642.

SB419 "regulate[s] the manner—not the content—of affected speech." *Lone Star Sec. & Video, Inc. v. City of L.A.*, 827 F.3d 1192, 1200 (9th Cir. 2016). And it applies equally to all speech on the platform. *Id.* It doesn't prohibit TikTok "based on the type of information" it conveys, *Reed*, 576 U.S. at 159, nor does it distinguish "between commercial and

noncommercial forms of expression," *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998). "There has been no suggestion that [SB419] appl[ies] differently to … political endorsements than to its commercial promotional campaigns." *Lone Star*, 827 F.3d at 1200. Nor does SB419 prohibit only videos showing dangerous conduct, such as "cars swerving at high speeds." *See* Br. Supp. Consolidated Pl.'s Mot. Prelim. Inj. ("TikTok.Br.") at 7, *Alario, et al., v. Knudsen*, No. CV 23-56-M-DWM (D. Mont. July 5, 2023), ECF No. 12; Pls.' Mem. Law Supp. Mot. Prelim. Inj. ("User.Br.") at 10-11, *Alario, et al., v. Knudsen*, No. CV 23-56-M-DWM (D. Mont. July 5, 2023), ECF No. 18. SB419 doesn't apply based only on an enforcer's view of a user's message; it applies to the platform writ large. *Foti v. City of Menlo Park*, 146 F.3d 629, 635-36 (9th Cir. 1998). All of this points to a content-neutral regulation.

TikTok's viewpoint-discrimination claim fails for these same reasons. Nothing in SB419 regulates use of TikTok "because of disagreement with the message," *Ward*, 491 U.S. at 791, or disagreement with "particular views taken" on a subject, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). SB419 regulates all content, viewpoints, and speakers the same. *Cf. id.* at 836-37 (declaring

40

unconstitutional the withholding of funding for a student newspaper because it "promote[d] or manifest[ed] a particular belief in or about a deity or ultimate reality") (cleaned up); *R.A.V. v. St. Paul*, 505 U.S. 377, 390 (1992) (declaring unconstitutional a law prohibiting fighting words containing bias-motivated hatred); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993) (declaring unconstitutional a policy permitting presentations "about family issues and child rearing except those dealing with the subject matter from a religious standpoint"). SB419 permits any person to make any statement about any topic, even China. It just prohibits one way they can make that statement. *See Leathers*, 499 U.S. at 444 (that one medium "is taxed differently from other media does not by itself, however, raise First Amendment concerns").

The district court didn't ultimately determine whether SB419 is a content- or viewpoint-based restriction on speech, *see* ER-18–21, but it instead found that SB419 could be considered a "time, place, or manner" restriction, *see* ER-21. So the district court held that intermediate scrutiny applied. *See* ER-17–18, 21.

41

### i. SB419 passes intermediate scrutiny.

Assuming that SB419 regulates speech by barring TikTok's operation in Montana (it doesn't), intermediate scrutiny applies because SB419 applies to all speech on TikTok no matter its substance or message. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).  Montana need only show that SB419 furthers a substantial or important government interest unrelated to the suppression of expression, and the "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Jacobs*, 526 F.3d at 434 (quoting *Turner*, 512 U.S. at 661-62).  SB419 does both.

Montana has a substantial and important interest in its consumer-protection laws unrelated to TikTok's or the Users' expression.  SB419 reflects a broad concern over TikTok's data-privacy practices.  *See supra* n.28.  While TikTok accuses Montana of "mak[ing] a series of unsubstantiated allegations," TikTok.Br.9, the widespread bipartisan responses to the news reports about TikTok belie TikTok's claim that the Legislature was "fishing" for a justification or that SB419 is based on "unfounded speculation," TikTok.Br.20.

42

While the district court "[assumed] for the sake of … argument" that Montana "may have at least an important interest" in SB419, *see* ER-24, it effectively rejected Montana's stated interests and recasts them as foreign policy and child-protection interests. ER-24–28. But to do that, the district court misreads the SB419's text and preamble, attributes "pervasive … anti-Chinese sentiment" to Montana, and faults Montana for failing to produce unnecessary affidavits supporting its stated interest. ER-25–27.

Courts begin by evaluating whether "*the government's stated goals [for the policy] qualify as important or substantial.*" *Jacobs*, 526 F.3d at 435. In SB419's preamble, Montana articulates a clear consumer protection interest: SB419 was warranted because "China is an adversary of the United States and Montana and has an interest in *gathering information about Montanans, Montana companies, and the intellectual property of users to engage in corporate and international espionage.*" ER-63 (emphasis added). Yet the district court concluded, despite this clear language, that Montana was asserting a "foreign policy purpose." ER-25. But the district court ignored other statements in the preamble that support Montana's consumer protection interest: "China exercises control

43

and oversight over ByteDance … and can direct the company *to share user information, including real-time physical locations of users*"; and "TikTok *gathers significant information from its users, accessing data against their will* to share with … China." ER-63 (emphases added). And SB419 states that it was "intended to be codified as an integral part" of Montana's Unfair Trade Practices and Consumer Protection Act (at Title 30, chapter 14). ER-65, § 2. On its face, SB419 asserts a consumer protection interest that "unquestionably qualif[ies] as important." *Jacobs*, 526 F.3d at 435 (quotations omitted).

Not only does SB419 assert a clear consumer protection interest, but "the record is devoid of any evidence suggesting that [Montana's] stated goals were mere pretexts for its *true* purpose" of suppressing TikTok's or the Users' expression. *See id.* at 436. Yet the district court found that Montana's *true* purpose was a foreign policy purpose because "SB419 explicitly banned TikTok because of its direct connection to a specific foreign nation" and "the pervasive undertone of anti-Chinese sentiment that permeates the State's case." *See* ER-25–26. But SB419 regulates a U.S. company for data-privacy practices that harm Montana citizens by collecting their personal data and sending it to a hostile foreign power—in

44

other words, SB419's focus is on primarily domestic conduct that also involves a foreign actor. And far from suggesting that Montana was motivated by "anti-Chinese sentiment," ER-26, the record shows that SB419 was motivated by a broad, bipartisan concern over TikTok's data-privacy practices.

SB419 is narrowly drawn. It doesn't ban all "online platform[s] that enable[] users to create, share, and view videos and other forms of content." TikTok.Br.2. Rather, it "eliminate[d] the exact source of the evil it sought to remedy." *City of L.A.*, 466 U.S. at 808. Plaintiffs' cases are inapt. SB419 is like the school-uniform policy in *Jacobs*—it regulates one channel of internet expression but leaves all others untouched. Unlike Plaintiffs' cases, in which the speakers' preferred medium was banned entirely, SB419 does not impose a blanket prohibition on creating, sharing, and viewing videos on *every* internet-based application. *Cf. Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 75 (1981) (all live entertainment); *Martin v. City of Struthers*, 319 U.S. 141, 142 (1943) (all door-to-

45

door distribution of literature); *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994) (all residential yard signs).[33]

The district court's reliance on SB384 misses the mark. Because it understood SB384 to already "protect Montanans against unsafe data collection practices from social media companies in the state," the district court inferred that SB419 necessarily "burden[ed] more speech than necessary." ER-30. But SB384 applies to all "data controllers," which extends beyond just social media companies, and it provides Montana consumers the right to obtain copies of their personal data, to request deletion of it, and to opt out of the sale of their data. SB384, § 5. And if data controllers fail to do follow through on these consumer requests, they may

---

[33] The district court correctly concluded that intermediate scrutiny applies (assuming any First Amendment scrutiny is warranted). *See* ER-17–22 (concluding intermediate applied because SB419 likely wasn't content- or viewpoint-based, but "could be seen as a restriction on the time, place, or manner that a person could speak in the public forum"). But if this Court disagrees and finds that strict scrutiny analysis is required, Montana's significant interest in consumer protection laws, established above, is also a compelling interest. While Montana asserts a consumer protection interest, it's not precluded from pursuing that interest just because it overlaps with a national security interest. *See, e.g., Wash. Post v. McManus,* 944 F.3d 506, 520 (4th Cir. 2019) (affirming district court's conclusion that Maryland "undoubtedly [has] an important state interest" in "deter[ing] foreign interference in its elections"). And for the reasons described above, SB419 is also narrowly tailored. *See supra* n.28.

46

be subject to enforcement actions. *See id.* So SB384 confers additional control to consumers over their personal data, but it isn't designed to protect Montanans "from unsafe data collection practices." *See* ER-30. Nor does it address the specific harm asserted here—TikTok's forced data harvesting with at-will CCP access. To address that harm, Montana reasonably determined that SB419's broader prohibition—barring TikTok from operating in Montana until it removes the source of the harm—was the only appropriate response. And for that reason, the district court's inference is unwarranted. It simply isn't the case that because Montana addressed one data privacy concern (consumer control over personal data) in a narrower way, that it had to address a different data privacy concern (forced data harvesting with at-will CCP access) in the same way.

## B. SB419 isn't preempted by federal law.

### 1. SB419 isn't preempted under the foreign affairs doctrine.

The Supremacy Clause provides a "rule of decision" for determining whether to apply state or federal law in any one case. *See Chamber of Commerce of the U.S. v. Bonta*, 62 F.4th 473, 482 (9th Cir. 2023) (quoting *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020)). It provides that federal law and the U.S Constitution "shall be the supreme law of the land; and

47

Judges in every state shall be bound thereby, anything in the Constitution or the laws of any state to the contrary notwithstanding." *Id.* at 481-82 (quoting U.S. Const. art. VI, cl.2) (cleaned up).

Federal law can preempt state law in a few ways. For one, a federal statute can expressly preempt state law with a clear statement to that effect. *See Arizona v. United States*, 567 U.S. 387, 399 (2012). But even in the absence of an express preemption provision, federal law preempts state law if Congress intends to "occupy the field" or to the extent state laws conflict with federal law. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (internal quotations omitted). Field preemption "can be inferred from a framework of regulation so pervasive … that Congress has left no room for the States to supplement it," or when "there is a federal interest … so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (internal quotations omitted). And conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility" or when the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quotations omitted). But when conducting

48

this preemption analysis, courts must presume that "the historic police powers of the States are not superseded unless that was *the clear and manifest purpose of Congress.*" *Id.* at 400 (quotations omitted; emphasis added).

The Constitution confers exclusive authority to the federal government to "administer foreign affairs." *Movsesian*, 670 F.3d at 1071. *Movsesian* explained that foreign affairs preemption covers both conflict and field preemption. *Id.* So state law must yield to the extent it conflicts with an express federal policy, such as a treaty, federal statute, or express executive branch policy. *Id.* at 1071-72. Even without an express federal policy, a state law may still be preempted if it "intrudes on the field of foreign affairs without addressing a traditional state responsibility."[34] *Id.* at 1072.

The district court found no conflict between SB419 and any express federal policy on TikTok or ByteDance. ER-34–41. And for good

_____

[34] *Movsesian* relied on a footnote from *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003), and on *Zschernig v. Miller*, 389 U.S. 429 (1968), *see Movsesian*, 670 F.3d at 1074-75, for its articulation of the "foreign affairs field preemption" doctrine, but the Supreme Court hasn't squarely adopted it. *See Garamendi*, 539 U.S. at 419-20 & n.11. Whatever this doctrine's vitality, it does Plaintiffs no good here because they failed to make either showing. The district court erred in concluding otherwise.

reason: SB419 aligns with both federal law and presidential foreign policy. *See* 15 C.F.R. § 7.4(a)(1); Executive Order 14034, 86 Fed. Reg. 31423 (June 9, 2021) ("E.O. 14034").

Even so, the district court found that SB419 likely violated the "foreign affairs field preemption" doctrine. ER-35. Because it found that SB419 "has no serious claim to be addressing a traditional state responsibility" and "intrudes on the federal government's foreign affairs power," the district court held that Plaintiffs were likely to prevail on their foreign affairs preemption claim. ER-35 (quoting *Movsesian*, 670 F.3d at 1074). But to reach this conclusion, the district court piled error on top of error, improperly shifting the evidentiary burden, drawing unsupported inferences against Montana, and improperly relying on legislators' (and an executive branch official's) isolated statements to discern legislative intent. *See* ER-35–41.

First, SB419 is a "consumer-protection law[]," so it "fall[s] in an area that is traditionally within the state's police powers to protect its own citizens." *Aguayo*, 653 F.3d at 917; *see generally* MCA §§ 30-14-101 *et seq.* (Montana Unfair Trade Consumer and Consumer Protection Act). The tsunami of reporting about TikTok's data-harvesting and storing

practices amply justifies SB419 as a proper exercise of Montana's con-sumer-protection police powers. *See supra* nn.2-14, 28 (reporting TikTok misled consumers about data security).

While the district court didn't dispute Montana's traditional police power to protect its consumers, it found—based on SB419's "text and leg-islative history"—that SB419's true purpose was "to make a foreign af-fairs statement." *See* ER-35. But neither the text nor the legislative his-tory suggests that SB419's "true purpose" is anything but what it says it is: protecting Montanans' data privacy.

Nothing the district court cites to support its view of SB419's pur-ported "true purpose" undermines this conclusion. The district court first looked to SB419's text, finding that "[o]n its face" SB419 doesn't "espouse its consumer protection purpose." ER-36. Rather, it found that the lone textual clue of a consumer protection purpose is § 2's statement that SB419 was "intended to be codified as an integral part of the 'unfair trade practices and consumer protection chapter' of the Montana Code Anno-tated." ER-36–37. It also found that SB419's contingent voidness provi-sion—which permits TikTok to operate in Montana if it eliminates the source of Montanans' threatened data privacy harms by severing ties

51

with China, a "foreign adversary" under 15 C.F.R. § 7.4(a)(1)—was evidence, not of a consumer protection purpose, but of a "foreign affairs purpose." ER-37. But to reach these conclusions the district court strained to draw adverse inferences against Montana's stated purposes for SB419.

Several parts of SB419's preamble state, in clear terms, its consumer protection interest, including its statements that China "has an interest in gathering information about Montanans, Montana companies, and the intellectual property of users to engage in corporate and international espionage"; that China "exercises control and oversight over ByteDance … and can direct the company to share user information"; and "TikTok gathers significant information from its users, accessing data against their will to share with … China." ER-63. When read in context with § 2 and the contingent voidness provision, SB419's consumer protection interest is clear: it bars TikTok from operating in Montana only while the threat of harvesting Montanans' personal data and providing at-will access for the CCP remains—a clear consumer protection interest. Yet the district court determined that these statements reflected a "foreign affairs purpose" because it showed that SB419 seeks to prevent "international espionage" by one of the United States' few

52

foreign adversaries.  ER-37–38.  Of course, the full statement was "*corporate* and international espionage," which supports a consumer protection purpose.  ER-63.  Even with the isolated reference to "international espionage," the other surrounding statements (discussed above) all support SB419's consumer protection interest.

After distorting SB419's clear text, the district court "look[ed] further to determine the real purpose of the state law."  ER-37–38 (quoting *Movsesian*, 670 F.3d at 175).  While the district court recognized that Montana supported its concerns that the CCP could exert control over ByteDance and TikTok to obtain U.S. user data with citations to volumes of credible news articles, it faulted Montana for failing to produce additional evidence.  ER-37–38; *but see, e.g.*, *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) (permitting city to "reasonably rely" on a single study from a department conducted years before the law was enacted); *Repub. Party v. Torrez*, 2023 U.S. Dist. LEXIS 145446, at *44 (D.N.M. Aug. 17, 2023) (permitting the State to rely on a "mountain of newspaper articles" to justify the challenged law).  And because the news articles were contradicted—*not rebutted*—by affidavits from a TikTok executive and purported data privacy experts, it found that Montana failed to

support its argument that SB419 advances a consumer protection inter-est. ER-37–38. But that improperly flips the evidentiary burden at the preliminary injunction stage on its head. The party seeking preliminary injunctive relief must still "*by a clear showing*, carr[y] the burden of per-suasion." *Norbert*, 10 F.4th at 927 (quoting *Mazurek*, 520 U.S. at 972). And by requiring Montana to prove its consumer protection interest, the district court improperly relieved Plaintiffs of their evidentiary burden.

The district court found more support for SB419's purported "for-eign affairs purpose" in the bill's legislative history. ER-37–38. In par-ticular, it relied on statements from two legislators and an executive branch official (who could not vote on the bill). Despite the Supreme Court's oft-repeated admonition to avoid imputing the intent of individ-ual legislators to the entire legislative body, the district court charged ahead. *See, e.g.*, *O'Brien*, 391 U.S. at 384 (decrying the practice of "void[ing] a statute that is … constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it" because "[w]hat motivates one legislator to make a speech about a statute is not neces-sarily what motivates scores of others to enact it"); *Renton*, 475 U.S. at 47-48 (same); *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1140 (9th

54

Cir. 2023) (same); *Paxton*, 49 F.4th at 482 (same). The district court erred in relying on these isolated statements.

But even on their own terms, those statements don't undermine Montana's asserted interest in consumer protection. The district court first cites portions of Attorney General Knudsen's statements at the first hearing on SB419, which refer to TikTok "spying on Americans," being a "tool of the Chinese Communist Party," and that China was using it "as an initial salvo in [an inevitable] war" with China. ER-37–38. But Knudsen also said that TikTok was "owned by a Chinese company," and if "you are based in China you will cooperate with the Chinese Communist Party, period." ER-37–38. And between these remarks—which the district court omitted—Knudsen said "[i]f [the CCP] requests that data, [TikTok] will [be] required to turn it over, and that's what's happening here." ER-73. In context, these statements fail to show a "foreign affairs purpose."

Next, the district court cites portions of statements made by two individual legislators, Brandon Ler and Katie Sullivan. Ler said that the CCP's indirect control of TikTok was a "national security threat," in part

55

because "they can spy on Americans by *collecting personal information by keystrokes and even use their locations*." ER-38 (emphasis added). Apart from observing that TikTok poses a national security threat, Ler's concern was motivated by TikTok's collection of personal information—the basis of SB419's consumer protection interest. And Sullivan, on the other hand, expressed concern that, even though TikTok may be dangerous, SB419 may not be "taking data privacy and security seriously" because it was limited to TikTok and other social media companies do the same thing. ER-38–39. At a minimum, Sullivan conceded that SB asserts a consumer protection purpose (data privacy and security), even if she questioned the seriousness of that purpose. But more importantly, she voted *against* the bill, so her statements provide even less information about SB419's "real purpose" than the statements of the legislators who voted for it. *E.g.*, *O'Brien*, 391 U.S. at 384.

Even if it were permissible to rely on text in SB419's preamble and statements in legislative hearings, those statements merely reiterate facts of record. The federal government already determined that China

56

is a "foreign adversary."  15 C.F.R. § 7.4(a)(1).[35]  And the President al-ready determined that China has accessed "large repositories of United States persons' data."  E.O. 14034.  TikTok is a subsidiary of a Chinese corporation.  *Compare* SB419 ("TikTok is a wholly owned subsidiary of ByteDance, a Chinese corporation.") *with* About, ByteDance, https://perma.cc/P2N9-WWGX (ByteDance is a Chinese company head-quartered in Beijing); *compare* SB419 (TikTok "may allow the People's Republic of China to track the real-time locations of … individuals ad-verse to the [CCP]'s interests") *with supra* n.28 (Letter to Senators Blu-menthal and Blackburn), at 1 (admitting some TikTok data is stored in China).  By reciting these facts, Montana neither made political judg-ments nor "express[ed]" any "distinct political point of view" about the treatment of China or its political arms nor addressed "foreign relations."

---

[35] While the district court agreed that SB419 didn't create a conflict with federal policy by incorporating the federal government's designation of China as "foreign adversary" under 15 C.F.R. § 7.4(a)(1), it found that SB419 still intruded on the federal government's current foreign policy interests because its "foray into foreign affairs interpret[ed]" those inter-ests.  But the district court failed to show any conflict *at all* between SB419 and federal foreign policy interests, and that was error.  *See Ari-zona*, 567 U.S. at 414 (finding preliminary relief improper when the court assumed that a state statute "w[ould] be construed in a way that creates a conflict with federal law" when it could be read to avoid those concerns).

57

*See Movsesian*, 670 F.3d at 1076-77. So SB419 doesn't require this Court to undertake "a highly politicized inquiry into the conduct of a foreign nation." *Id.* at 1076.

Second, the district court erroneously found that SB419 "intrudes on the federal government's exclusive power to conduct and regulate foreign affairs" because it "expresses a distinct political point of view on a specific matter of foreign policy." ER-39 (quoting *Movsesian*, 670 F.3d at 1076). What was SB419's "distinct [foreign policy] point of view"? According to the district court, it was "that TikTok is owned by a Chinese corporation that is taking Montanans' TikTok user data and sharing it with the Chinese government for nefarious purposes." *Id.* To be sure, that is a "distinct political point of view," *see* ER-40, but it reflects the consumer protection purpose supporting SB419—cutting off the CCP's access to Montanans' TikTok user data to protect their privacy. It isn't a foreign policy statement. And it certainly doesn't "ha[ve] more than some incidental or indirect effect on foreign affairs." *Movsesian*, 670 F.3d at 1076 (quotations omitted).

58

The district court in effect found that because Attorney General Knudsen and SB419's preamble state that China's alleged involvement in Montana endangers Montanans, SB419 therefore arrogates to Montana power reserved for the federal government. *See* ER-40. But that's a far cry from the kinds of direct impacts on foreign relations that courts have held sufficient to establish preemption. *Zschernig*, for example, held that Oregon's law preventing East German citizens from inheriting personal property was preempted because to implement that law, Oregon's probate courts had for over a decade engaged in "minute inquiries concerning the actual administration of foreign law [and] into the credibility of foreign diplomatic statements." 389 U.S. at 435. *Movsesian* held a California law preempted because it "establishe[d] a particular foreign policy for California—one that decries the actions of the Ottoman Empire and seeks redress for 'Armenian Genocide victim[s]' by subjecting foreign insurance companies to lawsuits in California." 670 F.3d at 1076. And the Ninth Circuit held another California law preempted because it would have "require[d] California courts to review acts of restitution made by foreign governments" to victims of Nazi war crimes. *Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954, 967 (9th Cir. 2010).

59

Neither Plaintiffs nor the district court points to comparable evidence of similar impacts. A few statements at a legislative hearing and the text of the law's preamble aren't the kind of state intrusion on foreign affairs sufficient to subject SB419 to any field-preemption component of the foreign-affairs doctrine.

### 2. SB419 isn't preempted by the DPA.

Conflict preemption cases require showing an "actual conflict." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 864 (2000). Yet the district court found that because TikTok's parent company, ByteDance, and the United States are engaged in negotiations under the DPA, SB419 likely conflicts with, and thus is preempted by, the DPA. ER-42–43. And it reached this conclusion, despite acknowledging that SB419 "may not directly impact" the negotiations between the Committee on Foreign Investment in the United States ("CFIUS") and TikTok and ByteDance over the ByteDance-Musical.ly transaction, because it "likely implicates the exact type of conflict the preemption doctrine seeks to prevent." ER-43.

Congress's purpose in enacting the DPA, *see Wyeth v. Levine*, 555 U.S. 555, 566 (2009), appears in the statute itself: the DPA "promote[s]

60

industrial resources preparedness," "support[s] continuing improvements in industrial efficiency," "provide[s] for the protection and restoration of domestic critical infrastructure operations under emergency conditions," and "respond[s] to actions taken outside of the United States that could result in reduced supplies of strategic and critical materials." 50 U.S.C. § 4502(a)(1). To further those goals, the DPA grants the President "an array of authorities to shape national defense preparedness programs and to take appropriate steps to maintain and enhance the domestic industrial base." *Id*. § 4502(a)(4). The DPA also delegates certain authority to CFIUS, which reviews "covered transactions" that "could result in foreign control of any person engaged in interstate commerce in the United States." *Id*. § 2170(a)(3); § 4565(b)(2)(A). CFIUS then can refer the transaction to the President for further action. *Id*. § 4565(b)(1)(A).

Plaintiffs and the district court fail to articulate a precise theory of conflict preemption under the DPA. But no matter, SB419 doesn't "obstruct the purposes and objectives" of the DPA. *Wyeth*, 555 U.S. at 573. First, § 721 applies only to "covered transactions," 50 U.S.C. § 4565(b)(2)(A), and neither Plaintiffs nor the district court identifies a

61

transaction at issue, let alone a "covered transaction" under § 721. Plaintiffs allude to negotiations between the federal government and TikTok in *TikTok Inc. v. CFIUS*, where TikTok sought review of Presidential Proclamation No. 10061, 85 Fed. Reg. 51297 (Aug. 14, 2020). There, President Trump ordered ByteDance to divest certain assets "used to enable or support ByteDance's operation of the TikTok application in the United States" and "any data obtained or derived from TikTok application or Musical.ly application users in the United States." 85 Fed. Reg. at 51297. In that litigation, though, TikTok asserted that the "covered transaction" at issue "did *not* include the core technology or other aspects of the TikTok business." *TikTok Inc.*, No. 20-1444, Doc. #1870778, at *2-3.

SB419 doesn't interfere with these ongoing negotiations, particularly since by TikTok's own terms, the negotiations don't involve TikTok's technology or business. *Id.* In any event, these ongoing negotiations are under seal, so it isn't possible to determine whether there is an "actual conflict." *Geier*, 529 U.S. at 884. This Court and Montana are not required to take Plaintiffs at their word that these ongoing negotiations create a true conflict that overcomes the "assumption that the historic

police powers of the States were not to be superseded … unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565.

If Congress intended to preclude *any* state regulation of a business that was simultaneously being investigated by CFIUS, "it surely would have enacted an express pre-emption provision." *Wyeth*, 555 U.S. at 574. And whatever the outcome of those negotiations, SB419 won't conflict with them. If Plaintiffs prevail, the President and CFIUS cannot prohibit the ByteDance and Musical.ly transaction. *See TikTok Inc.*, No. 20-1444, Doc. #1870778. Or if the federal government prevails, TikTok will need to divest certain assets. Either way, TikTok can still comply with SB419. *See Wyeth*, 555 U.S. at 573.

That conclusion follows *Crosby* where Massachusetts's law barred doing business with Burma—the same problem addressed by the federal sanctions. 530 U.S. at 367, 379-80. The applicability of the DPA is only triggered by the ByteDance and Musical.ly transaction. And as TikTok itself has made clear, this is unrelated to TikTok's operations. *TikTok Inc.*, No. 20-1444, Doc. #1870778, at *2-3. Any future agreements between the federal government and TikTok cannot preempt today an otherwise valid state law. *See Crosby*, 530 U.S. at 367.

63

### C. SB419 doesn't violate the Commerce Clause.

The district court first found that SB419 likely violates the Commerce Clause because it facially discriminates against commerce with China. ER-47; *see Granholm v. Heald*, 544 U.S. 460, 476 (2005) ("State laws that discriminate against interstate commerce face a virtually per se rule of invalidity." (internal quotations omitted)). But SB419 does not discriminate against *commerce with China*; as the district court in effect concedes, it addresses harms from a domestic corporation's harmful data practices that allow the CCP to access that data. *See* ER-47 (conceding that Montana banned TikTok because of "harms inseparable from Tik-Tok's data-harvesting practices and ownership by a hostile foreign government").

The district court next found that SB419 likely violates the dormant Commerce Clause because the burden it imposes on interstate commerce exceeds its local benefits. ER-47. The Commerce Clause implicitly limits the states' authority to enact legislation about interstate commerce. *S. Pac. Co. v. Arizona*, 325 U.S. 761, 769 (1945). Courts approach this give-and-take in a "two-tiered approach." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986). If a state "directly

64

regulates" interstate commerce or "favor[s] in-state economic interests over out-of-state interests," the law likely violates the Commerce Clause. *Id.* at 578-79. But when a state law "regulates even-handedly" and has an "*indirect* effect[t]" on interstate commerce, courts must balance the state's legitimate interests against the burden imposed. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

And here, the district court determined the pertinent question is whether SB419 imposes a burden on "[interstate] commerce that is clearly excessive in relation to the putative local benefits." ER-46 (quoting *Pike*, 397 U.S. at 142). Relying on the purportedly "enormous discretion" afforded to district courts, the district court found that SB419's burden on the Users' business and TikTok business model exceeds SB419's local benefits. ER-46–47.

In weighing those relative burdens and benefits, the district court found that SB419 burdened both the Users and TikTok. For the Users, SB419 prevented them from conducting business on TikTok, and for TikTok, SB419 required it to sell its business to an owner in a non-adversarial country to operate in Montana. ER-46–47. Yet in dismissing SB419's local benefits as lacking "evidentiary support," ER-47, the district court

65

ignored the abundance of evidence showing the harms that TikTok poses to users, *see supra* nn.2-14, 28. And because the district had to balance Montana's interests with the burden imposed, its cursory treatment of SB419's local benefits undermines its conclusion. *See Pike*, 397 U.S. at 142. Even so, legislatures, not courts, "are entitled to weigh the relevant 'political and economic' costs and benefits for themselves." *Nat'l Pork Producers Council*, 143 S. Ct. 1154, 1160 (2023) (quoting *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 279 (1978)).

The lone case the district court relied on was *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 521 (1959), *see* ER-46, but it fails to support the district court's conclusion. Like the few other cases in which the Supreme Court has overturned nondiscriminatory restrictions on commerce, *Bibb* involved a barrier to the physical, interstate movement of vehicles trans- porting goods. *See* 359 U.S. at 521; *see also, e.g., Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 450 (1978). But the evidentiary sup- port for the burdens on interstate commerce in *Bibb* far surpassed Plain- tiffs' showing here. *See* 359 U.S. at 521 ("massive showing" of actual costs of burden on interstate commerce); *see also Raymond Motor Transp., Inc.*, 434 U.S. at 450 ("overwhelming empirical data" about the burdens).

66

Consider *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 187 (2d Cir. 2007). There, the Second Circuit upheld a law that regulated gift cards sold on the internet by eliminating fees and expiration dates. The court found *Bibb* inapplicable because the plaintiff could not show the state law "impede[d] the interstate movement of gift cards subject to different terms and conditions." *Id.* at 196. It added that the sellers had a near-perfect ways to distinguish between online consumers residing in Connecticut and those residing elsewhere. *Id.* at 195. SB419 similarly doesn't impede the interstate movement of information, and there are near-perfect ways to determine whether TikTok is operating in Montana.

The district court erred in finding that Plaintiffs showed that they were likely to succeed on the merits of their Commerce Clause claim.

## II. The remaining preliminary injunction factors do not weigh in Plaintiffs' favor.

### A. Plaintiffs haven't shown irreparable harm to support preliminary relief.

As shown above, Plaintiffs are unlikely to prevail on the merits of any of their constitutional claims. *See supra* Sect.I.A.-C. And by failing to meet this "threshold factor" for each of their claims, *see Baird*, 81 F.4th at 1040, they necessarily fail to show irreparable harm, either from a

67

constitutional violation or from the loss of business goodwill, *see* ER-48–49.

Both TikTok and the Users also argued that they suffered irreparable economic harms to their business. As for TikTok, the district court found that "TikTok's business harms argument is not entirely persuasive," but it held that those harms were irreparable because "[Montana] has not substantively rebutted it." ER-48–49. But that improperly shifts Plaintiffs' evidentiary burden to Montana. *Norbert*, 10 F.4th at 927 (party seeking preliminary injunction must, "*by a clear showing*, carr[y] the burden of persuasion") (internal quotations omitted).

As for the Users, they failed to establish a likelihood of irreparable economic harm because their asserted harms are speculative. Only two Users said that they relied on TikTok for an income stream, *see* ER-55, ¶ 12; ER-60, ¶ 7, and both failed to sufficiently show what monetary harm they would suffer if they had to use a different online platform. *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy[.]").

68

## B. The balance of the equities and public interest favor Montana.

The balance of equities favors Montana. As shown above, Plaintiffs are unlikely to prevail on the merits of their constitutional claims. *See supra* Sect.I.A.-C. By failing to meet this "threshold factor" on each of their claims, *Baird*, 81 F.4th at 1040, they necessarily fail to show that the balance "tips sharply in [their] favor," *hiQ*, 31 F.4th at 1188. Not only that, but the federal government has already designated China a "foreign adversary" under 15 C.F.R. § 7.4(a)(1). And the concerns with TikTok are well documented at both the state and federal level, Democrat and Republican. SB419, therefore, furthers the public interest because it protects the public from the harms inseparable from TikTok's operation.

## CONCLUSION

For the reasons above, this Court should reverse the district court's entry of a preliminary injunction because Plaintiffs (1) failed to carry their burden show that they are likely to succeed on the merits of their First Amendment, Supremacy Clause, and Commerce Clause claims; and

69

(2) failed to show irreparable harm or that the balance of equities tips sharply in their favor.

DATED this 1st day of March, 2024.

AUSTIN KNUDSEN
 *Montana Attorney General*
CHRISTIAN B. CORRIGAN
 *Solicitor General*

*/s/ Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.
 *Deputy Solicitor General*

215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
p. 406.444.2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

70

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Peter M. Torstensen, Jr., an employee in the Office of the Attorney General of the Montana, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,635 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)–(7), and Circuit Rule 29-2(c)(3).

/s/ *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.