**No. 24-34**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SAMANTHA ALARIO, HEATHER DIROCCO, CARLY ANN GODDARD,
ALICE HELD, AND DALE STOUT,

*Plaintiffs-Appellees*,

and

TIKTOK INC.,

*Plaintiff-Appellee*,

v.

AUSTIN KNUDSEN, in his official capacity as Attorney General
of the State of Montana,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Montana
Nos. CV 23-56-M-DWM and CV 23-61-M-DWM
Hon. Donald W. Molloy

### APPELLEE TIKTOK INC.'S ANSWERING BRIEF

Anders Linderot
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1163
alinderot@cov.com

Rob Cameron
JACKSON, MURDO & GRANT, P.C.
203 North Ewing
Helena, MT 59601
(406) 389-8244
rcameron@jmgattorneys.com

Alexander A. Berengaut
Megan A. Crowley
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-5367
aberengaut@cov.com
mcrowley@cov.com

*Attorneys for Appellee TikTok Inc.*

## DISCLOSURE STATEMENT

TikTok Inc. is a wholly owned subsidiary of TikTok LLC, which is a wholly owned subsidiary of TikTok Ltd.  TikTok Ltd. is a wholly owned subsidiary of ByteDance Ltd.  ByteDance Ltd. is a privately held corporation.  No publicly held corporation owns 10% or more of the stock of TikTok Inc.

/s/ *Alexander A. Berengaut*
Alexander A. Berengaut

*Attorney for Appellee*
*TikTok Inc.*

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................................... ii

TABLE OF CONTENTS ........................................................................... iii

TABLE OF AUTHORITIES ...................................................................... vi

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................ 3

STATUTORY ADDENDUM .................................................................... 3

STATEMENT OF THE CASE ................................................................... 3

      A.    TikTok Is a Popular Platform for Speech and Expression.................. 3

      B.    TikTok's Efforts to Protect the Privacy and Security of U.S. User Data. ................................................................................... 4

      C.    Montana Bans TikTok. ................................................................. 5

      D.    The District Court Preliminarily Enjoins the TikTok Ban.................. 7

SUMMARY OF THE ARGUMENT................................................................. 10

STANDARD OF REVIEW......................................................................... 13

ARGUMENT............................................................................................. 15

I.     PLAINTIFF IS LIKELY TO SUCCEED ON ITS FIRST AMENDMENT CLAIM. ............................................................ 15

      A.    The TikTok Ban Is Subject to First Amendment Scrutiny.............. 15

      B.    The TikTok Ban Is Subject to Strict Scrutiny. ............................... 21

            1.    The Ban is content- and viewpoint-based.............................. 21

            2.    The Ban is speaker-based.................................................... 22

            3.    The Ban is a prior restraint.................................................. 24

4. The Ban is not merely a time, place, or manner restriction. .................................................................. 26

C. The Ban Fails Both Strict and Intermediate Scrutiny. ....................... 28

1. The Ban does not further a compelling or significant state interest. ................................................... 28

2. The Ban is not narrowly tailored. ........................................... 33

3. The Ban fails to leave open ample alternative channels of communication. ...................................... 35

D. The TikTok Ban Is Facially Overbroad. ........................................... 38

II. PLAINTIFF IS LIKELY TO SUCCEED ON ITS CLAIMS THAT THE TIKTOK BAN IS PREEMPTED. ..................................................... 39

A. The TikTok Ban Impermissibly Intrudes on the Field of Foreign Affairs. .......................................................................... 40

1. The Ban's real purpose is to regulate foreign affairs, not to protect consumers. ............................................... 40

2. The Ban intrudes on the federal government's foreign affairs powers. ................................................... 46

B. The TikTok Ban Conflicts with Federal Law. ................................... 48

III. PLAINTIFF IS LIKELY TO SUCCEED ON ITS CLAIMS THAT THE TIKTOK BAN VIOLATES THE COMMERCE CLAUSE. .............. 52

A. The TikTok Ban Discriminates Against Foreign Commerce. ............ 52

B. The TikTok Ban Unduly Burdens Interstate Commerce. .................. 55

IV. THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR MAINTAINING THE STATUS QUO. ......................................... 57

A. The TikTok Ban Will Cause Plaintiff Irreparable Harm. ................. 57

B. The Balance of Equities and the Public Interest Require Preliminary Injunctive Relief. ......................................................... 58

iv

CONCLUSION .................................................................................... 59

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ins. Ass'n v. Garamendi,*
   539 U.S. 396 (2003)..................................................................40

*Ams. for Prosperity Found. v. Bonta,*
   141 S. Ct. 2373 (2021)............................................................28

*Anderson v. City of Hermosa Beach,*
   621 F.3d 1051 (9th Cir. 2010)......................................18, 28, 36

*Arcara v. Cloud Books, Inc.,*
   478 U.S. 697 (1986)..........................................................19, 20

*Arellano v. Clark Cnty. Collection Serv.,*
   875 F.3d 1213 (9th Cir. 2017)................................................49

*Arkansas Educ. Television Comm'n v. Forbes,*
   523 U.S. 666 (1998)................................................................17

*Arkansas Writers' Project v. Ragland,*
   481 U.S. 221 (1987)................................................................23

*Ass'n of Int'l. Auto. Mfrs. v. Abrams,*
   84 F.3d 602 (2d Cir. 1996).....................................................55

*Backpage.com, LLC v. Dart,*
   807 F.3d 229 (7th Cir. 2015)..................................................25

*Bantam Books Inc. v. Sullivan,*
   372 U.S. 58 (1963)..................................................................26

*Bd. of Airport Comm'rs v. Jews for Jesus,*
   482 U.S. 569 (1987)................................................................38

*Berger v. City of Seattle,*
   569 F.3d 1029 (9th Cir. 2009)................................................39

*Bibb v. Navajo Freight Lines, Inc.,*
   359 U.S. 520 (1959)................................................................56

vi

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000).....................................................................27

*Brown v. Ent. Merch.'s Ass'n*,
  564 U.S. 786.................................................................................35

*Cal. Chamber of Commerce v. Council for Educ.*,
  29 F.4th 468 (9th Cir. 2022)......................................................57

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
  563 F.3d 847 (9th Cir. 2009)......................................................57

*Chamber of Com. v. Bonta*,
  62 F.4th 473 (9th Cir. 2023)......................................................52

*Church of Scientology v. U.S. Dept. of Justice*,
  612 F.2d 417 (9th Cir. 1979)......................................................44

*Citizens United v. FEC*,
  558 U.S. 310 (2010)....................................................................23

*City of Ladue*,
  512 U.S. 43 (1994)...............................................................15, 36

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984)....................................................................26

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)..............................................48, 50, 51, 52

*Ctr. For Bio-Ethical Reform v. Honolulu*,
  455 F.3d 910 (9th Cir. 2006)......................................................37

*Cuviello v. City of Vallejo*,
  944 F.3d 816 (9th Cir. 2019)......................................................24

*D.O. By & Through Walker v. Escondido Union Sch. Dist.*,
  59 F.4th 394 (9th Cir. 2023)......................................................25

*Denver Area Educ. Telecomms. v. FCC*,
  518 U.S. 727 (1996)....................................................................17

vii

*Deutsch v. Turner Corp.*,
    324 F.3d 692 (9th Cir. 2003)..............................................................40

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014)..............................................................14

*Edenfield v. Fane*,
    507 U.S. 761 (1993)..........................................................................29

*Edwards v. District of Columbia*,
    755 F.3d 996 (D.C. Cir. 2014) .........................................................33

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975)..........................................................................15

*FEC v. Cruz*,
    596 U.S. 289 (2022)..........................................................................32

*First Resort, Inc. v. Herrera*,
    860 F.3d 1263 (9th Cir. 2017)....................................................16, 22

*Fowler Packing Co. v. Lanier*,
    844 F.3d 809 (9th Cir. 2016)..............................................................44

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015)..............................................................56

*Galvin v. Hay*,
    374 F.3d 739 (9th Cir. 2004)..............................................................16

*Granholm v. Heald*,
    544 U.S. 460 (2005)..........................................................................52

*Green v. Miss USA LLC*,
    52 F.4th 773 (9th Cir. 2022)..............................................................27

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)............................................................................28

*hiQ Labs, Inc. v. LinkedIn Corp*,
    31 F.4th 1180 (9th Cir. 2022)............................................................14

viii

*Hurley v. Irish-Am. Grp.*,
  515 U.S. 557 (1995)................................................................16, 17

*IMDb.com v. Becerra*,
  962 F.3d 1111 (9th Cir. 2020)................................................34, 35

*Jacobs v. Clark Cnty. Sch. Dist.*,
  526 F.3d 419 (9th Cir. 2008)..........................................27, 31, 37

*Junior Sports Mags., Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023)......................................................33

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022)..............................................................29, 31

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009)....................................................32

*Kraft General Foods, Inc. v. Iowa Dept. of Revenue & Finance*,
  505 U.S. 71 (1992)......................................................................52

*Mahoney Area Sch. Dist. v. B.L.*,
  594 U.S. 180 (2021)....................................................................37

*Maine v. Taylor*,
  477 U.S. 131 (1986)..............................................................52, 54

*Manhattan Cmty Access Corp. v. Halleck*,
  587 U.S. 802 (2019)....................................................................17

*Marino v. Vasquez*,
  812 F.2d 499 (9th Cir. 1987)......................................................39

*May v. Cooperman*,
  780 F.2d 240 (3d Cir. 1985)........................................................30

*McCullen v. Coakley*,
  573 U.S. 464 (2014)....................................................................33

*Metromedia, Inc. v. City of San Diego*,
  453 U.S. 490 (1981)....................................................................15

ix

*Miami Herald Publ'g Co. v. Tornillo,*
    418 U.S. 241 (1974)..............................................................16, 17, 18

*Minneapolis Star v. Minnesota Comm'r of Revenue,*
    460 U.S. 575 (1983)....................................................................15, 23

*Movsesian v. Victoria Versicherung AG,*
    670 F.3d 1067 (9th Cir. 2012).................................................*passim*

*Nat'l Inst. of Fam. and Life Advocs. v. Becerra,*
    585 U.S. 755 (2018)....................................................................22, 35

*Near v. Minnesota,*
    283 U.S. 697 (1931)..............................................................24, 25, 27

*Neb. Press Ass'n v. Stuart,*
    427 U.S. 539 (1976)...........................................................................24

*NetChoice, LLC v. Paxton,*
    49 F.4th 439 (5th Cir. 2023).............................................................17

*NFTC v. Natsios,*
    181 F.3d 38 (1st Cir. 1999)...............................................................53

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022)..............................................................................56

*Odebrecht v. Prasad,*
    876 F. Supp. 2d 1305 (S.D. Fla. 2012)............................................53

*Org. for a Better Austin v. Keefe,*
    402 U.S. 415 (1971)...........................................................................25

*Pac. Coast Horseshoeing Co. v. Kirchmeyer,*
    961 F.3d 1062 (9th Cir. 2020)..............................................18, 19, 23

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*
    810 F.3d 631 (9th Cir. 2015).............................................................14

*Packingham v. North Carolina,*
    582 U.S. 98 (2017).............................................................................15

x

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970)............................................................55

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Relations*,
  413 U.S. 376 (1973)............................................................24

*Porretti v. Dzurenda*,
  11 F.4th 1037 (9th Cir. 2021)..............................................14

*Raymond Motor Transp., Inc. v. Rice*,
  434 U.S. 429 (1978)............................................................56

*Real v. City of Long Beach*,
  852 F.3d 929 (9th Cir. 2017)..............................................26

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)............................................................21

*Reno v. Am. C.L. Union*,
  521 U.S. 844 (1997)............................................................29

*Rent-A-Center, Inc. v. Canyon Television*,
  944 F.2d 597 (9th Cir. 1991)..............................................57

*Rosenberger v. Rector*,
  515 U.S. 819 (1995)............................................................22

*Rudin v. Myles*,
  781 F.3d 1043 (9th Cir. 2015)............................................32

*Sable Commc'ns of Cal. v. FCC*,
  492 U.S. 115 (1989)............................................................29

*Se. Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975)......................................................24, 26

*Smith v. California*,
  361 U.S. 147 (1959)............................................................17

*SPGGC v. Blumenthal*,
  505 F.3d 183 (2d Cir. 2007)..............................................56

*Thunder Studios v. Kazal*,
    13 F.4th 736 (9th Cir. 2021) ............................................................16

*TikTok Inc. v. CFIUS*,
    No. 20-1444 (D.C. Cir. Apr. 22, 2024) ........................................49

*TikTok Inc. v. Trump*,
    507 F. Supp. 3d 92 (D.D.C. 2020) ...............................................22

*Tucson v. City of Seattle*,
    91 F.4th 1318 (9th Cir. 2024) ......................................................14

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ...................................................15, 23, 32

*U.S. WeChat Users All. v. Trump*,
    488 F. Supp. 3d 912 (N.D. Cal. 2020) ..........................................25

*United States v. Excel Packing Co.*,
    210 F.2d 596 (10th Cir. 1954) .....................................................48

*United States v. O'Brien*,
    391 U.S. 367 (1968) ....................................................................27

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000) ....................................................................34

*United States v. Stevens*,
    559 U.S. 460 (2010) ..............................................................38, 39

*United States v. Texas*,
    97 F.4th 268 (5th Cir. 2024) ........................................................51

*Von Saher v. Norton Simon Museum of Art*,
    592 F.3d 964 (9th Cir. 2010) ....................................43, 44, 46, 47

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) .....................................................58

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ....................................................................35

*Winter v. NRDC*,
　555 U.S. 7 (2008)............................................................13

*Wolfson v. Concannon*,
　750 F.3d 1145 (9th Cir. 2014)......................................21

*Zschernig v. Miller*,
　389 U.S. 429 (1968)......................................................40

**Statutes**

50 U.S.C § 4565............................................................9, 49

S.B. 419, 68th Leg., Reg. Sess. (Mont. 2023) ..................*passim*

Mont. Code Ann. § 30-14-102 ......................................43

Mont. Code Ann. § 30-14-103 ......................................30

Protecting Americans from Foreign Adversary Controlled
　Applications Act, Pub. L. No. 118-50, div. H ............9, 50

**Other Authorities**

15 C.F.R. § 7.4..............................................................6, 47

85 Fed. Reg. 51,297 (Aug. 14, 2020) ..........................47

House Comm. Rep., H.R. Rep. No. 118-417..................48

Montana Bill Drafting Manual, 68th Legislature (2022) ......45

U.S. Const. art. I, § 8 ................................................40, 52

U.S. Const. art. II, § 2 ................................................40

## INTRODUCTION

TikTok is an online platform used by more than 150 million Americans, including several hundred thousand Montanans, to express themselves and communicate with people around the world.  In May 2023, Montana enacted S.B. 419, An Act Banning TikTok in Montana (the "TikTok Ban" or "Ban").  The Ban does exactly what its name suggests: if it were to go into effect, it would prohibit "the operation of tiktok" within Montana, S.B. 419 §1(1)(a), shutting down a unique and popular platform for speech throughout the State.

Shortly after the Ban was enacted, Plaintiff TikTok Inc., which provides the TikTok platform in the United States, filed suit and sought a preliminary injunction, arguing that the Ban is unconstitutional under the First Amendment, the Supremacy Clause, and the Commerce Clause.  The District Court agreed and preliminarily enjoined the Ban.  ER-50.  The District Court held that, in banning a "means of expression used by over 300,000 Montanans" because of purported national security and foreign policy concerns, the Ban likely violates the First Amendment and Commerce Clause, and likely is preempted by federal law.  ER-16 (internal quotations omitted).

The State now appeals that ruling, but its arguments are premised on a fiction.  As the District Court correctly found, the Ban's text and legislative history make clear that the State's "actual purpose" in banning TikTok is "to stop a perceived

1

national security threat" from the Chinese government.  ER-16, ER-39.  The State argues that the District Court wrongly "assum[ed] that because SB419 mentions China it has a national security or foreign affairs purpose," when the Ban is instead a run-of-the-mill consumer protection statute.  State Br. 15.  But the State cannot save its unconstitutional legislation by rewriting it in litigation.

The TikTok Ban is a textbook attempt to regulate foreign affairs.  It seeks to prevent "international espionage" by a "foreign adversary"; it contains no restrictions whatsoever on how TikTok Inc. (or any other company) must treat Montanans' data; and it is voided if the platform is sold to a company not incorporated in a foreign adversary country.  ER-63-65.  Even if the State sought to "protect" Montanans' data from the Chinese government, the Ban was expressly enacted to address perceived national security risks posed by a foreign power, which is an exclusively federal interest.

The State's Ban of TikTok, a popular forum for speech, plainly exceeds its constitutional authority.  The State does not have a valid state interest in regulating national security, and it fails to advance any other interest to justify the Ban—let alone an interest supported by evidence.  Nor has the State met its burden to establish that the many less-restrictive alternatives to a ban would be insufficient.  Instead, as the District Court explained, "the Legislature used an axe to solve its professed concerns when it should have used a constitutional scalpel."  ER-28.  Moreover,

2

because the Ban's purpose and effect are to inject the State into matters of national security and foreign affairs, it is preempted by federal law.  And by discriminating against foreign commerce and unreasonably burdening interstate commerce, the Ban violates the Commerce Clause.

The District Court did not abuse its discretion in finding that a preliminary injunction was warranted.  This Court should affirm its well-reasoned decision.

## JURISDICTIONAL STATEMENT

TikTok Inc. agrees with the State's jurisdictional statement.

## STATUTORY ADDENDUM

Pertinent statutory authorities are contained in an addendum to this brief.

## STATEMENT OF THE CASE

### A.     TikTok Is a Popular Platform for Speech and Expression.

TikTok is an online platform that enables users to create, share, and view videos and other forms of content.  ER-7.  Users view content primarily through TikTok's "For You" page, which presents a collection of videos curated by TikTok's recommendation system based on each user's interests.  SER-221-22.  TikTok users can communicate on the platform in various ways, including by creating and sharing videos, commenting on videos, "tagging" users in comments, and using the "duet" and "stitch" functions to create new content that incorporates and responds to content created by others.  SER-217.  Users over age 16 can also exchange direct messages,

and those over 18 can use the "TikTok LIVE" feature to communicate with others in real time.  SER-217, 228.

TikTok's unique design and functionality have made it extremely popular and valuable to its users.  SER-221-22.  More than 150 million Americans use TikTok every month, and TikTok Inc. estimates that several hundred thousand users are located in Montana.  ER-6-7.  People use TikTok to share and receive information on a range of topics—including entertainment, religion, and politics.  ER-7.  TikTok Inc. itself uses the platform to communicate, including through its own account and by promoting public-interest content on the platform.  SER-220-21.

TikTok works to foster a safe and supportive environment on the platform, including by enforcing its Community Guidelines, a publicly available collection of rules and standards that apply to all TikTok users.  SER-223.  The Guidelines prohibit users from posting certain categories of content on the TikTok platform, such as videos featuring nudity, sexual activity, and sexually explicit or exploitative content, as well as videos that appear dangerous or otherwise harmful.  *Id.*  TikTok enforces the Guidelines through a mix of technology-based and human moderation.  SER-226-27.

## B.    TikTok's Efforts to Protect the Privacy and Security of U.S. User Data.

TikTok is committed to protecting its users' privacy.  SER-229.  TikTok's Privacy Policy, which users must agree to, explains that TikTok collects certain

4

information from users, including usernames, dates of birth, phone numbers and/or email addresses.  ER-8.  Current versions of the TikTok app do not collect GPS location information from U.S. users.  ER-7.

TikTok is also committed to safeguarding the security of U.S. user data, including against foreign government access.  SER-230-31.  Among other things, TikTok Inc. has formed a special-purpose subsidiary, TikTok U.S. Data Security Inc., to oversee U.S. user data and the U.S. platform.  SER-231.  TikTok has also partnered with Oracle Corporation, a prominent U.S. provider of cloud-based services, to route TikTok U.S. user traffic to the Oracle cloud and other secure data infrastructure in the United States.  SER-231-32.  More than $1.5 billion has been spent on this initiative to date.  SER-231.

### C.    Montana Bans TikTok.

On May 4, 2023, the Montana Legislature passed the TikTok Ban.  ER-10. The Ban imposes a $10,000 penalty on TikTok Inc. and mobile application stores for each "discrete violation" of the statute, defined as each time "a user accesses tiktok, is offered the ability to access tiktok, or is offered the ability to download tiktok" in the state.  S.B. 419 §§ 1(2), 1(7)(a).  The Ban imposes an additional $10,000 penalty "each day thereafter that the violation continues."  *Id.* § 1(2).  The Ban becomes

5

"void" if TikTok is "acquired or sold to a company that is not incorporated in any other country designated as a foreign adversary in 15 C.F.R. 7.4."[1]  *Id.* § 4.

The statute's preamble offers two purported justifications for the Ban.  First, it asserts a national security rationale: TikTok Inc. "is a wholly owned subsidiary of ByteDance, a Chinese corporation" that allegedly "gathers significant information from its users, accessing data against their will to share with the People's Republic of China" and enables "the Chinese Communist Party" ("CCP") to "conduct corporate and international espionage in Montana." *Id.*, Preamble.  Second, the Ban asserts a rationale related to the safety of minors: TikTok "fails to remove, and may even promote, dangerous content that directs minors to engage in dangerous activities." *Id.*

The Ban's proponents in the Legislature echoed these rationales, describing TikTok as "the perfect tool for mass surveillance, political interference and influence operations" by the Chinese government, "a powerful propaganda tool," and "the music played by the Pied Piper to steal this generation's heart and mind."  SER-259-60, 286.

After the Legislature passed the Ban, Montana Governor Greg Gianforte acknowledged "technical and legal concerns" with the legislation and suggested that

---

[1] Section 4 of the Ban appears to incorrectly assume that TikTok is owned by a Chinese-incorporated company.  In fact, TikTok Inc.'s ultimate parent company ByteDance Ltd. is incorporated in the Cayman Islands.  SER-218.

certain changes be made to address these legal deficiencies.  SER-242.  The Legislature did not, however, adopt those changes.  On May 17, 2023, the Governor signed the Ban into law.

### D.    The District Court Preliminarily Enjoins the TikTok Ban.

Shortly after the Ban was enacted, TikTok Inc., as well as a group of Montanans who create and share content on the platform ("Creators") (collectively, "Plaintiffs"), sued to enjoin the Ban.  After Plaintiffs in both cases moved for preliminary injunctions, the suits were consolidated.

On November 30, 2023, after the State took expedited discovery, the District Court preliminarily enjoined the Ban, concluding that it likely violates the First Amendment, is preempted by federal law, and violates the Commerce Clause.  ER-13.  The District Court found that Plaintiffs would be irreparably harmed absent an injunction and that the balance of equities and the public interest support an injunction.  ER-47-50.

The District Court rejected the State's argument that the First Amendment is not implicated by the Ban, finding that the legislation is, "at the very least," a "regulation of expressive conduct that triggers intermediate scrutiny."  ER-17, ER-21.  Applying intermediate scrutiny, the District Court concluded that the Ban fails to advance an important state interest because (1) its first stated interest of national security is not a valid *state* interest, and (2) the State abandoned any argument that

7

the Ban was necessary to serve its second stated interest in the safety of minors.  ER-24-27.  The District Court also rejected the State's "attempts to persuade that its actual interest in passing this bill is consumer protection," as the State "has yet to provide any evidence to support that argument."  ER-27.

The District Court further concluded that, even accepting the State's purported consumer protection rationale, the Ban likely still fails intermediate scrutiny because it is not narrowly tailored and does not leave open ample alternative channels of communication.  ER-29-32.  As to tailoring, the District Court reasoned that the Ban burdens substantially more speech than necessary because, rather than limiting TikTok in any "targeted way," it eliminates TikTok "completely."  ER-29.  The District Court explained that there was no evidence that a ban would alleviate any of the State's professed concerns because other online platforms collect similar data, and there are many ways in which a foreign adversary like China can access that data.  ER-30.  As to alternative channels, the District Court found that TikTok provides its users with a way to communicate with their audiences "that they cannot get elsewhere on the Internet."  ER-33.

The District Court next found that the Ban is "most likely preempted by federal law."  ER-34.  The District Court first concluded that the Ban is likely preempted under the foreign affairs doctrine because it does not regulate an area of traditional state responsibility, but instead "interprets the United States' current

8

foreign policy interests and intrudes on them." ER-41.  The District Court also concluded that the Ban is likely preempted because it conflicts with Section 721 of the Defense Production Act ("DPA"), 50 U.S.C. § 4565, which establishes the Committee on Foreign Investment in the United States ("CFIUS"), and that it could interfere with CFIUS's negotiations over its national security concerns. ER-43.  The District Court found it unlikely, however, that the Ban was separately preempted by the International Emergency Economic Powers Act.  ER-43-44.

The District Court also concluded that the Ban likely violates the Commerce Clause.  ER-45-47.  The District Court first found that the Ban would burden interstate commerce and the State had not provided "any evidentiary support" for the Ban's purported local benefits.  ER-47.  The District Court also concluded that the Ban likely discriminates against foreign commerce because the Ban is voided if TikTok is sold to a company not incorporated in a country designated as a foreign adversary. *Id.*

Finally, the District Court concluded that, after weighing the evidence and argument presented by both sides, enforcement of the Ban would irreparably harm Plaintiffs, and the balance of equities and the public interest supported enjoining the Ban during this litigation.  ER-47-51.

On April 24, 2024, the President signed into law the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H (the

9

"Federal Ban"), which forbids the hosting or distribution of TikTok within the United States unless the President determines that a "qualified divestiture" of TikTok is executed. TikTok Inc. intends to challenge the constitutionality of the Federal Ban in the U.S. Court of Appeals for the D.C. Circuit, which has exclusive jurisdiction over such challenges.

## SUMMARY OF THE ARGUMENT

The District Court did not abuse its discretion in preliminarily enjoining the TikTok Ban.

1.  The TikTok Ban violates the First Amendment because it shuts down a popular platform for speech used by TikTok Inc. and several hundred thousand Montanans to express themselves and communicate. The Ban is a regulation of speech. The Ban prohibits TikTok Inc. from (1) using the platform to speak with Montana TikTok users and (2) exercising editorial discretion to present a compilation of content in Montana. By banning TikTok, the State is necessarily banning the *speech* on TikTok. To the extent the "operation of tiktok" is considered conduct, not speech, it is inherently expressive.

The TikTok Ban is subject to strict scrutiny because it singles out TikTok for content- and viewpoint-based reasons and enacts a prior restraint on speech. As the District Court observed, one of the Ban's *stated justifications* is that TikTok Inc. purportedly fails to remove "dangerous content" from the platform. And by its

10

terms, the Ban does not limit only the time, place, or manner of protected expressive activity—it bans the activity altogether, and therefore is subject to strict scrutiny.

Whatever level of scrutiny applies, the TikTok Ban violates the First Amendment. The Ban fails to advance a compelling or significant state interest. As the District Court found, the State's two stated interests in banning TikTok are preventing Chinese espionage and protecting minors from dangerous content. The District Court correctly concluded that national security is not a valid *state* interest, and the State has abandoned its stated interest to protect minors. The State attempts to recast the Ban as a consumer-protection measure, but as the District Court recognized, the Ban's text and legislative history show that its aim was not to protect Montanans in their capacity as consumers, but to meddle in foreign policy. The State cannot defend the Ban with a post-hoc justification created for litigation.

The Ban also is not narrowly tailored, let alone the least restrictive means to achieve a compelling state interest. The State could have used a range of less restrictive alternatives to advance its alleged data security concerns, such as generally applicable data privacy laws. And the Ban is under-inclusive and thus not narrowly tailored because the data security issues the Ban purports to address are industry-wide concerns.

Because the Ban forecloses an entire medium of expression, it fails to leave open ample alternative channels of communication.

11

The TikTok Ban independently violates the First Amendment because it is facially overbroad, burdening not only Plaintiffs' First Amendment rights, but also those of several hundred thousand TikTok users in Montana and millions of TikTok users outside the state who would be deprived of the right to communicate with Montana TikTok users.

2.  The TikTok Ban is preempted by federal law because it intrudes on the federal government's exclusive authority over foreign affairs and conflicts with federal law.

While the State contends that the purpose of the Ban is to protect consumers, the District Court correctly found that the Ban's text, findings, and legislative history make clear that the State's real purpose was to regulate foreign affairs.  The Ban both expresses dissatisfaction with the federal government's resolution of the State's foreign-policy concerns and compromises the federal government's flexibility to calibrate foreign policy for the nation as a whole.

The Ban also conflicts with federal law.  The Ban undermines the federal government's authority in negotiations with TikTok Inc. to address the same purported national security concerns reflected in the Ban.

3.  The District Court correctly concluded that the TikTok Ban likely violates the Commerce Clause in two ways.

First, the Ban discriminates against foreign commerce because it would allow TikTok to operate in Montana if it is sold to a buyer not incorporated in an "adversary" country.  That discrimination is unconstitutional because regulating foreign affairs is not a legitimate state interest, and Montana could have enacted less burdensome legislation—such as prohibiting all platforms from engaging in the harmful data practices with which the State was purportedly concerned.

The Ban also unduly burdens interstate commerce because it would require a sale of TikTok or require TikTok to collect *more* data, such as GPS information, from *all* U.S. users to determine which users are in Montana at any given point in time.

4.  As the District Court found, if the TikTok Ban is allowed to take effect, it will irreparably harm TikTok Inc. by infringing on its First Amendment rights, decimating its user base in Montana, and damaging its reputation and goodwill.  And because the Ban is unconstitutional, the balance of equities and the public interest tip sharply in favor of a preliminary injunction.

## STANDARD OF REVIEW

A preliminary injunction is warranted when the moving party shows (l) a likelihood of success on the merits; (2) it will suffer irreparable harm absent preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction is in the public interest.  *See Winter v. NRDC*, 555 U.S. 7, 20 (2008).  Under this Court's "serious questions" test, "when the balance of hardships tips

sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022).

While it is the moving party's burden to establish a likelihood of success on the merits, the government "bears the burden of justifying [a] speech-restrictive law." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (quotation omitted). Thus, in the First Amendment context, "the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Id.*

This Court reviews a district court's grant of a preliminary injunction for abuse of discretion, *see Tucson v. City of Seattle*, 91 F.4th 1318, 1324 (9th Cir. 2024), employing a two-part test: "first, determining whether the trial court identified the correct legal rule to apply to the requested relief and second, determining whether the court's application of that rule was illogical, implausible, or without support from inferences that may be drawn from facts in the record," *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 635 (9th Cir. 2015). The Court's review of factual findings is "restricted to the record available to the district court when it granted or denied the injunction motion." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (quotation marks omitted).

## ARGUMENT

### I.   PLAINTIFF IS LIKELY TO SUCCEED ON ITS FIRST AMENDMENT CLAIM.

#### A.   The TikTok Ban Is Subject to First Amendment Scrutiny.

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more" without government interference. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). This right extends to a wide variety of privately owned and operated means of communication. *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) (cable television operators); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 500-03 (1981) (billboards); *Minneapolis Star v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581-82 (1983) (newspapers); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211-12 (1975) (movie theaters); *City of Ladue*, 512 U.S. 43, 48 (1994) (yard signs). And "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham*, 582 U.S. at 104 (quoting *Reno v. Am. C.L. Union*, 521 U.S. 844, 868 (1997)).

As the District Court correctly concluded, the TikTok Ban violates these bedrock principles, "banning a 'means of expression' used by over 300,000

Montanans." ER-16 (citing *Minneapolis Star*, 460 U.S. at 582-83). While the State argues that the Ban does not implicate the First Amendment at all, the TikTok Ban regulates TikTok Inc.'s speech in at least two ways.

*First*, the Ban prohibits TikTok Inc. from using the platform to communicate with a specific audience of its choosing: Montana TikTok users. *See Thunder Studios v. Kazal*, 13 F.4th 736, 745 (9th Cir. 2021) (tweets "fall squarely within the protection of the First Amendment"); *Galvin v. Hay*, 374 F.3d 739, 752 (9th Cir. 2004) (recognizing a "strong First Amendment interest" in "reach[ing] a particular audience"). The State does not address—let alone dispute—that TikTok Inc. has a First Amendment right to post content on the platform to communicate with Montana users. For this reason alone, the TikTok Ban must satisfy First Amendment scrutiny.

*Second*, the Ban prohibits TikTok Inc. from exercising in Montana its constitutionally protected right to editorial discretion by presenting to each user a compilation of content on the platform. *See, e.g.*, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("choice of material" to recommend or forbid "constitute[s] the exercise of editorial control and judgment" protected by the First Amendment); *Hurley v. Irish-Am. Grp.*, 515 U.S. 557, 569-70 (1995) (similar). The State argues that the Supreme Court has never recognized "editorial discretion" as a freestanding category of First Amendment-protected expression. State Br. 30 (citing

16

*NetChoice, LLC v. Paxton*, 49 F.4th 439, 465 (5th Cir. 2023)).[2]  That is wrong: the Supreme Court has repeatedly recognized that when an entity "exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (citing *Turner*, 512 U.S. at 636).  In other words, "the editorial function itself is an aspect of 'speech.'"  *Denver Area Educ. Telecomms. v. FCC*, 518 U.S. 727, 737 (1996) (plurality op.) (citation omitted).

As the District Court correctly concluded, ER-17, this right includes the ability to "present[] an edited compilation of speech generated by other persons," *Hurley*, 515 U.S. at 569-70—such as in newspapers' op-ed pages, *Miami Herald*, 418 U.S. at 258; bookstores, *Smith v. California*, 361 U.S. 147, 150 (1959); and "community bulletin boards," *Manhattan Cmty Access Corp. v. Halleck*, 587 U.S. 802, 812 (2019).  These protections are not diminished because TikTok uses "automated moderation"—as well as human moderation—to filter certain content. State Br. 30.  These moderation procedures are themselves an expression of TikTok

[2] The Fifth Circuit's decision in *Paxton* (which is currently on review before the Supreme Court) does not change this conclusion.  The Fifth Circuit found that Texas's law regulating online platforms' editorial discretion "protects Texans' ability to freely express a diverse set of opinions through one of the most important communications mediums used in that State.  And it leaves the Platforms free to similarly opine:  They can still say whatever they want …."  49 F.4th at 454.  The TikTok Ban, by contrast, *eliminates* Montanans' and TikTok Inc.'s ability to do the same.

Inc.'s editorial judgment of what content to allow on the platform. *See, e.g.*, *Miami Herald*, 418 U.S. at 258.

The State insists that the TikTok Ban is immune from First Amendment scrutiny because it is a "consumer protection" measure that regulates conduct, not speech. State Br. 24-25. As an initial matter, the District Court correctly rejected the State's portrayal of the Ban as a consumer protection law, and this Court should defer to that finding. ER-5; *see infra* at 29-31 (explaining why the Ban is not a consumer protection law). In any event, *all* state laws that regulate speech must face First Amendment scrutiny—even those meant to protect consumers. *See, e.g.*, *Pac. Coast Horseshoeing Co. v. Kirchmeyer*, 961 F.3d 1062, 1068-69 (9th Cir. 2020) (First Amendment applies to "consumer-protection provision"). The TikTok Ban is no different.

More fundamentally, the State is wrong that the Ban regulates only conduct, not speech. The Ban prohibits TikTok from operating anywhere in the state. And by banning TikTok, the State is necessarily banning the *speech* on TikTok—indeed, the whole point of using TikTok is for expression. The State cannot get around this reality by simply characterizing the operation of TikTok as "conduct." As this Court has explained, "[a]lthough writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation." *Anderson v. City of Hermosa Beach*, 621 F.3d

18

1051, 1061-62 (9th Cir. 2010).  The same is true of the State's efforts to separate the TikTok platform from the speech communicated on it.  Taken to its logical conclusion, the State's conception of "conduct" would treat a ban on publishing a particular, disfavored newspaper as a regulation of conduct, not speech.  That is not the law—and the State cites nothing to suggest that it is.

Even if the Ban did target only *conduct*, not speech, it still would trigger First Amendment scrutiny because it targets *expressive* conduct.  *See* State Br. 19 (quoting *Arcara v. Cloud Books, Inc*., 478 U.S. 697, 706-07 (1986)).  The conduct regulated by the Ban—*i.e.*, the "operation of tiktok"—is inherently expressive because, as discussed, *supra* at 16-18, it allows TikTok Inc. to communicate with its users and to engage in editorial activities on the platform.  The Ban also "has the inevitable effect of singling out those engaged in expressive activity," which independently triggers First Amendment scrutiny.  State Br. 18-19 (quoting *Arcara*, 478 U.S. at 706-07).  Indeed, the effects of the Ban will be felt almost exclusively by those engaged in expressive activities:  Plaintiffs and other TikTok users.  Regardless of whether the Ban was intended to suppress speech, it has the "inevitable effect" of doing so, *Arcara*, 478 U.S. at 707, and therefore is subject to First Amendment scrutiny.  *See Kirchmeyer*, 961 F.3d at 1069 ("courts must consider a restriction's practical effects in determining whether it implicates speech").

19

The State seeks to avoid this conclusion through a strained analogy to *Arcara*—an argument the District Court correctly rejected. State Br. 26; ER-16. *Arcara* concerned a "public health regulation of general application," which allowed New York State to temporarily close buildings used for prostitution. Under this regulation, New York closed a bookstore after an investigation revealed "instances of [prostitution]" in the building. *Arcara*, 478 U.S. at 699, 707. Unlike the Ban, which regulates inherently expressive conduct (*i.e.*, the "operation of tiktok"), the law in *Arcara* regulated prostitution in public buildings, conduct which "manifests absolutely no element of protected expression." *Id.* at 705. The law in *Arcara* did not "inevitably single out bookstores or others engaged in First Amendment protected activities for the imposition of its burden," *id.*, whereas the Ban applies *only* to TikTok, its users, and app stores that make TikTok available to Montanans. Finally, while the bookstore in *Arcara* "remain[ed] free to sell the same materials at another location," *id.*, the Ban does not permit TikTok Inc. to offer the platform elsewhere in the State, but instead shutters the platform statewide.[3]

---

[3] Subjecting the Ban to First Amendment scrutiny would not, as the State argues, prevent the State from banning "cancer-causing radio[s]." State Br. 27. A generally applicable law, like in *Arcara*, prohibiting dissemination of carcinogenic materials would likely be upheld because the prohibited conduct would be selling a cancer-causing product, not the offering of radio communications. And even if a ban on cancer-causing radios implicated First Amendment scrutiny, it would likely survive scrutiny if, as the State's hypothetical suggests, the government had evidence that the radios in fact caused cancer and other ways to address the public health danger were insufficient.

20

(34 of 138), Page 34 of 138   Case: 24-34, 04/29/2024, DktEntry: 28.1, Page 34 of 138

**B.     The TikTok Ban Is Subject to Strict Scrutiny.**

The Ban not only restricts an unprecedented amount of First Amendment activity, it does so based on content, speaker, and viewpoint, and it constitutes a prior restraint, each of which triggers strict scrutiny.

### 1.     *The Ban is content- and viewpoint-based.*

The Ban is subject to strict scrutiny because it singles out TikTok for content-based reasons. *See Wolfson v. Concannon*, 750 F.3d 1145, 1152-53 (9th Cir. 2014) (strict scrutiny applies to content-based restrictions). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Here, as the District Court observed, one of the Ban's *stated justifications* is that TikTok purportedly fails to remove "dangerous content" from the platform. ER-11. The State's argument that the TikTok Ban is "content neutral on its face," State Br. 39, is flatly inconsistent with this stated purpose. Even if the Ban could be considered "content neutral" because it bans not just dangerous content but "all speech on the platform," State Br. 39, the Ban nevertheless is subject to strict scrutiny because the Legislature justified the Ban based on its (unsupported) finding that TikTok tolerates or promotes such content. *Reed*, 576 U.S. at 166 ("[S]trict scrutiny applies either when a law is content based on its face or when the purpose and

21

justification for the law are content based").  And even though the State has not *defended* the Ban on content-based grounds, it plainly *enacted* the Ban because of the "dangerous content" the State believes "TikTok fails to remove, and may even promote."  ER-63.  That the State's briefing "highlights one goal (preventing the transmission of U.S. user data to China) … does not somehow erase the second goal (preventing the dissemination of [dangerous content]) previously emphasized by the" Legislature.  *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 106 (D.D.C. 2020).

The legislative record makes clear that the Ban targets TikTok because it purportedly promotes content favorable to China.  SER-259-60.  "A regulation engages in viewpoint discrimination when it regulates speech based on the specific motivating ideology or perspective of the speaker."  *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017) (quotation marks omitted).  Because the Ban targets TikTok for the opinions it purportedly promotes, the Ban is viewpoint-based and subject to strict scrutiny.  *See Rosenberger v. Rector*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is … an egregious form of content discrimination.").

## 2.    *The Ban is speaker-based.*

Even disregarding Montana's content- and viewpoint-based justifications for banning TikTok, the Ban is subject to strict scrutiny because it singles out TikTok for disfavored treatment.  "[S]peaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own.'"  *Nat'l Inst.*

*of Fam. and Life Advocs. v. Becerra*, 585 U.S. 755, 778 (2018) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)). And such laws present very real "dangers of suppression and manipulation" of protected speech and risk "distort[ing] the market [of] ideas." *Turner*, 512 U.S. at 660-61. Accordingly, "when the government regulates who may speak or what we may say—then the law is ordinarily reviewed under strict scrutiny." *Kirchmeyer*, 961 F.3d at 1068 (quotation marks omitted).

The TikTok Ban facially "distinguish[es] among different speakers," banning TikTok—and only TikTok—from the state. *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Accordingly, the TikTok Ban is "presumptively unconstitutional," *Minneapolis Star*, 460 U.S. at 585, and subject to strict scrutiny, *Arkansas Writers' Project v. Ragland*, 481 U.S. 221, 228 (1987).

The State's assertion that "[n]othing in the record suggests that SB419 singles out TikTok as a pretext to suppress its First Amendment protected activities," State Br. 34, is both irrelevant and incorrect. The Supreme Court applies strict scrutiny to discriminatory regulations that burden select speakers "even where … there is no evidence of an improper censorial motive." *Arkansas Writers' Project*, 481 U.S. at 228. And in any event, the Ban's findings and history make clear the State intended to target TikTok Inc. in light of its First Amendment protected activities: the findings criticize TikTok for its alleged promotion of dangerous content, and proponents of

23

the Ban declared the platform "'the perfect tool for … political interference and influence operations'" by the CCP, as well as "a powerful propaganda tool," and "the music played by the Pied Piper to steal this generation's heart and mind." SER-259-60, 286.

### 3. The Ban is a prior restraint.

The TikTok Ban is subject to strict scrutiny because it is a prior restraint on speech—"the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The Supreme Court has "consistently" recognized in a "long line" of cases that laws that "deny use of a forum in advance of actual expression" are prior restraints. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

The protection against prior restraints bars not only licensing schemes, but extends to all restrictions that "stifle[] speech before it can take place." *Cuviello v. City of Vallejo*, 944 F.3d 816, 831 (9th Cir. 2019). For example, in *Near v. Minnesota*, 283 U.S. 697 (1931), the Supreme Court invalidated a Minnesota statute that authorized injunctions against the publication of defamatory newspapers. As the Court explained, the object of a prior restraint "is not punishment, in the ordinary sense, but suppression of the offending" expression; "[t]his suppression is accomplished by enjoining publication, and that restraint is the object and effect" of the prior restraint. *Id.* at 711-12; *see Pittsburgh Press Co. v. Pittsburgh Comm'n on*

24

*Hum. Relations*, 413 U.S. 376, 389-90 (1973) ("[P]rotection against prior restraint at common law barred only a system of administrative censorship…. [T]he Court boldly stepped beyond this narrow doctrine in *Near*").

Here, the Ban effects a total ban on speech on TikTok platform, preventing TikTok Inc. and hundreds of thousands of Montanans who use the platform from engaging in protected speech before that speech occurs. *See, e.g.*, *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235-36 (7th Cir. 2015) (restricting operation of website is prior restraint); *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 418-19 (1971) (injunction against distributing leaflets is prior restraint); *U.S. WeChat Users All. v. Trump*, 488 F. Supp. 3d 912, 926-28 (N.D. Cal. 2020) (ban on communications app likely a prior restraint).[4]

The District Court nonetheless concluded that the Ban is not a prior restraint because Montana TikTok users—even if cut off from TikTok—might be able to use other Internet-based platforms to communicate. ER-23. But the question of whether a speech restriction is a prior restraint does not turn on the availability of alternative channels of communication. Numerous courts have concluded that speech

---

[4] The State does not address TikTok Inc.'s argument that the Ban represents a prior restraint. Instead, the State maintains that the issue is not before this Court because the District Court rejected the argument and Plaintiffs did not cross-appeal. State Br. 24-25 n.29. But a cross-appeal is unnecessary for arguments—like this one— that "support the judgment as entered," even when "the argument being raised has been explicitly rejected by the district court." *D.O. By & Through Walker v. Escondido Union Sch. Dist.*, 59 F.4th 394, 407 (9th Cir. 2023).

restrictions that leave open other avenues for speech are nonetheless prior restraints. *See Se. Promotions*, 420 U.S. at 556 (denial of application to perform in theater was prior restraint regardless of alternative venues); *Bantam Books Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (law was prior restraint even though publishers could distribute through other means); *see also Real v. City of Long Beach*, 852 F.3d 929, 935 (9th Cir. 2017) ("An outright prohibition is not required to bring a prior restraint claim."). And even if this were relevant, and even if Montana TikTok users had adequate alternative means to communicate—which, as discussed *infra* at 35-38, they do not—the District Court overlooked that the Ban also cuts off *TikTok Inc.'s* right to engage in editorial activities in Montana—rights it cannot exercise elsewhere. This ban on TikTok Inc.'s speech activities in Montana is thus a prior restraint.

### 4.   *The Ban is not merely a time, place, or manner restriction.*

The State asserts that the District Court "held that intermediate scrutiny applied" because "SB419 could be considered a 'time, place, or manner' restriction." State Br. 41.  But the District Court in fact found it "unnecessary" to decide that question because the Ban "is, at the very least, a regulation of expressive conduct that triggers intermediate scrutiny."  ER-21.  In any event, Montana does not seek to restrict only when, where, or how TikTok Inc. may speak; instead, it "attempts to ban [TikTok] generally" and "to ban it everywhere in [Montana]."  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 295 (1984) (restriction on camping in park

26

was time, place, or manner restriction because government "neither attempts to ban sleeping generally nor to ban it everywhere in the parks").

The State is wrong that *United States v. O'Brien*, 391 U.S. 367 (1968), applies here.  State Br. 34.  The intermediate scrutiny standard[5] articulated in *O'Brien* applies to "regulations that have only an incidental effect on protected speech," *Green v. Miss USA LLC*, 52 F.4th 773, 790 (9th Cir. 2022) (quotation marks omitted), such as *O'Brien*'s prohibition on destroying draft cards, which "only incidentally affects those who happen to use a violation of that law as a symbol of protest," *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000).  By contrast, and as the District Court correctly found, the TikTok Ban "'directly and immediately affects' First Amendment rights" because banning TikTok—a platform for expression—"directly implicates speech."  ER-20 (citing *Dale*, 530 U.S. at 659).  Taken to its logical conclusion, the State's argument would allow it to ban the distribution of Fox News or *The New York Times* in Montana and call the impact on speech "incidental."  There is no doubt that such a law would be subject to the most exacting level of scrutiny. *See Near*, 283 U.S. at 720 ("Characterizing the publication as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint.").  The same is true for the State's Ban here.

_____

[5] As the State acknowledges, the *O'Brien* test is "nearly identical" to intermediate scrutiny.  State Br. 19; *see also Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 428 n.23 (9th Cir. 2008) (similar).

C.      **The Ban Fails Both Strict and Intermediate Scrutiny.**

Regardless of which tier of scrutiny applies, the TikTok Ban violates the First Amendment.  Under strict scrutiny, a restriction on speech must be narrowly tailored to promote a compelling government interest and be the least restrictive means of achieving that interest.  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021).  Intermediate scrutiny requires a speech restriction to be "narrowly tailored to serve a significant governmental interest" and "leave[] open ample alternative channels for communication."  *Anderson*, 621 F.3d at 1064-65 (cleaned up).  The TikTok Ban fails both levels of scrutiny because it fails to serve a compelling or significant state interest, is not narrowly tailored—let alone the least restrictive alternative to achieve its purported objectives—and does not leave open ample alternative channels of communication.

1.      *The Ban does not further a compelling or significant state interest.*

The legislative findings identify the two interests purportedly served by the Ban: (1) "a national security interest of protecting Montanans from Chinese corporate and business espionage"; and (2) "a public interest of protecting Montana youth from dangerous content on TikTok."  ER-24.  The State does not argue that either of these interests are sufficient under the First Amendment.  Nor could it. National security is not a valid *state* interest.  *See Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) (federal government's national security authority should "be left entirely

28

free from local interference"); *see also infra* at 40.  And while the State may have a cognizable interest in protecting minors, the Ban would necessarily fail narrow tailoring analysis under this rationale, as have many other overbroad laws seeking to regulate speech for *all* people in an effort to protect minors.  *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 875 (1997) ("[i]t is true that we have repeatedly recognized the governmental interest in protecting children from harmful materials," but "that interest does not justify an unnecessarily broad suppression of speech addressed to adults") (internal citation omitted); *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 128 (1989) (same).

Instead, the State seeks to recast the Ban as a garden-variety consumer protection law, referring to the law's purported "consumer protection" purpose more than thirty times in its opening brief.  State Br. At 2.  But unlike other laws subject to rational basis review, speech-restrictive laws subject to strict or intermediate scrutiny must be supported by the bases upon which the legislature *actually relied*. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) ("Government justification[s] for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation.") (citation omitted); *Edenfield v. Fane*, 507 U.S. 761, 768 (1993) (similar).  Because the Legislature did not ground the TikTok Ban in a consumer protection rationale, the State cannot now defend the Ban on that basis.  ER-40 (rejecting State's "attempt[] to persuade" that

29

Ban had consumer protection purpose due to total lack of evidence "to support that argument").

As the District Court recognized, the Ban has all the hallmarks of a law regulating foreign policy, not consumer protection—a finding to which this Court should defer. *See May v. Cooperman*, 780 F.2d 240, 252 (3d Cir. 1985) (deferring to district court's finding that statute "had a religious and not a secular purpose"). The words "consumer" and "protection" appear nowhere in the Ban.  By contrast, the Ban's legislative findings expressly declare China an "adversary" of the United States and TikTok a "tool" of that adversary, allegedly used to conduct "corporate and international espionage."  S.B. 419, Preamble; *see* ER-40 ("[F]rom the very first line of the bill, the Legislature makes a distinct foreign policy statement[.]").

That the State might in some sense have sought to "protect" Montanans in banning TikTok does not make it a consumer protection law, any more than a defense spending appropriation is a consumer protection law simply because it was enacted to protect Americans.  Moreover, consumer protection laws protect people from harms they face *in their capacity as consumers—e.g.*, commercial misrepresentations, hazardous products, and other unfair trade practices.  Montana has just such a law.  *See* Mont. Code Ann. § 30-14-103 (prohibiting "[u]nfair methods of competition and unfair or deceptive acts or practices").  The Ban, however, does not protect consumers from those types of harms.  Instead, its stated

30

goal is to prevent a foreign power from using TikTok to engage in hostile state action. Those concerns are the province of foreign policy, not state consumer protection law.

The Ban's legislative history confirms the State's foreign policy purpose.  For example, at a legislative hearing on the bill, Attorney General Knudsen, whose office drafted the bill, ER-20, argued that banning TikTok was necessary because "[China] see[s] a war with the United States as inevitable, and they're using TikTok as an initial salvo into that war."  ER-73.  The Ban's chief proponent in the House likewise argued that "TikTok is a national security threat" and urged his colleagues to "stand up to the Chinese and ban TikTok."  SER-244-45.

The State's citations to the legislative record are not to the contrary.  For example, the State points to Senator Shelley Vance's statements that "TikTok's parent company, ByteDance, is operating as a surveillance arm of the [CCP] and gathers information about Americans against their will or unknown to them."  State Br. 13.  But those statements merely emphasize that Montana banned TikTok because of its purported connection to the Chinese government and its supposed surveillance operations.

The State thus has it backwards when it argues that the District Court "recast[]" its consumer protection interest as one of foreign policy.  State Br. 43. Montana's "stated goals," *Jacobs*, 526 F.3d at 435, are the ones *stated in the legislation*, not the ones "invented post-hoc in response to litigation," *Bremerton*,

597 U.S. at 543 n.8.  The District Court had no obligation to "credit[]" that post hoc rationalization, as the State suggests.  State Br. 2.

Furthermore, even accepting the State's purported consumer protection purpose, the State still needs to show that the supposed harms to consumers "are real, not merely conjectural, and that the [Ban] will in fact alleviate these harms in a direct and material way."  *Turner*, 512 U.S. at 664.  Even after taking expedited discovery from TikTok Inc. in this case, Dkt 112, the State has been unable to point to any evidence to substantiate its assertion of harm.  Instead, the State relies on unconfirmed allegations in selected news articles that are plainly insufficient to substantiate the harms asserted by the State.  State Br. 5-12; *see FEC v. Cruz*, 596 U.S. 289, 307 (2022) ("handful of media reports and anecdotes" insufficient to justify speech restrictions); *Klein v. City of San Clemente*, 584 F.3d 1196, 1202 (9th Cir. 2009) (similar).  Furthermore, the State offers no evidence that the legislature even considered these articles in enacting the TikTok Ban—in fact, some of the articles post-date the Ban's enactment.[6]

For example, the State repeatedly claims that TikTok permits "at-will CCP access" to user data, State Br. 5, 25, 27, 29, 35, 47, 52, but its "evidence" comes

---

[6] The State's reliance on extra-record articles and allegations is improper.  State Br. 11-12.  *See Rudin v. Myles*, 781 F.3d 1043, 1057 n.18 (9th Cir. 2015) ("As a general rule, documents not filed with the district court cannot be made part of the record on appeal.").

from news articles reporting on unproven allegations in an employment lawsuit filed by a former ByteDance employee who left the company in 2018 and did not even work on the TikTok platform.  State Br. 25.  These unsubstantiated allegations would not suffice to justify a ban on speech in 2018, let alone six years later, following TikTok's multi-billion-dollar initiative to protect U.S. user data.  *See Edwards v. District of Columbia*, 755 F.3d 996, 1004 (D.C. Cir. 2014) ("Current burdens demand contemporary evidence.").

As the District Court observed, the State's unproven allegations of consumer harm stand in stark contrast to the "sworn affidavits by a TikTok executive and its data privacy experts."  ER-37.  Those unrebutted record materials detail TikTok's "robust system of controls to mitigate data security risks."  SER-202-03; *see also* SER-230-32.  Because the State "spins a web of speculation"—"not facts or evidence"—it thus "has not justified its intrusion on protected speech."  *Junior Sports Mags., Inc. v. Bonta*, 80 F.4th 1109, 1119 (9th Cir. 2023).

### 2.     *The Ban is not narrowly tailored.*

Even if the State's purported consumer protection interest were substantial or compelling (which it is not), the TikTok Ban would still fail First Amendment scrutiny because it is not narrowly tailored—let alone the least restrictive means of advancing that interest (as required by strict scrutiny).  *See McCullen v. Coakley*,

33

573 U.S. 464, 486 (2014); *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 816 (2000).

As to the State's purported national security concerns, the Ban is overinclusive because "the State has not explored, or even considered," a less restrictive means— short of a total ban—to address its concerns. *IMDb.com v. Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020). For example, the State could restrict the kinds of data companies may collect from Montanans, prevent companies from providing data to certain third parties, or impose other security and data access requirements. As the District Court highlighted, the Montana Data Privacy Act—enacted the same week as the TikTok Ban—is just the type of generally applicable law that could further the State's aims.[7] ER-5. Alternatively, the State could require heightened data security protections for the "public officials, journalists, and other individuals adverse to the [CCP]'s interests" whom the Ban identifies as high-risk users, rather than applying the Ban to every person who lives in, travels to, or passes through Montana. Even if any of these measures singled out TikTok in particular, that would raise legal concerns of its own but would nonetheless be a more tailored measure than the Ban. Without "point[ing] to *any* evidence demonstrating that less restrictive measures

---

[7] The State argues that its Data Privacy Act does not address the State's purported concerns with TikTok. State Br. 46-47. But the point is not that the Montana Data Privacy Act is a substitute for the Ban. Instead, it shows that the State could have enacted a generally applicable law to pursue a narrowly tailored means of advancing its purported consumer protection interest, and, if its Data Privacy Act is insufficient, could have expanded it to address that interest.

34

would not be effective," the State "cannot meet its burden" under strict scrutiny. *IMDb.com*, 962 F.3d at 1126.  ER-5.

The Ban separately fails narrow tailoring because it is fatally underinclusive. *See Nat'l Inst. of Fam. and Life Advocs.*, 585 U.S. at 774.  The data security issues cited by the State—such as unauthorized misuse of data by corporate insiders—are an "industry-wide issue," SER-203-05, yet the Ban targets TikTok alone.  The District Court did not clearly err in finding that there are many other ways in which a foreign country like China can gather data from Montanans, such as buying information from data brokers, conducting open-source intelligence gathering, and hacking servers.  ER-31; *see* SER-201-02.  The Ban, however, targets TikTok alone and does not seek to address any of those other methods.  As the District Court thus correctly concluded, "it is not clear how [the Ban] will alleviate the potential harm of protecting Montanans from China's purported evils."  ER-31.  That under-inclusiveness is "alone enough" to invalidate the Ban.  *Brown v. Ent. Merch.'s Ass'n*, 564 U.S. 786, 801-02; *IMDb.com*, 962 F.3d at 1126-27.

> ### 3.   The Ban fails to leave open ample alternative channels of communication.

If the Ban were subject to intermediate scrutiny, it would fail for the independent reason that it does not leave open "ample alternative channels of communication."  *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989).  First, TikTok Inc. would have no alternative means to exercise its protected right to

editorial discretion in the state.  Second, the Ban would "foreclose an entire medium of expression" used by hundreds of thousands of Montanans, some of whom depend on it for their livelihoods and who have attested that other platforms would be an inadequate substitute for TikTok.  *City of Ladue*, 512 U.S. at 55.  A "long line of Supreme Court cases indicates that such laws [that foreclose an entire medium] are almost *never* reasonable."  *Anderson*, 621 F.3d at 1064 (collecting cases).  The TikTok Ban is no different.

The State argues that the TikTok Ban nevertheless is constitutional because the relevant "medium of expression" here is the Internet *writ large* and the Ban does not prohibit individuals in Montana from speaking elsewhere online.  State Br. 45-46.  But the State cannot save the Ban by offering an overbroad definition of the "medium of expression."  In *City of Ladue*, for example, the Supreme Court invalidated a ban on residential yard signs.  Even though the ban left residents "free to convey their desired messages by other means, such as hand-held signs, letters, handbills, flyers, telephone calls, newspaper advertisements, bumper stickers, speeches, and neighborhood or community meetings," residential yard signs were an important medium of expression because they better enabled residents to communicate with their neighbors—"an audience that could not be reached nearly as well by other means."  512 U.S. at 56-57 (emphasis omitted).  *Cit of Ladue* did not, as the State's logic would suggest, uphold the yard sign ban by defining the

36

relevant medium of expression broadly to include, for example, all speech of any kind in a neighborhood, or any use of expressive images, whether or not printed on a sign and whether or not placed in a yard.

Instead, "*Ladue* teaches that in evaluating the adequacy of substitutes, the court must look to the unique communicative importance of the foreclosed medium in relation to the individual speaker." *Ctr. For Bio-Ethical Reform v. Honolulu*, 455 F.3d 910, 924 (9th Cir. 2006). TikTok's unique design and functionality have made it extremely popular and extremely important to its users. SER-221-22. Through the TikTok platform, TikTok Inc. and its users can better communicate with a large and distinct audience—other TikTok users—and the Creators have explained why communicating with that audience through TikTok is so important to their livelihoods, *see* ER-53-54, 60-61; SER-163, 171-72.

The TikTok Ban is thus nothing like a school-uniform policy. *See* State Br. 45 (citing *Jacobs*, 426 F.3d at 437). For one thing, more limited First Amendment protections apply in public schools. *See Mahoney Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187-88 (2021). And, in any event, a dress code is not nearly as burdensome as being cut off from a national platform for speech used by more than 150 million Americans. The students in *Jacobs* could express themselves to the same population of fellow students in ways other than through their clothing choices. *See* 426 F.3d at 437. The Ban, by contrast, *completely* bars TikTok Inc. from speaking to Montana

37

TikTok users or exercising its editorial rights in the State, without an available alternative.

### D.   The TikTok Ban Is Facially Overbroad.

The Ban independently violates the First Amendment because it is facially overbroad.  A statute is unconstitutionally "overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted).

The TikTok Ban is a classic case of overbreadth.  If it took effect, it would infringe not only on the First Amendment rights of Plaintiffs, but also the rights of more than *300,000* Montanans who use TikTok each month—as well as the millions of TikTok users outside the State who would be deprived of the right to speak to, and hear from, Montana TikTok users.

The Ban's burdens on speech sweep even more broadly than those found to be unconstitutional in other cases.  For instance, in *Bd. of Airport Comm'rs v. Jews for Jesus*, the Supreme Court considered a local resolution banning all "First Amendment activities" within the Central Terminal at the Los Angeles Airport.  482 U.S. 569, 574 (1987).  The Court struck down the resolution because it "d[id] not merely regulate expressive activity … that might create problems such as congestion or … disruption," *id.*, but instead prohibited *all* expressive activity of any kind.  The TikTok Ban operates in much the same way: prohibiting all speech on TikTok in

38

Montana, regardless of whether prohibiting that speech serves any legitimate state interest. But where the resolution in *Jews for Jesus* was limited to speech in a portion of a single airport (a place primarily used for travel, not expression), the TikTok Ban is far broader, applying statewide to a platform for speech used by hundreds of thousands of Montanans. *See Berger v. City of Seattle*, 569 F.3d 1029, 1055-56 (9th Cir. 2009) (*en banc*) (ordinance banning "speech activities" at public park was "too broad").

Because the TikTok Ban would shut down an important medium of communication in the State—applicable not just to Montanans, but to anyone passing through its "territorial jurisdiction"—based on speculative and unfounded concerns about national security and minor safety, *all*—not just "a substantial number"—"of its applications are unconstitutional." *Stevens*, 559 U.S. at 473.[8]

## II.   PLAINTIFF IS LIKELY TO SUCCEED ON ITS CLAIMS THAT THE TIKTOK BAN IS PREEMPTED.

TikTok Inc. is also likely to succeed on its claims that the TikTok Ban is barred by foreign affairs field preemption and conflict preemption.

---

[8] The State fails to address TikTok Inc.'s overbreadth argument, arguing that because the District Court did not address the issue, it is not before this Court. The State is wrong, as "[t]his court may affirm the district court on any ground finding support in the record." *Marino v. Vasquez*, 812 F.2d 499, 508 (9th Cir. 1987).

39

## A.   The TikTok Ban Impermissibly Intrudes on the Field of Foreign Affairs.

The Constitution vests responsibility for national security and foreign affairs exclusively with the federal government. *See, e.g.*, U.S. Const. art. I, § 8; *id.* art. II, § 2, cl. 1-2; *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003); *Deutsch v. Turner Corp.*, 324 F.3d 692, 709 (9th Cir. 2003).   Accordingly, the Constitution forbids "an intrusion by the State[s] into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Zschernig v. Miller*, 389 U.S. 429, 432 (1968).

This principle is reflected in the doctrine known as foreign affairs field preemption, under which a state law must be set aside if (1) its "real purpose" does not concern an area of "traditional state responsibility," and (2) it "intrudes on the federal government's foreign affairs power." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc).   As the District Court correctly held, the TikTok Ban fails this test.

### 1.   *The Ban's real purpose is to regulate foreign affairs, not to protect consumers.*

While the State contends that the real purpose of the TikTok Ban is to serve "consumer protection" interests, State Br. 52, and thus falls within the State's traditional police powers, this argument fails for multiple reasons.

40

As already discussed, *see supra* at 29-31, and as the District Court correctly found, the TikTok Ban is *not* a consumer protection law.  Even if the Ban espoused *some* consumer protection purpose, in determining whether a law addresses a traditional state responsibility, this Court does "not stop" with a statute's "general subject area." *Movsesian*, 670 F.3d at 1074-75.  Instead, the Court "must look further to determine the 'real purpose of the state law,'" *id.* at 1075 (quoting *Von Saher v. Norton Simon Museum of Art*, 592 F.3d 964 (9th Cir. 2010)), as evidenced by the statute's "text and legislative history," *id.*  As the District Court correctly found, the text, legislative findings, and legislative history of the TikTok Ban make clear that its "real purpose" is to regulate national security and foreign affairs.  ER-37.  Accordingly, even if the Ban *also* addressed "consumer protection" concerns, that would not change the reality that, at its core, the Ban is aimed at addressing perceived security risks posed by a foreign power—the heartland of foreign policy.

*Text*.  The text of the TikTok Ban alone makes clear that the law "cannot be fairly categorized as a garden variety" consumer protection regulation. *Movsesian*, 670 F.3d at 1075 (quotation omitted).  Like the law in *Movsesian*, which vested California courts with jurisdiction over insurance claims brought by victims of the Armenian Genocide, the Ban "is *not* a neutral law of general application," *id.*; instead, it targets just one company.  This "narrow scope" makes the Ban's foreign affairs purpose even more "apparent." *Id.* at 1073, 1075 n.3.

41

Indeed, the Ban forbids TikTok from "operat[ing] within the territorial jurisdiction of Montana" *unless* TikTok is "sold to a company that is not incorporated in any other country designated as a foreign adversary." S.B. 419 §§ 1(1), 4. By its terms, then, the Ban's application turns solely on foreign-policy judgments concerning (incorrect) assumptions about TikTok Inc.'s parent company's place of incorporation. By contrast, none of the concerns now advanced by the State regarding "TikTok's data-harvesting and storing practices," State Br. 50-51, are regulated in any way by the Ban.

The State nonetheless asserts that the Ban would "eliminate[] the source of Montanans' threatened data privacy harms" because, under the Ban, TikTok could operate in Montana only "by severing ties with China." State Br. 51-52. But again, the Ban does not prevent *any* company from exchanging data with China— regardless of its ownership. Instead, the Ban regulates only the ownership structure of one company based on concerns about America's "foreign adversar[ies]." S.B. 419 § 4.

*Legislative findings*. To determine a statute's "real purpose," this Court also considers "the legislative findings accompanying the statute." *Movsesian*, 670 F.3d at 1075. The TikTok Ban's preamble includes eight findings, six of which concern China. S.B. 419, Preamble. The first of these asserts that "*the People's Republic of China is an adversary of the United States and Montana* and has an interest in

42

gathering information about Montanans, Montana companies, and the intellectual property of users to engage in corporate and *international espionage*." *Id.* (emphases added). Thus, as the District Court observed, "from the very first line of the bill, the Legislature makes a distinct foreign policy statement." ER-40.

The State argues that this finding's reference to "corporate" espionage evinces the Ban's "consumer protection interest." State Br. 53. But corporations are not protected "consumers" under Montana law, Mont. Code Ann. § 30-14-102(1), and an isolated reference to corporate espionage does not change the State's obvious focus on national security and foreign affairs. *Cf. Von Saher*, 592 F.3d at 966 (foreign affairs preemption applied where "[t]he legislative findings accompanying the statute repeatedly reference the 'Nazi regime'").

*Legislative history.* In *Movsesian*, this Court left unresolved "how courts might determine the real purpose of a statute when that purpose is not apparent from the legislative findings and scope of the statute." 670 F.3d at 1075 n.3. Given the clarity of that evidence here, the Court need not resolve that issue, particularly at the preliminary injunction stage. However, if the Court *does* consider legislative history, it only underscores that the TikTok Ban's real purpose is not to regulate an area of traditional state responsibility.

In determining legislative intent, a court may look "to the intent expressed by members of the legislature who voted for its passage," *Fowler Packing Co. v. Lanier*,

43

844 F.3d 809, 817 (9th Cir. 2016) (cleaned up), as well as "to the statements by the initiators" of the legislation, *Church of Scientology v. U.S. Dept. of Justice*, 612 F.2d 417, 424 n.13 (9th Cir. 1979). Those statements reinforce the TikTok Ban's foreign policy purpose. For instance, the Ban's primary sponsor, Senator Vance, urged her colleagues to support the Ban because it "puts an end to China's surveillance operation in Montana." ER-71. Representative Brandon Ler, a lead proponent of the Ban, likewise argued that "TikTok is a national security threat" and urged his colleagues to "stand up to the Chinese and ban TikTok."[9] SER-244-45. Similarly, Attorney General Knudsen urged support for the Ban by claiming that "[China] see[s] a war with the United States as inevitable, and they're using TikTok as an initial salvo in that war." ER-40; *see also* ER-73, SER-110. *Cf. Von Saher*, 592 F.3d at 965 ("A memorandum from the Governor's office provides further illustration of California's intent."). And Governor Gianforte stated that he signed the Ban to protect Montanans' personal data "from intelligence gathering by the" CCP. SER-237.[10]

---

[9] The State wrongly claims that the District Court cited statements of an opponent of the bill, Representative Katie Sullivan, as evidence of the Legislature's intent. State Br. 55-56. The District Court quoted Representative Sullivan's criticism of the bill for singling out TikTok "when we know very well that [other] social media companies are doing the same thing" not because it reflected the Legislature's intent, but because the District Court agreed with the criticism. ER-38-39.

[10] While statements in the record suggest that some legislators were also concerned with purportedly dangerous content on TikTok, as discussed above, the State has abandoned the argument that the Ban was (unconstitutionally) enacted to protect (continued…)

44

The State's efforts to rebut this extensive evidence fall short. It first points to Section 2 of the law, which states that it was "intended to be codified as an integral part of" the chapter of the Montana Code concerning consumer protection. State Br. 51; *see* S.B. 419 § 2. But this "[c]odification instruction," S.B. 419 § 2, means little. As the Montana Bill Drafting Manual instructs, codification instructions "must be included" in all new legislation, and "[t]he standard codification instruction"— including the language about serving as "an integral part of" a particular chapter— "must be used in its entirety."[11]  As the Manual further clarifies, the Legislature's purpose is not to be divined from codification instructions, but from legislative findings, which provide "the reasons for the enactment of the law."[12]  Those findings here concern national security and foreign affairs, not consumer protection.

The State next claims that the District Court "flip[ped] the evidentiary burden" by "fault[ing] Montana for failing to produce additional evidence" of its consumer protection purpose. State Br. 53-54. This is incorrect. The District Court correctly concluded, after considering the Ban's text and legislative findings and history, that the Ban cannot be characterized as a consumer protection measure. ER-35. That the State pointed to *no* evidence of its asserted consumer protection interest only

---

minors from such videos or was necessary to advance that interest. *See supra* at 11; ER-27.

[11]  Montana Bill Drafting Manual, 68th Legislature, at 89 (2022), https://leg.mt.gov/content/Publications/2022-bill-drafting-manual.pdf.

[12]  *Id.* at 73.

45

reinforced the District Court's finding that the State's "real purpose" was to regulate national security and foreign affairs, not consumer protection.  ER-37.

> 2. *The Ban intrudes on the federal government's foreign affairs powers.*

The District Court was correct in concluding that the TikTok Ban impermissibly "attempts to establish a foreign policy for Montana."  ER-40; *see Movsesian*, 670 F.3d at 1072.

As the statutory text, legislative findings, and legislative history make clear, *see supra* at 41-45, the TikTok Ban "is, at its heart, intended to send a political message on an issue of foreign affairs." *Id.* at 1077.  In enacting the Ban, the State "express[ed] its dissatisfaction with the federal government's resolution (or lack thereof) of" issues related to the ownership of online platforms by allegedly foreign-adversary-based companies. *Von Saher*, 592 F.3d at 965.

It is irrelevant that implementation of the TikTok Ban does not require "a highly politicized inquiry into the conduct of a foreign nation."  State Br. 58 (quotation omitted).  As the District Court summarized, the TikTok Ban "makes a distinct foreign policy statement, which is that TikTok Inc. is owned by a Chinese corporation that is taking Montanans' TikTok user data and sharing it with the Chinese government for nefarious purposes."  ER-40.  Nor does it help the State that the federal government has also declared China a "foreign adversary."  15 C.F.R. § 7.4.  In determining *how* to address the federal government's concerns about a

particular foreign adversary, the TikTok Ban "interprets the United States' current foreign policy interests and intrudes on them." ER-41.

What's more, Montana's second-guessing of the federal government's China strategy "may well adversely affect the power of the central government to deal with [foreign-relations] problems." *Movsesian*, 670 F.3d at 1077 (quotation marks omitted). Although the federal government's foreign affairs powers may preempt state law "even in the absence of any treaty, federal statute, or executive order," *id.* at 1072, that Montana intruded into foreign affairs "is buttressed by the documented history of federal action addressing" the same subject. *Von Saher*, 592 F.3d at 967.

Here, as discussed below, the federal government has asserted an authority to require divestment of TikTok under the DPA and has negotiated since 2020 over mitigation measures relating to TikTok. *See infra* at 49; *see also* 85 Fed. Reg. 51,297 (Aug. 14, 2020). Additionally, Congress recently enacted the Federal Ban, which forbids the hosting or distribution within the United States of TikTok and other ByteDance platforms and software applications. TikTok can avoid this ban only if the President determines that the TikTok platform has completed a "qualified divestiture" by, among other things, severing "any operational relationship" with any entities owned by ByteDance. While TikTok plans to challenge that law on constitutional grounds, the mere fact that Congress passed a law that is both similar in effect to Montana's Ban and apparently focused on the same national security

47

concerns confirms that the State is meddling in matters of foreign affairs reserved exclusively to the federal government. *See, e.g.*, House Committee Report, H.R. Rep. No. 118-417, at 8 (discussing, *inter alia*, "the possibility that the [CCP] could use [TikTok] to control data collection on millions of users").

By inserting itself into delicate U.S.-China relations, the TikTok Ban has "'more than some incidental or indirect effect' on foreign affairs," and is preempted. *Movsesian*, 670 F.3d at 1076 (quoting *Zschernig*, 389 U.S. at 434).

## B.    The TikTok Ban Conflicts with Federal Law.

The Ban is also preempted under the doctrine of conflict preemption because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as expressed in the DPA and the Federal Ban. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quotation marks omitted).

The DPA "was primarily passed to promote the national defense." *United States v. Excel Packing Co.*, 210 F.2d 596, 598 (10th Cir. 1954). Pursuant to his authority under Section 721 of the DPA, the President established CFIUS—an interagency committee that reviews certain foreign acquisitions of U.S. businesses for national security risks. If CFIUS determines that a "covered transaction" would adversely affect "the national security of the United States," 50 U.S.C § 4565(b)(2)(A), CFIUS may mitigate those risks by "negotiat[ing], enter[ing] into or impos[ing]" conditions on the parties to the transaction, *id.* § 4565(l)(3)(A)(i). If

48

the risks cannot be mitigated, CFIUS refers the transaction to the President, who can prohibit the transaction if he finds "credible evidence" that it would "impair the national security," and existing law does not "provide adequate and appropriate authority" to protect national security.  *Id.* § 4565(d).

Starting in August 2020, CFIUS and TikTok Inc. worked to reach a negotiated agreement to address the federal government's national security concerns related to TikTok*, see* Status Report, *TikTok Inc. v. CFIUS*, No. 20-1444 (D.C. Cir. Apr. 22, 2024), grappling with *exactly* the same concerns the State now asserts underlie the Montana TikTok Ban.  State Br. 52.  By taking action when CFIUS has not, the Montana Ban "interferes with the methods by which the federal statute was designed to reach its goal." *Arellano v. Clark Cnty. Collection Serv.*, 875 F.3d 1213, 1216 (9th Cir. 2017) (cleaned up).  Indeed, a party would have little incentive to negotiate with CFIUS if even a successful resolution could still result in a patchwork of states requiring divestment based on their own interpretation of the same national security concerns.

The same is true for the recently enacted Federal Ban, which TikTok intends to challenge as unconstitutional.  If, however, the Federal Ban were upheld, it would further support conflict preemption.  As the State recognizes, conflict preemption arises where "the same problem [is] addressed by the federal [law]," but where the state takes a divergent approach.  State Br. 63 (citing *Crosby*, 530 U.S. at 367, 379-

49

80).  That is the case with the Federal Ban.  For example, Montana's Ban is "void" if TikTok is acquired by or sold to a company not incorporated in a country deemed a "foreign adversary" of the United States, S.B. 419 § 4—a divestment requirement that is different from the "qualified divestiture" requirements under the Federal Ban. Additionally, whereas the Federal Ban would not take effect until January 19, 2025, and authorizes the President to grant an extension in certain circumstances, Montana's TikTok Ban would, if the District Court's preliminary injunction were lifted, prohibit TikTok from being offered in the State *today*.  *See Crosby*, 530 U.S. at 367, 379-80 (finding conflict preemption where "the same problem [is] addressed by the federal" and state laws, but different approaches are taken).

Thus, while the State purports to share the federal government's goal of protecting Americans' personal data, "[t]he fact of a common end hardly neutralizes conflicting means."  *Crosby*, 530 U.S. at 379.  "If every state could regulate" the national security risks associated with foreign ownership of domestic companies, "each additional statute would incrementally diminish the federal government's control over enforcement and detract from the integrated scheme of regulation created by Congress."  *United States v. Texas*, 97 F.4th 268, 286 (5th Cir. 2024) (quoting *Wis. Dep't of Indus., Lab & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 288-89 (1986)) (cleaned up).  In *Crosby*, for example, both Massachusetts and federal law imposed sanctions on Burma (Myanmar), but Massachusetts's law was preempted

50

because it penalized entities and conduct excluded from federal sanctions and undermined Congress's intent to "provide the President with flexible and effective authority over economic sanctions against Burma." *Crosby*, 530 U.S. at 374, 378. The same is true here. The TikTok Ban undermines the federal government's more precise "calibration of force" and "compromises the very capacity of the President to speak for the Nation with one voice" and "to bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics." *Id*.

Finally, the State argues that the Ban does not conflict with federal law because TikTok Inc. "can still comply" with federal law *even if* Montana's TikTok Ban were to take effect. State Br. 63. That argument confuses the requirements of conflict preemption. State laws are preempted not only when it is *impossible* to comply with both state and federal law, but also when, as here, a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Chamber of Com. v. Bonta*, 62 F.4th 473, 486 n.4 (9th Cir. 2023) (quoting *Hines*, 312 U.S. at 67). If the ability to technically comply with both state and federal law were enough to defeat conflict preemption, *Crosby* and other cases cited above would have come out differently.

51

### III.   PLAINTIFF IS LIKELY TO SUCCEED ON ITS CLAIMS THAT THE TIKTOK BAN VIOLATES THE COMMERCE CLAUSE.

TikTok Inc. is also likely to succeed on its claims that the TikTok Ban impermissibly discriminates against foreign commerce and burdens interstate commerce in violation of the Commerce Clause.  *See* U.S. Const. art. I, § 8, cl. 3.

#### A.   The TikTok Ban Discriminates Against Foreign Commerce.

State laws that discriminate against foreign commerce face "a virtually *per se* rule of invalidity."  *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (quotation omitted); *Kraft General Foods, Inc. v. Iowa Dept. of Revenue & Finance*, 505 U.S. 71, 81 (1992) ("Absent a compelling justification … a State may not advance its legitimate goals by means that facially discriminate against foreign commerce."). Such laws are unconstitutional unless they "serve[] a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131, 138 (1986).  The District Court correctly concluded that the TikTok Ban facially discriminates against foreign commerce and that the State failed to show that the Ban serves a legitimate local purpose that could not be served by nondiscriminatory means.  ER-47.

Under the Ban's contingent-voidness provision, the Ban is "void" if TikTok is acquired by or sold to a company not incorporated in a country deemed a "foreign adversary" of the United States.  S.B. 419 § 4.  Prohibiting a business from operating in a state based on its business ties to specified foreign countries is clearly

52

discrimination against foreign commerce. In *NFTC v. Natsios*, for example, Massachusetts prohibited state agencies from purchasing goods or services from individuals or companies doing business with Burma, including any "majority-owned subsidiary" of an entity headquartered in Burma. 181 F.3d 38, 45-46 (1st Cir. 1999), *aff'd on other grounds*, *Crosby*, 530 U.S. at 372, 374 n.8. The First Circuit held that the law facially discriminated against foreign commerce, explaining that its "chief goal" was to "affect business decisions pertaining to a foreign nation." *Id.* at 68. The same is true here. By specifying which countries' corporations may own TikTok, the Ban is a "direct attempt to regulate the flow of foreign commerce." *Id.*; *see Odebrecht v. Prasad*, 876 F. Supp. 2d 1305, 1318-19 (S.D. Fla. 2012) (state law preventing government contracts with companies operating in Cuba discriminated against foreign commerce), *aff'd on other grounds*, 715 F.3d 1268, 1287 & n.7 (11th Cir. 2013).

The State argues that the Ban does not discriminate against "commerce with China," but instead "addresses harms from a domestic corporation's harmful data practices that allow the CCP to access that data." State Br. 64 (emphasis omitted). But the Ban does not regulate any company's "data practices"; it bans TikTok unless it is sold to a company not incorporated in a foreign-adversary-designated country.[13]

---

[13] As noted above, *supra* n.1, TikTok Inc.'s ultimate parent company ByteDance Ltd. is incorporated in the Cayman Islands, not China.

Put differently, the Ban would have no effect on TikTok—much less regulate its data practices—if TikTok were sold to a company incorporated almost anywhere other than China.

Nor can Montana carry its heavy burden to show that the TikTok Ban's discrimination serves a legitimate local purpose that no nondiscriminatory alternatives would achieve. *See Maine*, 477 U.S. at 138. National security and foreign policy vis-à-vis China are not legitimate *state* (or local) interests. *Supra* at 28-29. And even if "address[ing] harms from a domestic corporation's harmful data practices," State Br. 64, were a legitimate state purpose, there is no shortage of nondiscriminatory alternatives to further this end. Most obviously, the State could have considered legislation to prevent *any* online platform—foreign or domestic— from engaging in "harmful data practices" or providing user data to certain third parties, including the CCP. And again, the State enacted a generally applicable data privacy law *the same week* that it enacted the Ban. *See* ER-30. The State could have added generally applicable provisions to that law to address its asserted harms—but it did not. Instead, it enacted legislation facially discriminating against foreign commerce. The District Court correctly found that the State thus violated the Commerce Clause.

54

**B.     The TikTok Ban Unduly Burdens Interstate Commerce.**

State laws violate the dormant Commerce Clause if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  The State agrees that this test—known as *Pike* balancing—applies to the TikTok Ban, State Br. 65, and as the District Court concluded, the Ban fails this test, ER-47.

As the District Court found, the Ban's burdens on TikTok Inc. and on TikTok users would be substantial, requiring the company to "completely change its business to operate in Montana by selling to an owner based in a non-adversarial country." ER-47.  This factual finding is entitled to significant deference. *See Ass'n of Int'l. Auto. Mfrs. v. Abrams*, 84 F.3d 602, 612 (2d Cir. 1996) (extent of burden on interstate commerce is a question of fact).  Absent a sale, the Ban would require TikTok to prevent all users in Montana from accessing the platform.  The State contends that there are "near-perfect ways to determine whether TikTok is operating in Montana," State Br. 67, but doing so would require TikTok to start collecting *more* data, such as GPS data, from *all* 150 million U.S. TikTok users.  SER-177.  Otherwise TikTok would have to approximate users' locations based on IP address— an inexact practice that necessarily would deny access to some users outside of Montana, while allowing some users in Montana to access the platform.  SER-177, 179-85.

55

Contrary to the State's suggestion, *SPGGC v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007), in which the Second Circuit rejected a dormant Commerce Clause challenge to a state law that regulated prepaid gift cards, does not undermine this showing of burden. In *SPGGC*, "the only real burden resulting from disparate state regulation" was on the plaintiff itself. *Id.* at 196. But here, implementation of the TikTok Ban would inevitably cause even some users *outside* Montana to lose access to TikTok unless TikTok starts collecting *more* data from all U.S. users. SER-177. The burdens imposed by the Ban are thus at least as substantial as those imposed by other laws held unconstitutional under the dormant Commerce Clause. *See, e.g.*, *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529-30 (1959) (requirement of motor carriers to change mud flaps or reload cargo at state lines unreasonably burdened interstate commerce).

The State failed to adduce any contrary evidence at the preliminary-injunction stage, leaving TikTok Inc.'s evidence of burden "uncontradicted." *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 438 (1978). The District Court also properly dismissed the Ban's purported local benefits as lacking "any evidentiary support." ER-47. It is not for this Court to "re-weigh the evidence and overturn the district court's evidentiary determinations." *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

56

## IV.   THE REMAINING PRELIMINARY INJUNCTION FACTORS FAVOR MAINTAINING THE STATUS QUO.

### A.   The TikTok Ban Will Cause Plaintiff Irreparable Harm.

The State does not seriously dispute that shutting down the TikTok platform in Montana will irreparably harm TikTok Inc.   Because the Ban is likely unconstitutional—at the very least, TikTok Inc. has "a colorable First Amendment claim," *Cal. Chamber of Commerce v. Council for Educ.*, 29 F.4th 468, 482 (9th Cir. 2022)—TikTok Inc. has established irreparable harm.   In addition, as TikTok Inc. established below with sworn affidavits, the Ban will, among other things, decimate TikTok's user base in Montana, causing some users not to return even if the Ban were later reversed; undercut TikTok's commercial goodwill in Montana; and severely damage TikTok's reputation and goodwill outside Montana.   SER-234-35. Each of these unrebutted harms is irreparable.   *See Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) (monetary harm irreparable where plaintiff can "obtain no [monetary relief] against the state because of the Eleventh Amendment"), *vacated on other grounds*, 565 U.S. 606 (2012); *Rent-A-Center, Inc. v. Canyon Television*, 944 F.2d 597, 603 (9th Cir. 1991) ("damage to … goodwill[] qualif[ies] as irreparable harm").   The District Court also found irreparable harm because the Ban damages TikTok's goodwill by painting the company "as both disreputable and controlled by China."   ER-49.   This factual finding is entitled to deference.   *See Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998).

57

Rather than seek to rebut these findings, the State claims that the District Court improperly shifted the burden against it. State Br. 68. But the State failed—in the District Court and here—to present *any* evidence or argument in response to TikTok Inc.'s showing of irreparable harm. The District Court, which expressly acknowledged that it was TikTok Inc.'s burden to establish irreparable harm, ER-47-48, did not abuse its discretion in concluding that TikTok Inc. had met its burden, particularly in light of its unrebutted evidence.

### B.     The Balance of Equities and the Public Interest Require Preliminary Injunctive Relief.

The State agrees that the final two factors of the preliminary injunction analysis—balance of equities and public interest—merge in this case. State Br. 17, 69. Further, the State does not dispute that, if the TikTok Ban is unconstitutional, these factors support enjoining it. As the District Court correctly found, the Ban is likely unconstitutional, so the balance of equities and public interest "tip[] sharply" in TikTok Inc.'s favor. ER-50 (quoting *Am. Beverage Ass'n v. City and Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019)).

The State has not established that it will face harm if the status quo is preserved and TikTok continues operating in Montana during the pendency of this litigation. The State vaguely asserts that the Ban furthers the public interest by protecting the public "from the harms inseparable from TikTok's operation," State Br. 69, but fails to advance any evidence in support of that argument or explain why

58

it needs to enforce the Ban while the District Court resolves TikTok Inc.'s claims on the merits.

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's preliminary injunction of the TikTok Ban.

Date: April 29, 2024

Anders Linderot
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1163
alinderot@cov.com

Rob Cameron
JACKSON, MURDO & GRANT, P.C.
203 North Ewing
Helena, MT 59601
(406) 389-8244
rcameron@jmgattorneys.com

/s/ *Alexander A. Berengaut*
Alexander A. Berengaut
Megan A. Crowley
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-5367
aberengaut@cov.com
mcrowley@cov.com

*Attorneys for Appellee TikTok Inc.*

59

## CERTIFICATE OF COMPLIANCE

I am an attorney for Appellee TikTok Inc.  This brief contains 13,980 words excluding the parts of this brief exempted by Rule 32(f).  I hereby certify that this brief complies with the word limit imposed by Circuit Rule 32-1 and complies with the type size and typeface requirements of Rule 32(a)(5) and (6).

Date:  April 29, 2024

/s/ *Alexander A. Berengaut*
Alexander A. Berengaut

*Attorney for Appellee*
*TikTok Inc.*

# STATUTORY ADDENDUM

## STATUTORY ADDENDUM TABLE OF CONTENTS

S.B. 419, 68th Leg., Reg. Sess. (Mont. 2024) .......................................... A-1

50 U.S.C. § 4565 ................................................................................... A-6

Protecting Americans from Foreign Adversary Controlled Applications Act,
    H.R. 815, div. H, 118th Cong.,
    Pub. L. No. 118-50 (April 24, 2024) ............................................ A-57

- 2023
68th Legislature 2023                                                                                    SB0419



AN ACT BANNING TIKTOK IN MONTANA; PROHIBITING A MOBILE APPLICATION STORE FROM

OFFERING THE TIKTOK APPLICATION TO MONTANA USERS; PROVIDING FOR PENALTIES;

PROVIDING FOR ENFORCEMENT AUTHORITY; PROVIDING DEFINITIONS; PROVIDING FOR

CONTINGENT VOIDNESS; AND PROVIDING A DELAYED EFFECTIVE DATE.


WHEREAS, the People's Republic of China is an adversary of the United States and Montana and has

an interest in gathering information about Montanans, Montana companies, and the intellectual property of

users to engage in corporate and international espionage; and

WHEREAS, TikTok is a wholly owned subsidiary of ByteDance, a Chinese corporation; and

WHEREAS, the People's Republic of China exercises control and oversight over ByteDance, like other

Chinese corporations, and can direct the company to share user information, including real-time physical

locations of users; and

WHEREAS, TikTok gathers significant information from its users, accessing data against their will to

share with the People's Republic of China; and

WHEREAS, TikTok fails to remove, and may even promote, dangerous content that directs minors to

engage in dangerous activities, including but not limited to throwing objects at moving automobiles, taking

excessive amounts of medication, lighting a mirror on fire and then attempting to extinguish it using only one's

body parts, inducing unconsciousness through oxygen deprivation, cooking chicken in NyQuil, pouring hot wax

on a user's face, attempting to break an unsuspecting passerby's skull by tripping him or her into landing face

first into a hard surface, placing metal objects in electrical outlets, swerving cars at high rates of speed,

smearing human feces on toddlers, licking doorknobs and toilet seats to place oneself at risk of contracting

coronavirus, attempting to climb stacks of milkcrates, shooting passersby with air rifles, loosening lug nuts on

vehicles, and stealing utilities from public places; and

WHEREAS, TikTok's stealing of information and data from users and its ability to share that data with



*Authorized Print Version* – SB 419

**ENROLLED BILL**

**A-1**

- 2023
68th Legislature 2023                                                                                     SB0419

the Chinese Communist Party unacceptably infringes on Montana's right to privacy; and

WHEREAS, TikTok's continued operation in Montana serves as a valuable tool to the People's

Republic of China to conduct corporate and international espionage in Montana and may allow the People's

Republic of China to track the real-time locations of public officials, journalists, and other individuals adverse to

the Chinese Communist Party's interests; and

WHEREAS, TikTok's allowance and promotion of dangerous challenges threatens the health and

safety of Montanans.


BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MONTANA:


**Section 1.    Prohibition -- penalty -- enforcement -- definitions.** (1) Tiktok may not operate within

the territorial jurisdiction of Montana. An entity violates this prohibition when any of the following occurs within

the territorial jurisdiction of Montana:

(a)        the operation of tiktok by the company or users; or

(b)        the option to download the tiktok mobile application by a mobile application store.

(2)        An entity that violates a provision of this section is liable in the amount of $10,000 for each

discrete violation and is liable for an additional $10,000 each day thereafter that the violation continues.

(3)        It is an affirmative defense to this section if the violating entity could not have reasonably

known that the violation occurred within the territorial jurisdiction of Montana.

(4)        Penalties under this section do not apply to law enforcement activities, national security

interests and activities, security research activities, or essential government uses permitted by the governor on

the information technology system of the state.

(5)        Penalties in this section do not apply to users of tiktok.

(6)        The department of justice shall enforce the provisions of this section.

(7)        As used in this section, the following definitions apply:

(a)        "Discrete violation" means each time that a user accesses tiktok, is offered the ability to access

tiktok, or is offered the ability to download tiktok.

(b)        "Entity" means a mobile application store or tiktok.


Legislative
Services
Division

- 2 -                               *Authorized Print Version* – SB 419

**ENROLLED BILL**

A-2

(c)      "Mobile application" means a type of software program designed to run on a mobile device.

(d)      "Territorial jurisdiction" means all places subject to the criminal jurisdiction of Montana.

(e)      "Tiktok" means the social networking service owned by the Chinese company bytedance

limited or any successors.


**Section 2.    Codification instruction.** [Section 1] is intended to be codified as an integral part of Title

30, chapter 14, and the provisions of Title 30, chapter 14, applies to [section 1].


**Section 3.    Severability.** Each part of [this act] is severable. If any part of [this act] is invalid, illegal, or

unenforceable, all valid parts remain in effect. If a part of [this act] is invalid in one or more of its applications,

only those applications may be void and the remaining valid applications remain in effect as severable from the

invalid applications and parts.


**Section 4.    Contingent voidness.** [This act] is void if tiktok is acquired by or sold to a company that is

not incorporated in any other country designated as a foreign adversary in 15 C.F.R. 7.4 at the time tiktok is

sold or acquired.


**Section 5.    Effective date.** [This act] is effective January 1, 2024.

- END -



*Authorized Print Version* – SB 419

**ENROLLED BILL**

I hereby certify that the within bill,

SB 419, originated in the Senate.

_____

Secretary of the Senate

_____

President of the Senate

Signed this _____day

of_____, 2023.

_____

Speaker of the House

Signed this _____day
of_____, 2023.

A-4

SENATE BILL NO. 419

INTRODUCED BY S. VANCE

AN ACT BANNING TIKTOK IN MONTANA; PROHIBITING A MOBILE APPLICATION STORE FROM OFFERING THE TIKTOK APPLICATION TO MONTANA USERS; PROVIDING FOR PENALTIES; PROVIDING FOR ENFORCEMENT AUTHORITY; PROVIDING DEFINITIONS; PROVIDING FOR CONTINGENT VOIDNESS; AND PROVIDING A DELAYED EFFECTIVE DATE.

United States Code Annotated
   Title 50. War and National Defense (Refs & Annos)
      Chapter 55. Defense Production (Refs & Annos)
         Subchapter III. General Provisions (Refs & Annos)

50 U.S.C.A. § 4565

Formerly cited as 50 App. USCA § 2170

§ 4565. Authority to review certain mergers, acquisitions, and takeovers

Effective: January 1, 2021

Currentness

**(a) Definitions**

In this section:

**(1) Clarification**

The term "national security" shall be construed so as to include those issues relating to "homeland security", including its application to critical infrastructure.

**(2) Committee; chairperson**

The terms "Committee" and "chairperson" mean the Committee on Foreign Investment in the United States and the chairperson thereof, respectively.

**(3) Control**

The term "control" means the power, direct or indirect, whether exercised or not exercised, to determine, direct, or decide important matters affecting an entity, subject to regulations prescribed by the Committee.

**(4) Covered transaction**

**(A) In general**

Except as otherwise provided, the term "covered transaction" means--

**(i)** any transaction described in subparagraph (B)(i); and

**(ii)** any transaction described in clauses (ii) through (v) of subparagraph (B) that is proposed, pending, or completed on or after the effective date set forth in section 1727 of the Foreign Investment Risk Review Modernization Act of 2018.

**(B) Transactions described**

A transaction described in this subparagraph is any of the following:

**(i)** Any merger, acquisition, or takeover that is proposed or pending after August 23, 1988, by or with any foreign person that could result in foreign control of any United States business, including such a merger, acquisition, or takeover carried out through a joint venture.

**(ii)** Subject to subparagraphs (C) and (E), the purchase or lease by, or a concession to, a foreign person of private or public real estate that--

**(I)** is located in the United States;

**(II)(aa)** is, is located within, or will function as part of, an air or maritime port; or

**(bb)(AA)** is in close proximity to a United States military installation or another facility or property of the United States Government that is sensitive for reasons relating to national security;

**(BB)** could reasonably provide the foreign person the ability to collect intelligence on activities being conducted at such an installation, facility, or property; or

**(CC)** could otherwise expose national security activities at such an installation, facility, or property to the risk of foreign surveillance; and

**(III)** meets such other criteria as the Committee prescribes by regulation, except that such criteria may not expand the categories of real estate to which this clause applies beyond the categories described in subclause (II).

**(iii)** Any other investment, subject to regulations prescribed under subparagraphs (D) and (E), by a foreign person in any unaffiliated United States business that--

**(I)** owns, operates, manufactures, supplies, or services critical infrastructure;

**(II)** produces, designs, tests, manufactures, fabricates, or develops one or more critical technologies; or

**(III)** maintains or collects sensitive personal data of United States citizens that may be exploited in a manner that threatens national security.

A-7

**(iv)** Any change in the rights that a foreign person has with respect to a United States business in which the foreign person has an investment, if that change could result in--

**(I)** foreign control of the United States business; or

**(II)** an investment described in clause (iii).

**(v)** Any other transaction, transfer, agreement, or arrangement, the structure of which is designed or intended to evade or circumvent the application of this section, subject to regulations prescribed by the Committee.

**(C) Real estate transactions**

**(i) Exception for certain real estate transactions**

A real estate purchase, lease, or concession described in subparagraph (B)(ii) does not include a purchase, lease, or concession of--

**(I)** a single "housing unit", as defined by the Census Bureau; or

**(II)** real estate in "urbanized areas", as defined by the Census Bureau in the most recent census, except as otherwise prescribed by the Committee in regulations in consultation with the Secretary of Defense.

**(ii) Definition of close proximity**

With respect to a real estate purchase, lease, or concession described in subparagraph (B)(ii)(II)(bb)(AA), the Committee shall prescribe regulations to ensure that the term "close proximity" refers only to a distance or distances within which the purchase, lease, or concession of real estate could pose a national security risk in connection with a United States military installation or another facility or property of the United States Government described in that subparagraph.

**(D) Other investments**

**(i) Other investment defined**

For purposes of subparagraph (B)(iii), the term "other investment" means an investment, direct or indirect, by a foreign person in a United States business described in that subparagraph that is not an investment described in subparagraph (B)(i) and that affords the foreign person--

**(I)** access to any material nonpublic technical information in the possession of the United States business;

**(II)** membership or observer rights on the board of directors or equivalent governing body of the United States business or the right to nominate an individual to a position on the board of directors or equivalent governing body; or

**(III)** any involvement, other than through voting of shares, in substantive decisionmaking of the United States business regarding--

**(aa)** the use, development, acquisition, safekeeping, or release of sensitive personal data of United States citizens maintained or collected by the United States business;

**(bb)** the use, development acquisition, or release of critical technologies; or

**(cc)** the management, operation, manufacture, or supply of critical infrastructure.

### (ii) Material nonpublic technical information defined

#### (I) In general

For purposes of clause (i)(I), and subject to regulations prescribed by the Committee, the term "material nonpublic technical information" means information that--

**(aa)** provides knowledge, know-how, or understanding, not available in the public domain, of the design, location, or operation of critical infrastructure; or

**(bb)** is not available in the public domain, and is necessary to design, fabricate, develop, test, produce, or manufacture critical technologies, including processes, techniques, or methods.

#### (II) Exemption for financial information

Notwithstanding subclause (I), for purposes of this subparagraph, the term "material nonpublic technical information" does not include financial information regarding the performance of a United States business.

### (iii) Regulations

#### (I) In general

The Committee shall prescribe regulations providing guidance on the types of transactions that the Committee considers to be "other investment" for purposes of subparagraph (B)(iii).

#### (II) United States businesses that own, operate, manufacture, supply, or service critical infrastructure

The regulations prescribed by the Committee with respect to an investment described in subparagraph (B)(iii)(I) shall--

**(aa)** specify the critical infrastructure subject to that subparagraph based on criteria intended to limit application of that subparagraph to the subset of critical infrastructure that is likely to be of importance to the national security of the United States; and

**(bb)** enumerate specific types and examples of such critical infrastructure.

**(iv) Specific clarification for investment funds**

**(I) Treatment of certain investment fund investments**

Notwithstanding clause (i)(II) and subject to regulations prescribed by the Committee, an indirect investment by a foreign person in a United States business described in subparagraph (B)(iii) through an investment fund that affords the foreign person (or a designee of the foreign person) membership as a limited partner or equivalent on an advisory board or a committee of the fund shall not be considered an "other investment" for purposes of subparagraph (B)(iii) if--

**(aa)** the fund is managed exclusively by a general partner, a managing member, or an equivalent;

**(bb)** the general partner, managing member, or equivalent is not a foreign person;

**(cc)** the advisory board or committee does not have the ability to approve, disapprove, or otherwise control--

**(AA)** investment decisions of the fund; or

**(BB)** decisions made by the general partner, managing member, or equivalent related to entities in which the fund is invested;

**(dd)** the foreign person does not otherwise have the ability to control the fund, including the authority--

**(AA)** to approve, disapprove, or otherwise control investment decisions of the fund;

**(BB)** to approve, disapprove, or otherwise control decisions made by the general partner, managing member, or equivalent related to entities in which the fund is invested; or

**(CC)** to unilaterally dismiss, prevent the dismissal of, select, or determine the compensation of the general partner, managing member, or equivalent;

A-10

**(ee)** the foreign person does not have access to material nonpublic technical information as a result of its participation on the advisory board or committee; and

**(ff)** the investment otherwise meets the requirements of this subparagraph.

**(II) Treatment of certain waivers**

**(aa) In general**

For the purposes of items (cc) and (dd) of subclause (I) and except as provided in item (bb), a waiver of a potential conflict of interest, a waiver of an allocation limitation, or a similar activity, applicable to a transaction pursuant to the terms of an agreement governing an investment fund shall not be considered to constitute control of investment decisions of the fund or decisions relating to entities in which the fund is invested.

**(bb) Exception**

The Committee may prescribe regulations providing for exceptions to item (aa) for extraordinary circumstances.

**(v) Exception for air carriers**

For purposes of subparagraph (B)(iii), the term "other investment" does not include an investment involving an air carrier, as defined in section 40102(a)(2) of Title 49, that holds a certificate issued under section 41102 of that title.

**(vi) Rule of construction**

Any definition of "critical infrastructure" established under any provision of law other than this section shall not be determinative for purposes of this section.

**(E) Country specification**

The Committee shall prescribe regulations that further define the term "foreign person" for purposes of clauses (ii) and (iii) of subparagraph (B). In prescribing such regulations, the Committee shall specify criteria to limit the application of such clauses to the investments of certain categories of foreign persons. Such criteria shall take into consideration how a foreign person is connected to a foreign country or foreign government, and whether the connection may affect the national security of the United States.

**(F) Transfers of certain assets pursuant to bankruptcy proceedings or other defaults**

The Committee shall prescribe regulations to clarify that the term "covered transaction" includes any transaction described in subparagraph (B) that arises pursuant to a bankruptcy proceeding or other form of default on debt.

**(5) Critical infrastructure**

**A-11**

The term "critical infrastructure" means, subject to regulations prescribed by the Committee, systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems or assets would have a debilitating impact on national security.

**(6) Critical technologies**

**(A) In general**

The term "critical technologies" means the following:

**(i)** Defense articles or defense services included on the United States Munitions List set forth in the International Traffic in Arms Regulations under subchapter M of chapter I of title 22, Code of Federal Regulations.

**(ii)** Items included on the Commerce Control List set forth in Supplement No. 1 to part 774 of the Export Administration Regulations under subchapter C of chapter VII of title 15, Code of Federal Regulations, and controlled--

**(I)** pursuant to multilateral regimes, including for reasons relating to national security, chemical and biological weapons proliferation, nuclear nonproliferation, or missile technology; or

**(II)** for reasons relating to regional stability or surreptitious listening.

**(iii)** Specially designed and prepared nuclear equipment, parts and components, materials, software, and technology covered by part 810 of title 10, Code of Federal Regulations (relating to assistance to foreign atomic energy activities).

**(iv)** Nuclear facilities, equipment, and material covered by part 110 of title 10, Code of Federal Regulations (relating to export and import of nuclear equipment and material).

**(v)** Select agents and toxins covered by part 331 of title 7, Code of Federal Regulations, part 121 of title 9 of such Code, or part 73 of title 42 of such Code.

**(vi)** Emerging and foundational technologies controlled pursuant to section 4817 of this title.

**(B) Recommendations**

**(i) In general**

The chairperson may recommend technologies for identification under the interagency process set forth in section 4817(a) of this title.

A-12

**(ii) Matters informing recommendations**

Recommendations by the chairperson under clause (i) shall draw upon information arising from reviews and investigations conducted under subsection (b), notices submitted under subsection (b)(1)(C)(i), declarations filed under subsection (b)(1)(C)(v), and non-notified and non-declared transactions identified under subsection (b)(1)(H).

**(7) Foreign government-controlled transaction**

The term "foreign government-controlled transaction" means any covered transaction that could result in the control of any United States business by a foreign government or an entity controlled by or acting on behalf of a foreign government.

**(8) Intelligence community**

The term "intelligence community" has the meaning given that term in section 3003(4) of Title 50.

**(9) Investment**

The term "investment" means the acquisition of equity interest, including contingent equity interest, as further defined in regulations prescribed by the Committee.

**(10) Lead agency**

The term "lead agency" means the agency or agencies designated as the lead agency or agencies pursuant to subsection (k)(5).

**(11) Party**

The term "party" has the meaning given that term in regulations prescribed by the Committee.

**(12) United States**

The term "United States" means the several States, the District of Columbia, and any territory or possession of the United States.

**(13) United States business**

The term "United States business" means a person engaged in interstate commerce in the United States.

**(b) National security reviews and investigations**

**(1) National security reviews**

A-13

**(A) In general**

Upon receiving written notification under subparagraph (C) of any covered transaction, or pursuant to a unilateral notification initiated under subparagraph (D) with respect to any covered transaction, the President, acting through the Committee--

**(i)** shall review the covered transaction to determine the effects of the transaction on the national security of the United States; and

**(ii)** shall consider the factors specified in subsection (f) for such purpose, as appropriate.

**(B) Control by foreign government**

If the Committee determines that the covered transaction is a foreign government-controlled transaction, the Committee shall conduct an investigation of the transaction under paragraph (2).

**(C) Written notice**

**(i) In general**

**(I) In general**

Any party or parties to any covered transaction may initiate a review of the transaction under this paragraph by submitting a written notice of the transaction to the Chairperson of the Committee.

**(II) Comments and acceptance**

**(aa) In general**

Subject to item (cc), the Committee shall provide comments on a draft or formal written notice or accept a formal written notice submitted under subclause (I) with respect to a covered transaction not later than the date that is 10 business days after the date of submission of the draft or formal written notice.

**(bb) Completeness**

If the Committee determines that a draft or formal written notice described in item (aa) is not complete, the Committee shall notify the party or parties to the transaction in writing that the notice is not complete and provide an explanation of all material respects in which the notice is incomplete.

**(cc) Stipulations required**

The timing requirement under item (aa) shall apply only in a case in which the parties stipulate under clause (vi) that the transaction is a covered transaction.

**(ii) Withdrawal of notice**

No covered transaction for which a notice was submitted under clause (i) may be withdrawn from review, unless a written request for such withdrawal is submitted to the Committee by any party to the transaction and approved by the Committee.

**(iii) Continuing discussions**

A request for withdrawal under clause (ii) shall not be construed to preclude any party to the covered transaction from continuing informal discussions with the Committee or any member thereof regarding possible resubmission for review pursuant to this paragraph.

**(iv) Inclusion of partnership and side agreements**

The Committee may require a written notice submitted under clause (i) to include a copy of any partnership agreements, integration agreements, or other side agreements relating to the transaction, as specified in regulations prescribed by the Committee.

**(v) Declarations for certain covered transactions**

**(I) In general**

A party to any covered transaction may submit to the Committee a declaration with basic information regarding the transaction instead of a written notice under clause (i).

**(II) Regulations**

The Committee shall prescribe regulations establishing requirements for declarations submitted under this clause. In prescribing such regulations, the Committee shall ensure that such declarations are submitted as abbreviated notifications that would not generally exceed 5 pages in length.

**(III) Committee response to declaration**

**(aa) In general**

Upon receiving a declaration under this clause with respect to a covered transaction, the Committee may, at the discretion of the Committee--

**(AA)** request that the parties to the transaction file a written notice under clause (i);

A-15

**(BB)** inform the parties to the transaction that the Committee is not able to complete action under this section with respect to the transaction on the basis of the declaration and that the parties may file a written notice under clause (i) to seek written notification from the Committee that the Committee has completed all action under this section with respect to the transaction;

**(CC)** initiate a unilateral review of the transaction under subparagraph (D); or

**(DD)** notify the parties in writing that the Committee has completed all action under this section with respect to the transaction.

#### (bb) Timing

The Committee shall take action under item (aa) not later than 30 days after receiving a declaration under this clause.

#### (cc) Rule of construction

Nothing in this subclause (other than item (aa)(CC)) shall be construed to affect the authority of the President or the Committee to take any action authorized by this section with respect to a covered transaction.

### (IV) Mandatory declarations

#### (aa) Regulations

The Committee shall prescribe regulations specifying the types of covered transactions for which the Committee requires a declaration under this subclause.

#### (bb) Certain covered transactions with foreign government interests

#### (AA) In general

Except as provided in subitem (BB), the parties to a covered transaction shall submit a declaration described in subclause (I) with respect to the transaction if the transaction involves an investment that results in the acquisition, directly or indirectly, of a substantial interest in a United States business described in subsection (a)(4)(B)(iii) by a foreign person in which a foreign government has, directly or indirectly, a substantial interest.

#### (BB) Substantial interest defined

In this item, the term "substantial interest" has the meaning given that term in regulations which the Committee shall prescribe. In developing those regulations, the Committee shall consider the means by which a foreign government could influence the actions of a foreign person, including through board membership, ownership interest, or shareholder rights. An interest that is excluded under subparagraph (D) of subsection (a)(4) from the

term "other investment" as used in subparagraph (B)(iii) of that subsection or that is less than a 10 percent voting interest shall not be considered a substantial interest.

**(CC) Waiver**

The Committee may waive, with respect to a foreign person, the requirement under subitem (AA) for the submission of a declaration described in subclause (I) if the Committee determines that the foreign person demonstrates that the investments of the foreign person are not directed by a foreign government and the foreign person has a history of cooperation with the Committee.

**(cc) Other declarations required by Committee**

The Committee may require the submission of a declaration described in subclause (I) with respect to any covered transaction identified under regulations prescribed by the Committee for purposes of this item, at the discretion of the Committee, that involves a United States business described in subsection (a)(4)(B)(iii)(II).

**(dd) Exception**

The submission of a declaration described in subclause (I) shall not be required pursuant to this subclause with respect to an investment by an investment fund if--

**(AA)** the fund is managed exclusively by a general partner, a managing member, or an equivalent;

**(BB)** the general partner, managing member, or equivalent is not a foreign person; and

**(CC)** the investment fund satisfies, with respect to any foreign person with membership as a limited partner on an advisory board or a committee of the fund, the criteria specified in items (cc) and (dd) of subsection (a)(4)(D)(iv).

**(ee) Submission of written notice as an alternative**

Parties to a covered transaction for which a declaration is required under this subclause may instead elect to submit a written notice under clause (i).

**(ff) Timing and refiling of submission**

**(AA) In general**

In the regulations prescribed under item (aa), the Committee may not require a declaration to be submitted under this subclause with respect to a covered transaction more than 45 days before the completion of the transaction.

**(BB) Refiling of declaration**

The Committee may not request or recommend that a declaration submitted under this subclause be withdrawn and refiled, except to permit parties to a covered transaction to correct material errors or omissions in the declaration submitted with respect to that transaction.

### (gg) Penalties

The Committee may impose a penalty pursuant to subsection (h)(3) with respect to a party that fails to comply with this subclause.

### (vi) Stipulations regarding transactions

#### (I) In general

In a written notice submitted under clause (i) or a declaration submitted under clause (v) with respect to a transaction, a party to the transaction may--

**(aa)** stipulate that the transaction is a covered transaction; and

**(bb)** if the party stipulates that the transaction is a covered transaction under item (aa), stipulate that the transaction is a foreign government-controlled transaction.

#### (II) Basis for stipulation

A written notice submitted under clause (i) or a declaration submitted under clause (v) that includes a stipulation under subclause (I) shall include a description of the basis for the stipulation.

### (D) Unilateral initiation of review

Subject to subparagraph (G), the President or the Committee may initiate a review under subparagraph (A) of--

**(i)** any covered transaction (other than a covered transaction described in subparagraph (E));

**(ii)** any covered transaction described in subparagraph (E), if any party to the transaction submitted false or misleading material information to the Committee in connection with the Committee's consideration of the transaction or omitted material information, including material documents, from information submitted to the Committee; or

**(iii)** any covered transaction described in subparagraph (E), if--

**(I)** any party to the transaction or the entity resulting from consummation of the transaction materially breaches a mitigation agreement or condition described in subsection (l)(3)(A);

**(II)** such breach is certified to the Committee by the lead department or agency monitoring and enforcing such agreement or condition as a material breach; and

**(III)** the Committee determines that there are no other adequate and appropriate remedies or enforcement tools available to address such breach.

**(E) Covered transactions described**

A covered transaction is described in this subparagraph if--

**(i)** the Committee has informed the parties to the transaction in writing that the Committee has completed all action under this section with respect to the transaction; or

**(ii)** the President has announced a decision not to exercise the President's authority under subsection (d) with respect to the transaction.

**(F) Timing**

Any review under this paragraph shall be completed before the end of the 45-day period beginning on the date of the acceptance of written notice under subparagraph (C) by the chairperson, or beginning on the date of the initiation of the review in accordance with subparagraph (D), as applicable.

**(G) Limit on delegation of certain authority**

The authority of the Committee to initiate a review under subparagraph (D) may not be delegated to any person, other than the Deputy Secretary or an appropriate Under Secretary of the department or agency represented on the Committee.

**(H) Identification of non-notified and non-declared transactions**

The Committee shall establish a process to identify covered transactions for which--

**(i)** a notice under clause (i) of subparagraph (C) or a declaration under clause (v) of that subparagraph is not submitted to the Committee; and

**(ii)** information is reasonably available.

**(2) National security investigations**

**(A) In general**

In each case described in subparagraph (B), the Committee shall immediately conduct an investigation of the effects of a covered transaction on the national security of the United States, and take any necessary actions in connection with the transaction to protect the national security of the United States.

**(B) Applicability**

Subparagraph (A) shall apply in each case in which--

**(i)** a review of a covered transaction under paragraph (1) results in a determination that--

**(I)** the transaction threatens to impair the national security of the United States and the risk has not been mitigated during or prior to the review of a covered transaction under paragraph (1);

**(II)** the transaction is a foreign government-controlled transaction; or

**(III)** the transaction would result in control of any critical infrastructure of or within the United States by or on behalf of any foreign person, if the Committee determines that the transaction could impair national security, and that such impairment to national security has not been mitigated by assurances provided or renewed with the approval of the Committee, as described in subsection (l), during the review period under paragraph (1); or

**(ii)** the lead agency recommends, and the Committee concurs, that an investigation be undertaken.

**(C) Timing**

**(i) In general**

Except as provided in clause (ii), any investigation under subparagraph (A) shall be completed before the end of the 45-day period beginning on the date on which the investigation commenced.

**(ii) Extension for extraordinary circumstances**

**(I) In general**

In extraordinary circumstances (as defined by the Committee in regulations), the chairperson may, at the request of the head of the lead agency, extend an investigation under subparagraph (A) for one 15-day period.

**(II) Nondelegation**

The authority of the chairperson and the head of the lead agency referred to in subclause (I) may not be delegated to any person other than the Deputy Secretary of the Treasury or the deputy head (or equivalent thereof) of the lead agency, as the case may be.

§ 4565. Authority to review certain mergers, acquisitions, and takeovers, 50 USCA § 4565

**(III) Notification to parties**

If the Committee extends the deadline under subclause (I) with respect to a covered transaction, the Committee shall notify the parties to the transaction of the extension.

**(D) Exception**

**(i) In general**

Notwithstanding subparagraph (B)(i), an investigation of a foreign government-controlled transaction described in subclause (II) of subparagraph (B)(i) or a transaction involving critical infrastructure described in subclause (III) of subparagraph (B)(i) shall not be required under this paragraph, if the Secretary of the Treasury and the head of the lead agency jointly determine, on the basis of the review of the transaction under paragraph (1), that the transaction will not impair the national security of the United States.

**(ii) Nondelegation**

The authority of the Secretary or the head of an agency referred to in clause (i) may not be delegated to any person, other than the Deputy Secretary of the Treasury or the deputy head (or the equivalent thereof) of the lead agency, respectively.

**(E) Guidance on certain transactions with national security implications**

The Chairperson shall, not later than 180 days after the effective date of the Foreign Investment and National Security Act of 2007, publish in the Federal Register guidance on the types of transactions that the Committee has reviewed and that have presented national security considerations, including transactions that may constitute covered transactions that would result in control of critical infrastructure relating to United States national security by a foreign government or an entity controlled by or acting on behalf of a foreign government.

**(3) Certifications to Congress**

**(A) Certified notice at completion of review or assessment**

Upon completion of a review under this subsection that concludes action under this section, or upon the Committee making a notification under paragraph (1)(C)(v)(III)(aa)(DD), the chairperson and the head of the lead agency shall transmit a certified notice to the members of Congress specified in subparagraph (C)(iii).

**(B) Certified report at completion of investigation**

As soon as is practicable after completion of an investigation under subsection (b) that concludes action under this section, the chairperson and the head of the lead agency shall transmit to the members of Congress specified in subparagraph (C)(iii) a certified written report (consistent with the requirements of subsection (c)) on the results of the investigation, unless the matter under investigation has been sent to the President for decision.

**(C) Certification procedures**

**(i) In general**

Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be submitted to the members of Congress specified in clause (iii), and shall include--

    **(I)** a description of the actions taken by the Committee with respect to the transaction;

    **(II)** a certification that all relevant national security factors have received full consideration; and

    **(III)** whether the transaction is described under clause (i), (ii), (iii), (iv), or (v) of subsection (a)(4)(B).

**(ii) Content of certification**

Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be signed by the chairperson and the head of the lead agency, and shall state that, in the determination of the Committee, there are no unresolved national security concerns with the transaction that is the subject of the notice or report.

**(iii) Members of Congress**

Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be transmitted--

    **(I)** to the Majority Leader and the Minority Leader of the Senate;

    **(II)** to the chair and ranking member of the Committee on Banking, Housing, and Urban Affairs of the Senate and of any committee of the Senate having oversight over the lead agency;

    **(III)** to the Speaker and the Minority Leader of the House of Representatives;

    **(IV)** to the chair and ranking member of the Committee on Financial Services of the House of Representatives and of any committee of the House of Representatives having oversight over the lead agency; and

    **(V)** with respect to covered transactions involving critical infrastructure, to the members of the Senate from the State in which the principal place of business of the acquired United States person is located, and the member from the Congressional District in which such principal place of business is located.

**(iv) Signatures; limit on delegation**

**(I) In general**

Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be signed by the chairperson and the head of the lead agency, which signature requirement may only be delegated in accordance with subclause (II).

**(II) Delegation of certifications**

**(aa) In general**

Subject to item (bb), the chairperson, in consultation with the Committee, may determine the level of official to whom the signature requirement under subclause (I) for the chairperson and the head of the lead agency may be delegated. The level of official to whom the signature requirement may be delegated may differ based on any factor relating to a transaction that the chairperson, in consultation with the Committee, deems appropriate, including the type or value of the transaction.

**(bb) Limitation on delegation with respect to certain transactions**

The signature requirement under subclause (I) may be delegated not below the level of the Assistant Secretary of the Treasury or an equivalent official of the lead agency.

**(v) Authority to consolidate documents**

Instead of transmitting a separate certified notice or certified report under subparagraph (A) or (B) with respect to each covered transaction, the Committee may, on a monthly basis, transmit such notices and reports in a consolidated document to the Members of Congress specified in clause (iii).

**(4) Analysis by Director of National Intelligence**

**(A) Analysis required**

**(i) In general**

Except as provided in subparagraph (B), the Director of National Intelligence shall expeditiously carry out a thorough analysis of any threat to the national security of the United States posed by any covered transaction, which shall include the identification of any recognized gaps in the collection of intelligence relevant to the analysis.

**(ii) Views of intelligence community**

The Director shall seek and incorporate into the analysis required by clause (i) the views of all affected or appropriate agencies of the intelligence community with respect to the transaction.

**(iii) Updates**

At the request of the lead agency, the Director shall update the analysis conducted under clause (i) with respect to a covered transaction with respect to which an agreement was entered into under subsection (l)(3)(A).

**(iv) Independence and objectivity**

The Committee shall ensure that its processes under this section preserve the ability of the Director to conduct analysis under clause (i) that is independent, objective, and consistent with all applicable directives, policies, and analytic tradecraft standards of the intelligence community.

**(B) Basic threat information**

**(i) In general**

The Director of National Intelligence may provide the Committee with basic information regarding any threat to the national security of the United States posed by a covered transaction described in clause (ii) instead of conducting the analysis required by subparagraph (A).

**(ii) Covered transaction described**

A covered transaction is described in this clause if--

**(I)** the transaction is described in subsection (a)(4)(B)(ii);

**(II)** the Director of National Intelligence has completed an analysis pursuant to subparagraph (A) involving each foreign person that is a party to the transaction during the 12 months preceding the review or investigation of the transaction under this section; or

**(III)** the transaction otherwise meets criteria agreed upon by the Committee and the Director for purposes of this subparagraph.

**(C) Timing**

The analysis required under subparagraph (A) shall be provided by the Director of National Intelligence to the Committee not later than 30 days after the date on which notice of the transaction is accepted by the Committee under paragraph (1)(C), but such analysis may be supplemented or amended, as the Director considers necessary or appropriate, or upon a request for additional information by the Committee. The Director may begin the analysis at any time prior to acceptance of the notice, in accordance with otherwise applicable law.

**(D) Interaction with intelligence community**

A-24

The Director of National Intelligence shall ensure that the intelligence community remains engaged in the collection, analysis, and dissemination to the Committee of any additional relevant information that may become available during the course of any investigation conducted under subsection (b) with respect to a transaction.

**(E) Independent role of Director**

The Director of National Intelligence shall be a nonvoting, ex officio member of the Committee, and shall be provided with all notices received by the Committee under paragraph (1)(C) regarding covered transactions, but shall serve no policy role on the Committee, other than to provide analysis under subparagraphs (A) and (C) in connection with a covered transaction.

**(F) Assessment of operational impact**

The Director may provide to the Committee an assessment, separate from the analyses under subparagraphs (A) and (B), of any operational impact of a covered transaction on the intelligence community and a description of any actions that have been or will be taken to mitigate any such impact.

**(G) Submission to Congress**

The Committee shall submit the analysis required by subparagraph (A) with respect to a covered transaction to the Select Committee on Intelligence of the Senate and the Permanent Select Committee on Intelligence of the House of Representatives upon the conclusion of action under this section (other than compliance plans under subsection (l)(6)) with respect to the transaction.

**(5) Submission of additional information**

No provision of this subsection shall be construed as prohibiting any party to a covered transaction from submitting additional information concerning the transaction, including any proposed restructuring of the transaction or any modifications to any agreements in connection with the transaction, while any review or investigation of the transaction is ongoing.

**(6) Notice of results to parties**

The Committee shall notify the parties to a covered transaction of the results of a review or investigation under this section, promptly upon completion of all action under this section.

**(7) Regulations**

Regulations prescribed under this section shall include standard procedures for--

**(A)** submitting any notice of a covered transaction to the Committee;

**(B)** submitting a request to withdraw a covered transaction from review;

**(C)** resubmitting a notice of a covered transaction that was previously withdrawn from review; and

**(D)** providing notice of the results of a review or investigation to the parties to the covered transaction, upon completion of all action under this section.

**(8) Tolling of deadlines during lapse in appropriations**

Any deadline or time limitation under this subsection shall be tolled during a lapse in appropriations.

**(c) Confidentiality of information**

**(1) In general**

Except as provided in paragraph (2), any information or documentary material filed with the President or the President's designee pursuant to this section shall be exempt from disclosure under section 552 of Title 5, and no such information or documentary material may be made public.

**(2) Exceptions**

Paragraph (1) shall not prohibit the disclosure of the following:

**(A)** Information relevant to any administrative or judicial action or proceeding.

**(B)** Information to Congress or any duly authorized committee or subcommittee of Congress.

**(C)** Information important to the national security analysis or actions of the Committee to any domestic governmental entity, or to any foreign governmental entity of a United States ally or partner, under the exclusive direction and authorization of the chairperson, only to the extent necessary for national security purposes, and subject to appropriate confidentiality and classification requirements.

**(D)** Information that the parties have consented to be disclosed to third parties.

**(3) Cooperation with allies and partners**

**(A) In general**

The chairperson, in consultation with other members of the Committee, should establish a formal process for the exchange of information under paragraph (2)(C) with governments of countries that are allies or partners of the United States, in the discretion of the chairperson, to protect the national security of the United States and those countries.

**(B) Requirements**

The process established under subparagraph (A) should, in the discretion of the chairperson--

**(i)** be designed to facilitate the harmonization of action with respect to trends in investment and technology that could pose risks to the national security of the United States and countries that are allies or partners of the United States;

**(ii)** provide for the sharing of information with respect to specific technologies and entities acquiring such technologies as appropriate to ensure national security; and

**(iii)** include consultations and meetings with representatives of the governments of such countries on a recurring basis.

**(d) Action by the President**

**(1) In general**

Subject to paragraph (4), the President may take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States.

**(2) Announcement by the President**

The President shall announce the decision on whether or not to take action pursuant to paragraph (1) with respect to a covered transaction not later than 15 days after the earlier of--

**(A)** the date on which the investigation of the transaction under subsection (b) is completed; or

**(B)** the date on which the Committee otherwise refers the transaction to the President under subsection (l)(2).

**(3) Enforcement**

The President may direct the Attorney General of the United States to seek appropriate relief, including divestment relief, in the district courts of the United States, in order to implement and enforce this subsection.

**(4) Findings of the President**

The President may exercise the authority conferred by paragraph (1), only if the President finds that--

**(A)** there is credible evidence that leads the President to believe that a foreign person that would acquire an interest in a United States business or its assets as a result of the covered transaction might take action that threatens to impair the national security; and

A-27

**(B)** provisions of law, other than this section and the International Emergency Economic Powers Act, do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President.

**(5) Factors to be considered**

For purposes of determining whether to take action under paragraph (1), the President shall consider, among other factors each of the factors described in subsection (f), as appropriate.

**(e) Actions and findings nonreviewable**

**(1) In general**

The actions of the President under paragraph (1) of subsection (d) and the findings of the President under paragraph (4) of subsection (d) shall not be subject to judicial review.

**(2) Civil actions**

A civil action challenging an action or finding under this section may be brought only in the United States Court of Appeals for the District of Columbia Circuit.

**(3) Procedures for review of privileged information**

If a civil action challenging an action or finding under this section is brought, and the court determines that protected information in the administrative record, including classified or other information subject to privilege or protections under any provision of law, is necessary to resolve the challenge, that information shall be submitted ex parte and in camera to the court and the court shall maintain that information under seal.

**(4) Applicability of use of information provisions**

The use of information provisions of sections 1806, 1825, 1845, and 1881e of this title shall not apply in a civil action brought under this subsection.

**(f) Factors to be considered**

For purposes of this section, the President or the President's designee may, taking into account the requirements of national security, consider--

**(1)** domestic production needed for projected national defense requirements,

**(2)** the capability and capacity of domestic industries to meet national defense requirements, including the availability of human resources, products, technology, materials, and other supplies and services,

**(3)** the control of domestic industries and commercial activity by foreign citizens as it affects the capability and capacity of the United States to meet the requirements of national security,

**(4)** the potential effects of the proposed or pending transaction on sales of military goods, equipment, or technology to any country--

    **(A)** identified by the Secretary of State--

        **(i)** under section 4605(j) of this title, as a country that supports terrorism;

        **(ii)** under section 4605(l) of this title, as a country of concern regarding missile proliferation; or

        **(iii)** under section 4605(m) of this title, as a country of concern regarding the proliferation of chemical and biological weapons;

    **(B)** identified by the Secretary of Defense as posing a potential regional military threat to the interests of the United States; or

    **(C)** listed under section 2139a(c) of Title 42 on the "Nuclear Non-Proliferation-Special Country List" (15 C.F.R. Part 778, Supplement No. 4) or any successor list;

**(5)** the potential effects of the proposed or pending transaction on United States international technological leadership in areas affecting United States national security;

**(6)** the potential national security-related effects on United States critical infrastructure, including major energy assets;

**(7)** the potential national security-related effects on United States critical technologies;

**(8)** whether the covered transaction is a foreign government-controlled transaction, as determined under subsection (b)(1)(B);

**(9)** as appropriate, and particularly with respect to transactions requiring an investigation under subsection (b)(1)(B), a review of the current assessment of--

    **(A)** the adherence of the subject country to nonproliferation control regimes, including treaties and multilateral supply guidelines, which shall draw on, but not be limited to, the annual report on "Adherence to and Compliance with Arms Control, Nonproliferation and Disarmament Agreements and Commitments" required by section 2593a of Title 22;

**A-29**

**(B)** the relationship of such country with the United States, specifically on its record on cooperating in counter-terrorism efforts, which shall draw on, but not be limited to, the report of the President to Congress under section 7120 of the Intelligence Reform and Terrorism Prevention Act of 2004; and

**(C)** the potential for transshipment or diversion of technologies with military applications, including an analysis of national export control laws and regulations;

**(10)** the long-term projection of United States requirements for sources of energy and other critical resources and material; and

**(11)** such other factors as the President or the Committee may determine to be appropriate, generally or in connection with a specific review or investigation.

**(g) Additional information to Congress; confidentiality**

**(1) Briefing requirement on request**

The Committee shall, upon request from any Member of Congress specified in subsection (b)(3)(C)(iii), promptly provide briefings on a covered transaction for which all action has concluded under this section, or on compliance with a mitigation agreement or condition imposed with respect to such transaction, on a classified basis, if deemed necessary by the sensitivity of the information. Briefings under this paragraph may be provided to the congressional staff of such a Member of Congress having appropriate security clearance.

**(2) Application of confidentiality provisions**

**(A) In general**

The disclosure of information under this subsection shall be consistent with the requirements of subsection (c). Members of Congress and staff of either House of Congress or any committee of Congress, shall be subject to the same limitations on disclosure of information as are applicable under subsection (c).

**(B) Proprietary information**

Proprietary information which can be associated with a particular party to a covered transaction shall be furnished in accordance with subparagraph (A) only to a committee of Congress, and only when the committee provides assurances of confidentiality, unless such party otherwise consents in writing to such disclosure.

**(h) Regulations**

**(1) In general**

The President shall direct, subject to notice and comment, the issuance of regulations to carry out this section.

**(2) Content**

Regulations issued under this subsection shall--

**(A)** provide for the imposition of civil penalties for any violation of this section, including any mitigation agreement entered into, conditions imposed, or order issued pursuant to this section;

**(B)** to the extent possible--

**(i)** minimize paperwork burdens; and

**(ii)** coordinate reporting requirements under this section with reporting requirements under any other provision of Federal law;

**(C)** provide for an appropriate role for the Secretary of Labor with respect to mitigation agreements; and

**(D)** provide that, in any review or investigation of a covered transaction conducted by the Committee under subsection (b), the Committee should--

**(i)** consider the factors specified in subsection (f); and

**(ii)** as appropriate, require parties to provide to the Committee the information necessary to consider such factors.

**(i) Effect on other law**

No provision of this section shall be construed as altering or affecting any other authority, process, regulation, investigation, enforcement measure, or review provided by or established under any other provision of Federal law, including the International Emergency Economic Powers Act, or any other authority of the President or the Congress under the Constitution of the United States.

**(j) Technology risk assessments**

In any case in which an assessment of the risk of diversion of defense critical technology is performed by a designee of the President, a copy of such assessment shall be provided to any other designee of the President responsible for reviewing or investigating a transaction under this section.

**(k) Committee on Foreign Investment in the United States**

**(1) Establishment**

The Committee on Foreign Investment in the United States, established pursuant to Executive Order No. 11858, shall be a multi agency committee to carry out this section and such other assignments as the President may designate.

**(2) Membership**

The Committee shall be comprised of the following members or the designee of any such member:

**(A)** The Secretary of the Treasury.

**(B)** The Secretary of Homeland Security.

**(C)** The Secretary of Commerce.

**(D)** The Secretary of Defense.

**(E)** The Secretary of State.

**(F)** The Attorney General of the United States.

**(G)** The Secretary of Energy.

**(H)** The Secretary of Labor (nonvoting, ex officio).

**(I)** The Director of National Intelligence (nonvoting, ex officio).

**(J)** The heads of any other executive department, agency, or office, as the President determines appropriate, generally or on a case-by-case basis.

**(3) Chairperson**

The Secretary of the Treasury shall serve as the chairperson of the Committee.

**(4) Hiring authority**

**(A) Senior officials**

**(i) In general**

Each member of the Committee shall designate an Assistant Secretary, or an equivalent official, who is appointed by the President, by and with the advice and consent of the Senate, to carry out such duties related to the Committee as the member of the Committee may delegate.

**(ii) Department of the Treasury**

**(I) In general**

There shall be established in the Office of International Affairs at the Department of the Treasury 2 additional positions of Assistant Secretary of the Treasury, who shall be appointed by the President, by and with the advice and consent of the Senate, to carry out such duties related to the Committee as the Secretary of the Treasury may delegate, consistent with this section.

**(II) Assistant Secretary for Investment Security**

One of the positions of Assistant Secretary of the Treasury authorized under subclause (I) shall be the Assistant Secretary for Investment Security, whose duties shall be principally related to the Committee, as delegated by the Secretary of the Treasury under this section.

**(B) Special hiring authority**

The heads of the departments and agencies represented on the Committee may appoint, without regard to the provisions of sections 3309 through 3318 of Title 5, candidates directly to positions in the competitive service (as defined in section 2102 of that title) in their respective departments and agencies. The primary responsibility of positions authorized under the preceding sentence shall be to administer this section.

**(5) Designation of lead agency**

The Secretary of the Treasury shall designate, as appropriate, a member or members of the Committee to be the lead agency or agencies on behalf of the Committee--

**(A)** for each covered transaction, and for negotiating any mitigation agreements or other conditions necessary to protect national security; and

**(B)** for all matters related to the monitoring of the completed transaction, to ensure compliance with such agreements or conditions and with this section.

**(6) Other members**

The chairperson shall consult with the heads of such other Federal departments, agencies, and independent establishments in any review or investigation under subsection (a), as the chairperson determines to be appropriate, on the basis of the facts and

circumstances of the covered transaction under review or investigation (or the designee of any such department or agency head).

**(7) Meetings**

The Committee shall meet upon the direction of the President or upon the call of the chairperson, without regard to section 552b of Title 5 (if otherwise applicable).

## (l) Actions by the Committee to address national security risks

**(1) Suspension of transactions**

The Committee, acting through the chairperson, may suspend a proposed or pending covered transaction that may pose a risk to the national security of the United States for such time as the covered transaction is under review or investigation under subsection (b).

**(2) Referral to President**

The Committee may, at any time during the review or investigation of a covered transaction under subsection (b), complete the action of the Committee with respect to the transaction and refer the transaction to the President for action pursuant to subsection (d).

**(3) Mitigation**

**(A) Agreements and conditions**

**(i) In general**

The Committee or a lead agency may, on behalf of the Committee, negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction.

**(ii) Abandonment of transactions**

If a party to a covered transaction has voluntarily chosen to abandon the transaction, the Committee or lead agency, as the case may be, may negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction for purposes of effectuating such abandonment and mitigating any risk to the national security of the United States that arises as a result of the covered transaction.

**(iii) Agreements and conditions relating to completed transactions**

The Committee or lead agency, as the case may be, may negotiate, enter into or impose, and enforce any agreement or condition with any party to a completed covered transaction in order to mitigate any interim risk to the national

security of the United States that may arise as a result of the covered transaction until such time that the Committee has completed action pursuant to subsection (b) or the President has taken action pursuant to subsection (d) with respect to the transaction.

**(B) Treatment of outdated agreements or conditions**

The chairperson and the head of the lead agency shall periodically review the appropriateness of an agreement or condition imposed under subparagraph (A) and terminate, phase out, or otherwise amend the agreement or condition if a threat no longer requires mitigation through the agreement or condition.

**(C) Limitations**

An agreement may not be entered into or condition imposed under subparagraph (A) with respect to a covered transaction unless the Committee determines that the agreement or condition resolves the national security concerns posed by the transaction, taking into consideration whether the agreement or condition is reasonably calculated to--

**(i)** be effective;

**(ii)** allow for compliance with the terms of the agreement or condition in an appropriately verifiable way; and

**(iii)** enable effective monitoring of compliance with and enforcement of the terms of the agreement or condition.

**(D) Jurisdiction**

The provisions of section 4556(b) of this title shall apply to any mitigation agreement entered into or condition imposed under subparagraph (A).

**(4) Risk-based analysis required**

**(A) In general**

Any determination of the Committee to suspend a covered transaction under paragraph (1), to refer a covered transaction to the President under paragraph (2), or to negotiate, enter into or impose, or enforce any agreement or condition under paragraph (3)(A) with respect to a covered transaction, shall be based on a risk-based analysis, conducted by the Committee, of the effects on the national security of the United States of the covered transaction, which shall include an assessment of the threat, vulnerabilities, and consequences to national security related to the transaction.

**(B) Actions of members of the Committee**

**(i) In general**

Any member of the Committee who concludes that a covered transaction poses an unresolved national security concern shall recommend to the Committee that the Committee suspend the transaction under paragraph (1), refer the transaction to the President under paragraph (2), or negotiate, enter into or impose, or enforce any agreement or condition under paragraph (3)(A) with respect to the transaction. In making that recommendation, the member shall propose or contribute to the risk-based analysis required by subparagraph (A).

**(ii) Failure to reach consensus**

If the Committee fails to reach consensus with respect to a recommendation under clause (i) regarding a covered transaction, the members of the Committee who support an alternative recommendation shall produce--

**(I)** a written statement justifying the alternative recommendation; and

**(II)** as appropriate, a risk-based analysis that supports the alternative recommendation.

**(C) Definitions**

For purposes of subparagraph (A), the terms "threat", "vulnerabilities", and "consequences to national security" shall have the meanings given those terms by the Committee by regulation.

**(5) Tracking authority for withdrawn notices**

**(A) In general**

If any written notice of a covered transaction that was submitted to the Committee under this section is withdrawn before any review or investigation by the Committee under subsection (b) is completed, the Committee shall establish, as appropriate--

**(i)** interim protections to address specific concerns with such transaction that have been raised in connection with any such review or investigation pending any resubmission of any written notice under this section with respect to such transaction and further action by the President under this section;

**(ii)** specific time frames for resubmitting any such written notice; and

**(iii)** a process for tracking any actions that may be taken by any party to the transaction, in connection with the transaction, before the notice referred to in clause (ii) is resubmitted.

**(B) Designation of agency**

The lead agency, other than any entity of the intelligence community, shall, on behalf of the Committee, ensure that the requirements of subparagraph (A) with respect to any covered transaction that is subject to such subparagraph are met.

**(6) Negotiation, modification, monitoring, and enforcement**

**(A) Designation of lead agency**

The lead agency shall negotiate, modify, monitor, and enforce, on behalf of the Committee, any agreement entered into or condition imposed under paragraph (3) with respect to a covered transaction, based on the expertise with and knowledge of the issues related to such transaction on the part of the designated department or agency. The lead agency may, at its discretion, seek and receive the assistance of other departments or agencies in carrying out the purposes of this paragraph.

**(B) Reporting by designated agency**

The lead agency in connection with any agreement entered into or condition imposed with respect to a covered transaction shall--

**(i)** provide periodic reports to the Committee on any material modification to any such agreement or condition imposed with respect to the transaction; and

**(ii)** ensure that any material modification to any such agreement or condition is reported to the Director of National Intelligence, the Attorney General of the United States, and any other Federal department or agency that may have a material interest in such modification.

**(C) Compliance plans**

**(i) In general**

In the case of a covered transaction with respect to which an agreement is entered into under paragraph (3)(A), the Committee or lead agency, as the case may be, shall formulate, adhere to, and keep updated a plan for monitoring compliance with the agreement.

**(ii) Elements**

Each plan required by clause (i) with respect to an agreement entered into under paragraph (3)(A) shall include an explanation of--

**(I)** which member of the Committee will have primary responsibility for monitoring compliance with the agreement;

**(II)** how compliance with the agreement will be monitored;

**(III)** how frequently compliance reviews will be conducted;

**(IV)** whether an independent entity will be utilized under subparagraph (E) to conduct compliance reviews; and

**A-37**

**(V)** what actions will be taken if the parties fail to cooperate regarding monitoring compliance with the agreement.

**(D) Effect of lack of compliance**

If, at any time after a mitigation agreement or condition is entered into or imposed under paragraph (3)(A), the Committee or lead agency, as the case may be, determines that a party or parties to the agreement or condition are not in compliance with the terms of the agreement or condition, the Committee or lead agency may, in addition to the authority of the Committee to impose penalties pursuant to subsection (h)(3) and to unilaterally initiate a review of any covered transaction under subsection (b)(1)(D)(iii)--

**(i)** negotiate a plan of action for the party or parties to remediate the lack of compliance, with failure to abide by the plan or otherwise remediate the lack of compliance serving as the basis for the Committee to find a material breach of the agreement or condition;

**(ii)** require that the party or parties submit a written notice under clause (i) of subsection (b)(1)(C) or a declaration under clause (v) of that subsection with respect to a covered transaction initiated after the date of the determination of noncompliance and before the date that is 5 years after the date of the determination to the Committee to initiate a review of the transaction under subsection (b); or

**(iii)** seek injunctive relief.

**(E) Use of independent entities to monitor compliance**

If the parties to an agreement entered into under paragraph (3)(A) enter into a contract with an independent entity from outside the United States Government for the purpose of monitoring compliance with the agreement, the Committee shall take such action as is necessary to prevent a conflict of interest from arising by ensuring that the independent entity owes no fiduciary duty to the parties.

**(F) Successors and assigns**

Any agreement or condition entered into or imposed under paragraph (3)(A) shall be considered binding on all successors and assigns unless and until the agreement or condition terminates on its own terms or is otherwise terminated by the Committee in its sole discretion.

**(G) Additional compliance measures**

Subject to subparagraphs (A) through (F), the Committee shall develop and agree upon methods for evaluating compliance with any agreement entered into or condition imposed with respect to a covered transaction that will allow the Committee to adequately ensure compliance without unnecessarily diverting Committee resources from assessing any new covered transaction for which a written notice under clause (i) of subsection (b)(1)(C) or declaration under clause (v) of that subsection has been filed, and if necessary, reaching a mitigation agreement with or imposing a condition on a party to such covered transaction or any covered transaction for which a review has been reopened for any reason.

**(m) Annual report to Congress**

**(1) In general**

The chairperson shall transmit a report to the chairman and ranking member of the committee of jurisdiction in the Senate and the House of Representatives, before July 31 of each year on all of the reviews and investigations of covered transactions completed under subsection (b) during the 12-month period covered by the report.

**(2) Contents of report relating to covered transactions**

The annual report under paragraph (1) shall contain the following information, with respect to each covered transaction, for the reporting period:

**(A)** A list of all notices filed and all reviews or investigations of covered transactions completed during the period, with--

**(i)** a description of the outcome of each review or investigation, including whether an agreement was entered into or condition was imposed under subsection (l)(3)(A) with respect to the transaction being reviewed or investigated, and whether the President took any action under this section with respect to that transaction;

**(ii)** basic information on each party to each such transaction;

**(iii)** the nature of the business activities or products of the United States business with which the transaction was entered into or intended to be entered into; and

**(iv)** information about any withdrawal from the process.

**(B)** Specific, cumulative, and, as appropriate, trend information on the numbers of filings, investigations, withdrawals, and decisions or actions by the President under this section.

**(C)** Cumulative and, as appropriate, trend information on the business sectors involved in the filings which have been made, and the countries from which the investments have originated.

**(D)** Information on whether companies that withdrew notices to the Committee in accordance with subsection (b)(1)(C)(ii) have later refiled such notices, or, alternatively, abandoned the transaction.

**(E)** The types of security arrangements and conditions the Committee has used to mitigate national security concerns about a transaction, including a discussion of the methods that the Committee and any lead agency are using to determine compliance with such arrangements or conditions.

**(F)** A detailed discussion of all perceived adverse effects of covered transactions on the national security or critical infrastructure of the United States that the Committee will take into account in its deliberations during the period before delivery of the next report, to the extent possible.

**(G)** Statistics on compliance plans conducted and actions taken by the Committee under subsection (l)(6), including subparagraph (D) of that subsection, during that period, a general assessment of the compliance of parties with agreements entered into and conditions imposed under subsection (l)(3)(A) that are in effect during that period, including a description of any actions taken by the Committee to impose penalties or initiate a unilateral review pursuant to subsection (b)(1)(D)(iii), and any recommendations for improving the enforcement of such agreements and conditions.

**(H)** Cumulative and, as appropriate, trend information on the number of declarations filed under subsection (b)(1)(C)(v), the actions taken by the Committee in response to those declarations, the business sectors involved in those declarations, and the countries involved in those declarations.

**(I)** A description of--

**(i)** the methods used by the Committee to identify non-notified and non-declared transactions under subsection (b)(1)(H);

**(ii)** potential methods to improve such identification and the resources required to do so; and

**(iii)** the number of transactions identified through the process established under that subsection during the reporting period and the number of such transactions flagged for further review.

**(J)** A summary of the hiring practices and policies of the Committee pursuant to subsection (k)(4).

**(K)** A list of the waivers granted by the Committee under subsection (b)(1)(C)(v)(IV)(bb)(CC).

**(3) Contents of report relating to critical technologies**

In order to assist Congress in its oversight responsibilities with respect to this section, the President and such agencies as the President shall designate shall include in the annual report submitted under paragraph (1)--

**(A)** an evaluation of whether there is credible evidence of a coordinated strategy by 1 or more countries or companies to acquire United States companies involved in research, development, or production of critical technologies for which the United States is a leading producer;

**(B)** an evaluation of whether there are industrial espionage activities directed or directly assisted by foreign governments against private United States companies aimed at obtaining commercial secrets related to critical technologies; and

**A-40**

**(C)** a description of the technologies recommended by the chairperson under subsection (a)(6)(B) for identification under the interagency process set forth in section 4817(a) of this title.

**(4) Form of report**

**(A) In general**

All appropriate portions of the annual report under paragraph (1) may be classified. An unclassified version of the report, as appropriate, consistent with safeguarding national security and privacy, shall be made available to the public.

**(B) Inclusion in classified version**

If the Committee recommends that the President suspend or prohibit a covered transaction because the transaction threatens to impair the national security of the United States, the Committee shall, in the classified version of the report required under paragraph (1), notify Congress of the recommendation and, upon request, provide a classified briefing on the recommendation.

**(C) Inclusions in unclassified version**

The unclassified version of the report required under paragraph (1) shall include, with respect to covered transactions for the reporting period--

**(i)** the number of notices submitted under subsection (b)(1)(C)(i);

**(ii)** the number of declarations submitted under subsection (b)(1)(C)(v) and the number of such declarations that were required under subclause (IV) of that subsection;

**(iii)** the number of declarations submitted under subsection (b)(1)(C)(v) for which the Committee required resubmission as notices under subsection (b)(1)(C)(i);

**(iv)** the average number of days that elapsed between submission of a declaration under subsection (b)(1)(C)(v) and the acceptance of the declaration by the Committee;

**(v)** the median and average number of days that elapsed between acceptance of a declaration by the Committee and a response described in subsection (b)(1)(C)(v)(III);

**(vi)** information on the time it took the Committee to provide comments on, or to accept, notices submitted under subsection (b)(1)(C)(i), including--

**(I)** the average number of business days that elapsed between the date of submission of a draft notice and the date on which the Committee provided written comments on the draft notice;

**(II)** the average number of business days that elapsed between the date of submission of a formal written notice and the date on which the Committee accepted or provided written comments on the formal written notice; and

**(III)** if the average number of business days for a response by the Committee reported under subclause (I) or (II) exceeded 10 business days--

**(aa)** an explanation of the causes of such delays, including whether such delays are caused by resource shortages, unusual fluctuations in the volume of notices, transaction characteristics, or other factors; and

**(bb)** an explanation of the steps that the Committee anticipates taking to mitigate the causes of such delays and otherwise to improve the ability of the Committee to provide comments on, or to accept, notices within 10 business days;

**(vii)** the number of reviews or investigations conducted under subsection (b);

**(viii)** the number of investigations that were subject to an extension under subsection (b)(2)(C)(ii);

**(ix)** information on the duration of those reviews and investigations, including the median and average number of days required to complete those reviews and investigations;

**(x)** the number of notices submitted under subsection (b)(1)(C)(i) and declarations submitted under subsection (b)(1)(C)(v) that were rejected by the Committee;

**(xi)** the number of such notices and declarations that were withdrawn by a party to the covered transaction;

**(xii)** the number of such withdrawals that were followed by the submission of a subsequent such notice or declaration relating to a substantially similar covered transaction; and

**(xiii)** such other specific, cumulative, or trend information that the Committee determines is advisable to provide for an assessment of the time required for reviews and investigations of covered transactions under this section.

**(n) Certification of notices and assurances**

**(1) In general**

Each notice, and any followup information, submitted under this section and regulations prescribed under this section to the President or the Committee by a party to a covered transaction, and any information submitted by any such party in connection with any action for which a report is required pursuant to paragraph (6)(B) of subsection (l), with respect to the implementation of any mitigation agreement or condition described in paragraph (3)(A) of subsection (l), or any material

change in circumstances, shall be accompanied by a written statement by the chief executive officer or the designee of the person required to submit such notice or information certifying that, to the best of the knowledge and belief of that person--

**(A)** the notice or information submitted fully complies with the requirements of this section or such regulation, agreement, or condition; and

**(B)** the notice or information is accurate and complete in all material respects.

**(2) Effect of failure to submit**

The Committee may not complete a review under this section of a covered transaction and may recommend to the President that the President suspend or prohibit the transaction under subsection (d) if the Committee determines that a party to the transaction has--

**(A)** failed to submit a statement required by paragraph (1); or

**(B)** included false or misleading information in a notice or information described in paragraph (1) or omitted material information from such notice or information.

**(3) Applicability of law on fraud and false statements**

The Committee shall prescribe regulations expressly providing for the application of section 1001 of Title 18, to all information provided to the Committee under this section by any party to a covered transaction.

**(o) Testimony**

**(1) In general**

Not later than March 31 of each year, the chairperson, or the designee of the chairperson, shall appear before the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate to present testimony on--

**(A)** anticipated resources necessary for operations of the Committee in the following fiscal year at each of the departments or agencies represented on the Committee;

**(B)** the adequacy of appropriations for the Committee in the current and the previous fiscal year to--

**(i)** ensure that thorough reviews and investigations are completed as expeditiously as possible;

**(ii)** monitor and enforce mitigation agreements; and

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**(iii)** identify covered transactions for which a notice under clause (i) of subsection (b)(1)(C) or a declaration under clause (v) of that subsection was not submitted to the Committee;

**(C)** management efforts to strengthen the ability of the Committee to meet the requirements of this section; and

**(D)** activities of the Committee undertaken in order to--

**(i)** educate the business community, with a particular focus on the technology sector and other sectors of importance to national security, on the goals and operations of the Committee;

**(ii)** disseminate to the governments of countries that are allies or partners of the United States best practices of the Committee that--

**(I)** strengthen national security reviews of relevant investment transactions; and

**(II)** expedite such reviews when appropriate; and

**(iii)** promote openness to foreign investment, consistent with national security considerations.

**(2) Sunset**

This subsection shall have no force or effect on or after the date that is 7 years after August 13, 2018.

**(p) Funding**

**(1) Establishment of Fund**

There is established in the Treasury of the United States a fund, to be known as the "Committee on Foreign Investment in the United States Fund" (in this subsection referred to as the "Fund"), to be administered by the chairperson.

**(2) Authorization of appropriations for the Committee**

There are authorized to be appropriated to the Fund for each of fiscal years 2019 through 2023 $20,000,000 to perform the functions of the Committee.

**(3) Filing fees**

**(A) In general**

§ 4565. Authority to review certain mergers, acquisitions, and takeovers, 50 USCA § 4565

The Committee may assess and collect a fee in an amount determined by the Committee in regulations, to the extent provided in advance in appropriations Acts, without regard to section 9701 of Title 31, and subject to subparagraph (B), with respect to each covered transaction for which a written notice is submitted to the Committee under subsection (b)(1)(C)(i). The total amount of fees collected under this paragraph may not exceed the costs of administering this section.

**(B) Determination of amount of fee**

**(i) In general**

The amount of the fee to be assessed under subparagraph (A) with respect to a covered transaction--

**(I)** may not exceed an amount equal to the lesser of--

**(aa)** 1 percent of the value of the transaction; or

**(bb)** $300,000, adjusted annually for inflation pursuant to regulations prescribed by the Committee; and

**(II)** shall be based on the value of the transaction, taking into account--

**(aa)** the effect of the fee on small business concerns (as defined in section 632 of Title 15);

**(bb)** the expenses of the Committee associated with conducting activities under this section;

**(cc)** the effect of the fee on foreign investment; and

**(dd)** such other matters as the Committee considers appropriate.

**(ii) Updates**

The Committee shall periodically reconsider and adjust the amount of the fee to be assessed under subparagraph (A) with respect to a covered transaction to ensure that the amount of the fee does not exceed the costs of administering this section and otherwise remains appropriate.

**(C) Deposit and availability of fees**

Notwithstanding section 3302 of Title 31, fees collected under subparagraph (A) shall--

**(i)** be deposited into the Fund solely for use in carrying out activities under this section;

A-45

**(ii)** to the extent and in the amounts provided in advance in appropriations Acts, be available to the chairperson;

**(iii)** remain available until expended; and

**(iv)** be in addition to any appropriations made available to the members of the Committee.

### (D) Study on prioritization fee

#### (i) In general

Not later than 270 days after August 13, 2018, the chairperson, in consultation with the Committee, shall complete a study of the feasibility and merits of establishing a fee or fee scale to prioritize the timing of the response of the Committee to a draft or formal written notice during the period before the Committee accepts the formal written notice under subsection (b)(1)(C)(i), in the event that the Committee is unable to respond during the time required by subclause (II) of that subsection because of an unusually large influx of notices, or for other reasons.

#### (ii) Submission to Congress

After completing the study required by clause (i), the chairperson, or a designee of the chairperson, shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report on the findings of the study.

### (4) Transfer of funds

To the extent provided in advance in appropriations Acts, the chairperson may transfer any amounts in the Fund to any other department or agency represented on the Committee for the purpose of addressing emerging needs in carrying out activities under this section. Amounts so transferred shall be in addition to any other amounts available to that department or agency for that purpose.

## (q) Centralization of certain Committee functions

### (1) In general

The chairperson, in consultation with the Committee, may centralize certain functions of the Committee within the Department of the Treasury for the purpose of enhancing interagency coordination and collaboration in carrying out the functions of the Committee under this section.

### (2) Functions

Functions that may be centralized under paragraph (1) include identifying non-notified and non-declared transactions pursuant to subsection (b)(1)(H), and other functions as determined by the chairperson and the Committee.

**A-46**

**(3) Rule of construction**

Nothing in this section shall be construed as limiting the authority of any department or agency represented on the Committee to represent its own interests before the Committee.

### CREDIT(S)

(Sept. 8, 1950, c. 932, Title VII, § 721, as added Pub.L. 100-418, Title V, § 5021, Aug. 23, 1988, 102 Stat. 1425; amended Pub.L. 102-484, Div. A, Title VIII, § 837(a) to (c), (e), Oct. 23, 1992, 106 Stat. 2463 to 2465; Pub.L. 102-558, Title I, § 163, Oct. 28, 1992, 106 Stat. 4219; Pub.L. 103-359, Title VIII, § 809(d), Oct. 14, 1994, 108 Stat. 3454; Pub.L. 110-49, §§ 2 to 7(b), 8 to 10, July 26, 2007, 121 Stat. 246, 252 to 257, 259; Pub.L. 115-232, Div. A, Title XVII, §§ 1703 to 1717(a), 1718, 1719(a), 1720, 1721(c), 1723 to 1725, Aug. 13, 2018, 132 Stat. 2177, 2193, 2197, 2202, 2204; Pub.L. 116-283, Div. H, Title XCVII, § 9721(a), Jan. 1, 2021, 134 Stat. 4840.)

### TERMINATION DATE

<For termination of Title VII of the Act, with certain exceptions, see 50 U.S.C.A. § 4564(a).>

### EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11858

<May 7, 1975, 40 F.R. 20263, as amended by Ex. Ord. No. 12188, Jan. 2, 1980, 45 F.R. 989; Ex. Ord. No. 12661, Dec. 27, 1988, 54 F.R. 779; Ex. Ord. No. 12860, Sept. 3, 1993, 58 F.R. 47201; Ex. Ord. No. 13286, Sec. 57, Feb. 28, 2003, 68 F.R. 10629; Ex. Ord. No. 13456, Jan. 23, 2008, 73 F.R. 4677>

### Foreign Investment in the United States

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 721 of the Defense Production Act of 1950, as amended (50 U.S.C. App. 2170) [now 50 U.S.C.A. § 4565], and section 301 of Title 3, United States Code, it is hereby ordered as follows:

**Section 1. Policy.** International investment in the United States promotes economic growth, productivity, competitiveness, and job creation. It is the policy of the United States to support unequivocally such investment, consistent with the protection of the national security.

**Sec. 2. Definitions. (a)** The "Act" as used in this order means section 721 of the Defense Production Act of 1950 [50 U.S.C.A. § 4565], as amended.

**(b)** Terms used in this order that are defined in subsection 721(a) of the Act [50 U.S.C.A. § 4565(a)] shall have the same meaning in this order as they have in such subsection.

**(c)** "Risk mitigation measure" as used in this order means any provision of a risk mitigation agreement or a condition to which section 7 of this order refers.

**Sec. 3. Establishment. (a)** There is hereby established the Committee on Foreign Investment in the United States (the "Committee") as provided in the Act.

**(b)** In addition to the members specified in the Act, the following heads of departments, agencies, or offices shall be members of the Committee:

**(i)** The United States Trade Representative;

**(ii)** The Director of the Office of Science and Technology Policy; and

**(iii)** The heads of any other executive department, agency, or office, as the President or the Secretary of the Treasury determines appropriate, on a case-by-case basis.

**(c)** The following officials (or their designees) shall observe and, as appropriate, participate in and report to the President on the Committee's activities:

**(i)** The Director of the Office of Management and Budget;

**(ii)** The Chairman of the Council of Economic Advisers;

**(iii)** The Assistant to the President for National Security Affairs;

**(iv)** The Assistant to the President for Economic Policy; and

**(v)** The Assistant to the President for Homeland Security and Counterterrorism.

**Sec. 4. Duties of the Secretary of the Treasury.**

**(a)** The functions of the President under subsections (b)(1)(A) (relating to review and consideration after notification), (b)(1)(D) (relating to unilateral initiation of review and consideration), and (m)(3)(A) (relating to inclusion in annual report and designation) of the Act [50 U.S.C.A. § 4565(b)(1)(A), (D), (m)(30(A)] are assigned to the Secretary of the Treasury.

**(b)** The Secretary of the Treasury shall perform the function of issuance of regulations under section 721(h) of the Act [50 U.S.C.A. § 4565(h)]. The Secretary shall consult the Committee with respect to such regulations prior to any notice and comment and prior to their issuance.

**(c)** Except as otherwise provided in the Act or this order, the chairperson shall have the authority, exclusive of the heads of departments or agencies, after consultation with the Committee:

**(i)** to act, or authorize others to act, on behalf of the Committee; and

**(ii)** to communicate on behalf of the Committee with the Congress and the public.

**(d)** The chairperson shall coordinate the preparation of and transmit the annual report to the Congress provided for in the Act and may assign to any member of the Committee, as the chairperson determines appropriate and consistent with the Act, responsibility for conducting studies and providing analyses necessary for the preparation of the report.

**(e)** After consultation with the Committee, the chairperson may request that the Director of National Intelligence begin preparing the analysis required by the Act at any time, including prior to acceptance of the notice of a transaction, in accordance with otherwise applicable law. The Director of National Intelligence shall provide the Director's analysis as soon as possible and consistent with section 721(b)(4) of the Act [50 U.S.C.A. § 4565(b)(4)].

**Sec. 5. Lead Agency. (a)** The lead agency or agencies ("lead agency") shall have primary responsibility, on behalf of the Committee, for the specific activity for which the Secretary of the Treasury designates it a lead agency.

**(b)** In acting on behalf of the Committee, the lead agency shall keep the Committee fully informed of its activities. In addition, the lead agency shall notify the chairperson of any material action that the lead agency proposes to take on behalf of the Committee, sufficiently in advance to allow adequate time for the chairperson to consult the Committee and provide the Committee's direction to the lead agency not to take, or to amend, such action.

**Sec. 6. Reviews and Investigations.**

**(a)** Any member of the Committee may conduct its own inquiry with respect to the potential national security risk posed by a transaction, but communication with the parties to a transaction shall occur through or in the presence of the lead agency, or the chairperson if no lead agency has been designated.

**(b)** The Committee shall undertake an investigation of a transaction in any case, in addition to the circumstances described in the Act, in which following a review a member of the Committee advises the chairperson that the member believes that the transaction threatens to impair the national security of the United States and that the threat has not been mitigated.

**(c)** The Committee shall send a report to the President requesting the President's decision with respect to a review or investigation of a transaction in the following circumstances:

**(i)** the Committee recommends that the President suspend or prohibit the transaction;

**(ii)** the Committee is unable to reach a decision on whether to recommend that the President suspend or prohibit the transaction; or

**(iii)** the Committee requests that the President make a determination with regard to the transaction.

**(d)** Upon completion of a review or investigation of a transaction, the lead agency shall prepare for the approval of the chairperson the appropriate certified notice or report to the Congress called for under the Act. The chairperson shall transmit such notice or report to the Congress, as appropriate.

**Sec. 7. Risk Mitigation. (a)** The Committee, or any lead agency acting on behalf of the Committee, may seek to mitigate any national security risk posed by a transaction that is not adequately addressed by other provisions of law by entering into a mitigation agreement with the parties to a transaction or by imposing conditions on such parties.

**(b)** Prior to the Committee or a department or agency proposing risk mitigation measures to the parties to a transaction, the department or agency seeking to propose any such measure shall prepare and provide to the Committee a written statement that: (1) identifies the national security risk posed by the transaction based on factors including the threat (taking into account the Director of National Intelligence's threat analysis), vulnerabilities, and potential consequences; and (2) sets forth the risk mitigation measures the department or agency believes are reasonably necessary to address the risk. If the Committee agrees that mitigation is appropriate and approves the risk mitigation measures, the lead agency shall seek to negotiate such measures with the parties to the transaction.

**(c)** A risk mitigation measure shall not, except in extraordinary circumstances, require that a party to a transaction recognize, state its intent to comply with, or consent to the exercise of any authorities under existing provisions of law.

§ 4565. Authority to review certain mergers, acquisitions, and takeovers, 50 USCA § 4565

**(d)** The lead agency designated for the purpose of monitoring a risk mitigation measure shall seek to ensure that adequate resources are available for such monitoring. When designating a lead agency for those purposes, the Secretary of the Treasury shall consider the agency's views on the adequacy of its resources for such purposes.

**(e)(i)** Nothing in this order shall be construed to limit the ability of a department or agency, in the exercise of authorities other than those provided under the Act, to:

**(A)** conduct inquiries with respect to a transaction;

**(B)** communicate with the parties to a transaction; or

**(C)** negotiate, enter into, impose, or enforce contractual provisions with the parties to a transaction.

**(ii)** A department or agency shall not condition actions or the exercise of authorities to which paragraph (i) of this subsection refers upon the exercise, or forbearance in the exercise, of its authority under the Act or this order, and no authority under the Act shall be available for the enforcement of such actions or authorities.

**(f)** The Committee may initiate a review of a transaction that has previously been reviewed by the Committee only in the extraordinary circumstances provided in the Act.

**Sec. 8. Additional Assignments to the Committee.** In addition to the functions assigned to the Committee by the Act, the Committee shall review the implementation of the Act and this order and report thereon from time to time to the President, together with such recommendations for policy, administrative, or legislative proposals as the Committee determines appropriate.

**Sec. 9. Duties of the Secretary of Commerce.** The Secretary of Commerce shall:

**(a)** obtain, consolidate, and analyze information on foreign investment in the United States;

**(b)** monitor and, where necessary, improve procedures for the collection and dissemination of information on foreign investment in the United States;

**(c)** prepare for the public, the President or heads of departments or agencies, as appropriate, reports, analyses of trends, and analyses of significant developments in appropriate categories of foreign investment in the United States; and

**(d)** compile and evaluate data on significant transactions involving foreign investment in the United States.

**Sec. 10. General Provisions. (a)** The heads of departments and agencies shall provide, as appropriate and to the extent permitted by law, such information and assistance as the Committee may request to implement the Act and this order.

**(b)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** authority granted by law to a department or agency or the head thereof;

**(ii)** functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals; or

**(iii)** existing mitigation agreements.

**(c)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(d)** Officers of the United States with authority or duties under the Act or this order shall ensure that, in carrying out the Act and this order, the actions of departments, agencies, and the Committee are consistent with the President's constitutional authority to: (i) conduct the foreign affairs of the United States; (ii) withhold information the disclosure of which could impair the foreign relations, the national security, the deliberative processes of the Executive, or the performance of the Executive's constitutional duties; (iii) recommend for congressional consideration such measures as the President may judge necessary and expedient; and (iv) supervise the unitary executive branch.

**Sec. 11. Revocation.** Section 801 of Executive Order 12919 of June 3, 1994, is revoked.

<div align="right">GERALD R. FORD</div>

<div align="center">

**EXECUTIVE ORDER NO. 14083**

&lt;September 15, 2022, 86 F.R. 57369&gt;

**Continuing To Strengthen Americans' Access to Affordable, Quality Health Coverage**

</div>

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 721 of the Defense Production Act of 1950, as amended (50 U.S.C. 4565) (section 721), and section 301 of title 3, United States Code, it is hereby ordered as follows:

**Section 1. Policy.** The United States welcomes and supports foreign investment, consistent with the protection of national security. The United States commitment to open investment is a cornerstone of our economic policy and provides the United States with substantial economic benefits, including "the promotion of economic growth, productivity, competitiveness, and job creation, thereby enhancing national security," as the Congress recognized in section 1702(b)(1) of the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA) (Subtitle A of Title XVII of Public Law 115-232). Some investments in the United States by foreign persons, however, present risks to the national security of the United States, and it is for this reason that the United States maintains a robust foreign investment review process focused on identifying and addressing such risks.

It is important to ensure that the foreign investment review process remains responsive to an evolving national security landscape and the nature of the investments that pose related risks to national security, as the Congress recognized in section 1702(b)(4) of FIRRMA. One factor for the Committee on Foreign Investment in the United States (Committee) to consider, as the Congress highlighted in section 1702(c)(1) of FIRRMA, is that national security risks may arise from foreign investments involving "a country of special concern that has a demonstrated or declared strategic goal of acquiring a type of critical technology or critical infrastructure that would affect United States leadership in areas related to national security." Along these lines, I previously underscored in Executive Order 14034 of June 9, 2021 (Protecting Americans' Sensitive Data From Foreign Adversaries), and emphasize in this order the risks presented by foreign adversaries' access to data of United States persons. With respect to investments directly or indirectly involving foreign adversaries or other countries of special concern, what may otherwise appear to be an economic transaction undertaken for commercial purposes may actually present an unacceptable risk to United States national security due to the legal environment, intentions, or capabilities of the foreign person, including foreign governments, involved in the transaction. It is the policy of the United States Government to continue to respond to these risks as they evolve, including through a robust review of foreign investments in United States businesses.

In light of these risks, this order provides direction to the Committee to ensure that, in reviewing transactions within its jurisdiction (covered transactions), the Committee's review remains responsive to evolving national security risks, including by elaborating and expanding on the factors identified in subsections (f)(1)-(10) of section 721. This order shall be implemented

<div align="center">A-51</div>

§ 4565. Authority to review certain mergers, acquisitions, and takeovers, 50 USCA § 4565

consistent with the Committee's statutory mandate to determine the effects of each covered transaction reviewed by the Committee on the national security of the United States.

**Sec. 2. Elaboration on Existing Statutory Factors. (a)** In considering the factors described in subsection (f)(3) of section 721, the Committee shall, taking into account the requirements of national security, consider the following, as appropriate:

**(i)** It is important to national security that the Committee continues to assess the effect of foreign investment on domestic capacity to meet national security requirements, including those requirements that fall outside of the defense industrial base. In particular, the resilience of certain critical United States supply chains may have national security implications. The United States recognizes the importance of cooperating with its allies and partners to secure supply chains; however, certain foreign investment may undermine supply chain resilience efforts and therefore national security by making the United States vulnerable to future supply disruptions. These vulnerabilities may occur if an investment shifts ownership, rights, or control with respect to certain manufacturing capabilities, services, critical mineral resources, or technologies that are fundamental to national security-- including because they are critical to United States supply chain resilience--to a foreign person who might take actions that threaten to impair the national security of the United States as a result of the transaction, or to other foreign persons, including foreign governments, to whom the foreign person has commercial, investment, non-economic, or other ties (relevant third-party ties) that might cause the transaction to pose a threat to national security.

**(ii)** The Committee shall consider, as appropriate, the covered transaction's effect on supply chain resilience and security, both within and outside of the defense industrial base, in manufacturing capabilities, services, critical mineral resources, or technologies that are fundamental to national security, including: microelectronics, artificial intelligence, biotechnology and biomanufacturing, quantum computing, advanced clean energy (such as battery storage and hydrogen), climate adaptation technologies, critical materials (such as lithium and rare earth elements), elements of the agriculture industrial base that have implications for food security, and any other sectors identified in section 3(b) or section 4(a) of Executive Order 14017 of February 24, 2021 (America's Supply Chains).

**(A)** The Committee shall consider, as appropriate, the degree of involvement in the United States supply chain by a foreign person who is a party to the covered transaction and who might take actions that threaten to impair the national security of the United States as a result of the transaction, or who might have relevant third-party ties that might cause the transaction to pose such a threat.

**(B)** The Committee shall consider, as appropriate, the United States capability with respect to manufacturing capabilities, services, critical mineral resources, or technologies, including those described in subsection (a)(ii) of this section; the degree of diversification through alternative suppliers across the supply chain, including suppliers located in allied or partner economies; whether the United States business that is party to the covered transaction supplies, directly or indirectly, the United States Government, the energy sector industrial base, or the defense industrial base; and the concentration of ownership or control by the foreign person in a given supply chain, among other factors that the Committee determines to be appropriate in considering whether the covered transaction may undermine the resilience and security of supply chains critical to national security.

**(b)** In considering the factors described in subsection (f)(5) of section 721, the Committee shall, taking into account the requirements of national security, consider the following, as appropriate:

**(i)** Although foreign investments can in many circumstances help to foster domestic innovation, it is important to protect United States technological leadership by addressing the risks posed by investments by foreign persons who might take actions that threaten to impair the national security of the United States as a result of the transaction, and by addressing whether such persons have relevant third-party ties that might cause the transaction to pose such a threat.

**(ii)** The Committee shall consider, as appropriate, whether a covered transaction involves manufacturing capabilities, services, critical mineral resources, or technologies that are fundamental to United States technological leadership and therefore national

A-52

security, such as microelectronics, artificial intelligence, biotechnology and biomanufacturing, quantum computing, advanced clean energy, and climate adaptation technologies. The Committee shall also consider, as appropriate, relevant third-party ties that might cause the transaction to threaten to impair the national security of the United States.

**(iii)** The Committee shall consider, as appropriate, whether a covered transaction could reasonably result in future advancements and applications in technology that could undermine national security.

**(iv)** The Office of Science and Technology Policy (OSTP), in consultation with other members of the Committee, shall periodically publish a list of technology sectors, including those technologies listed in subsection (b)(ii) of this section, that it assesses are fundamental to United States technological leadership in areas relevant to national security. OSTP shall, as appropriate, draw on the findings of other United States Government efforts to identify technology sectors that are fundamental to United States technological leadership. The Committee shall consider the list described in this subsection, as appropriate.

**Sec. 3. Additional Factors to be Considered. (a)** In addition to the factors identified in subsections (f)(1)-(10) of section 721, the Committee shall consider, in reviewing the effects of a covered transaction on the national security of the United States, the following factors relating to aggregate industry investment trends that may have consequences for an individual covered transaction's impact on national security:

**(i)** Incremental investments over time in a sector or technology may cede, part-by-part, domestic development or control in that sector or technology and may give a foreign person who might take actions that threaten to impair the national security of the United States as a result of the transaction, or their relevant third-party ties that might cause the transaction to pose such a threat, control of or rights in United States businesses in a manner that may result in national security risk. A series of acquisitions in the same, similar, or related United States businesses involved in activities that are fundamental to national security or on terms that implicate national security may result in a particular covered transaction giving rise to a national security risk when considered in the context of transactions that preceded it. In aggregate, these transactions may facilitate harmful technology transfer in key industries or otherwise harm national security through the cumulative effect of these investments. As the Congress identified in section 1702(c)(2) of FIRRMA, the Committee may consider "the cumulative control of, or pattern of recent transactions involving, any one type of critical infrastructure, energy asset, critical material, or critical technology by a foreign government or foreign person" in considering national security risks. Contextualizing the Committee's review of an individual transaction in light of the aggregate or series of related transactions could reveal national security risks arising from the covered transaction that were not otherwise apparent.

**(ii)** The Committee shall consider, as appropriate, as part of the Committee's review of a covered transaction, the risks arising from the covered transaction in the context of multiple acquisitions or investments in a single sector or in related manufacturing capabilities, services, critical mineral resources, or technologies, by any foreign person who might take actions that threaten to impair the national security of the United States as a result of the transaction, or involving relevant third-party ties that might cause the transaction to pose such a threat.

**(iii)** The Committee may request, as part of the Committee's review of a covered transaction, that the Department of Commerce's International Trade Administration provide the Committee an analysis of the industry or industries in which the United States business operates, and the cumulative control of, or pattern of recent transactions by, a foreign person, including, directly or indirectly, a foreign government, in that sector or industry.

**(b)** In addition to the factors identified in subsections (f)(1)-(10) of section 721, the Committee shall consider, in reviewing the effects of a covered transaction on the national security of the United States, the following factors relating to cybersecurity risks resulting from a covered transaction that threaten to impair national security:

**(i)** It is important for the United States to ensure that foreign investment in United States businesses does not erode United States cybersecurity. Investments by foreign persons with the capability and intent to conduct cyber intrusions or other malicious cyber-

enabled activity--such as activity designed to affect the outcome of any election for Federal, State, Tribal, local, or territorial office; the operation of United States critical infrastructure; or the confidentiality, integrity, or availability of United States communications--may pose a risk to national security. The Congress, in section 1702(c)(6) of FIRRMA, identified "exacerbating or creating new cybersecurity vulnerabilities" as a relevant consideration for the Committee when considering national security risks arising from a covered transaction. Review of foreign investment is an important tool as part of broader United States efforts to ensure the cybersecurity of the United States.

**(ii)** The Committee shall consider, as appropriate, whether a covered transaction may provide a foreign person who might take actions that threaten to impair the national security of the United States as a result of the transaction, or their relevant third-party ties that might cause the transaction to pose such a threat, with direct or indirect access to capabilities or information databases and systems on which threat actors could engage in malicious cyber-enabled activities affecting the interests of the United States or United States persons, including:

**(A)** activity designed to undermine the protection or integrity of data in storage or databases or systems housing sensitive data;

**(B)** activity designed to interfere with United States elections, United States critical infrastructure, the defense industrial base, or other cybersecurity national security priorities set forth in Executive Order 14028 of May 12, 2021 (Improving the Nation's Cybersecurity); and

**(C)** the sabotage of critical energy infrastructure, including smart grids.

**(iii)** The Committee shall also consider, as appropriate, the cybersecurity posture, practices, capabilities, and access of both the foreign person and the United States business that could allow a foreign person who might take actions that threaten to impair the national security of the United States as a result of the transaction, or their relevant third-party ties that might cause the transaction to pose such a threat, to manifest cyber intrusion and other malicious cyber-enabled activity within the United States.

**(c)** In addition to the factors identified in subsections (f)(1)-(10) of section 721, the Committee shall consider, in reviewing the effects of a covered transaction on the national security of the United States, the following factors relating to national security concerns surrounding sensitive data:

**(i)** Data is an increasingly powerful tool for the surveillance, tracing, tracking, and targeting of individuals or groups of individuals, with potential adverse impacts on national security. In section 1702(c)(5) of FIRRMA, the Congress recognized that the Committee may consider whether a covered transaction may "expose, either directly or indirectly, personally identifiable information, genetic information, or other sensitive data of United States citizens to access by a foreign government or foreign person that may exploit that information in a manner that threatens national security." Moreover, advances in technology, combined with access to large data sets, increasingly enable the re-identification or de-anonymization of what once was unidentifiable data. Therefore, it is important for the United States Government to stay current with threats posed by advances in such technology, including by considering potential risks posed by foreign persons who might exploit access to certain data on United States persons to target individuals or groups within the United States to the detriment of national security. Accordingly, the Committee shall consider whether foreign investments in United States businesses that have access to or that store United States persons' sensitive data, including health and biological data, involve a foreign person who might take actions that threaten to impair the national security of the United States as a result of the transaction, including whether the foreign person might have relevant third-party ties that might cause the transaction to pose such a threat.

**(ii)** The Committee shall consider, as appropriate, whether a covered transaction involves a United States business that:

**(A)** has access to United States persons' sensitive data, including United States persons' health, digital identity, or other biological data and any data that could be identifiable or de-anonymized, that could be exploited to distinguish or trace an individual's identity in a manner that threatens national security; or

**(B)** has access to data on sub-populations in the United States that could be used by a foreign person to target individuals or groups of individuals in the United States in a manner that threatens national security.

**(iii)** The Committee shall also consider, as appropriate, whether a covered transaction involves the transfer of United States persons' sensitive data to a foreign person who might take actions that threaten to impair the national security of the United States as a result of the transaction, and whether the foreign person has relevant third-party ties that have sought to exploit such information or have the ability to exploit such information to the detriment of national security, including through the use of commercial or other means.

**Sec. 4. Periodic Review.** Consistent with the policy described in section 1 of this order, it is important for the Committee, on an ongoing basis, to continue to review its processes, practices, and regulations, and to continue to make any updates as needed and appropriate to ensure that the Committee's consideration of national security risks remains robust alongside changes to the national security landscape. Accordingly, the Committee shall regularly review its processes, practices, and regulations, and shall periodically provide to the Assistant to the President for National Security Affairs a report documenting the results of its review. The report shall also include any resulting policy recommendations that the Committee considers necessary to meet the evolving set of national security risks.

**Sec. 5. Definitions.** For purposes of this order, terms shall have the same meanings ascribed to them in section 721 and regulations promulgated by the Committee under section 721.

**Sec. 6. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, affect the requirements in section 721 relating to the scope of the Committee's jurisdiction.

**(d)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN JR.

## MEMORANDA OF PRESIDENT

### PRESIDENTIAL MEMORANDUM

<Oct. 26, 1988, 53 F.R. 43999>

### Interim Directive Regarding Disposition of Certain Mergers, Acquisitions, and Takeovers

By virtue of the authority vested in me by the Constitution and statutes of the United States, including without limitation Section 301 of Title 3 of the United States Code, the Defense Production Act of 1950, as amended (50 U.S.C. App. 2061 et seq.) [now

§ 4565. Authority to review certain mergers, acquisitions, and takeovers, 50 USCA § 4565

50 U.S.C.A. § 4501 et seq.], and the Omnibus Trade and Competitiveness Act of 1988 (Pub.L. 100-418, August 23, 1988) (the "Act") [see Tables for classification] it is ordered as follows:

Pending the issuance of an Executive order to implement the Act, the Secretary of the Treasury is hereby designated and empowered to perform the following-described functions of the President: The authority vested in the President by Section 721 of the Defense Production Act of 1950, as amended [this section], relative to mergers, acquisitions, and takeovers proposed or pending on or after the date of enactment of the Act [Aug. 23, 1988] by or with foreign persons which could result in foreign control of persons engaged in interstate commerce in the United States.

The Secretary of the Treasury shall consult with the Committee on Foreign Investment in the United States, established pursuant to Executive Order No. 11858 [set out under this section] and chaired by the representative of the Secretary of the Treasury, to take such actions or make such recommendations as requested by the Secretary of the Treasury.

The delegation provided herein shall terminate, and this interim directive shall be without any further effect, except as may be provided in the Executive order implementing the Act, upon the effective date of such order.

This interim directive shall be published in the Federal Register.

RONALD REAGAN

Notes of Decisions (5)

50 U.S.C.A. § 4565, 50 USCA § 4565
Current through P.L. 118-41. Some statute sections may be more current, see credits for details.

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**A-56**



H. R. 815

# One Hundred Eighteenth Congress
## of the
## United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Wednesday,*
*the third day of January, two thousand and twenty-four*

## An Act

Making emergency supplemental appropriations for the fiscal year ending September 30, 2024, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SECTION 1. ORGANIZATION OF ACT INTO DIVISIONS.

(a) DIVISIONS.—This Act is organized into the following divisions:

(1) DIVISION A.—Israel Security Supplemental Appropriations Act, 2024.

(2) DIVISION B.—Ukraine Security Supplemental Appropriations Act, 2024.

(3) DIVISION C.—Indo-Pacific Security Supplemental Appropriations Act, 2024.

(4) DIVISION D.—21st Century Peace through Strength Act.

(5) DIVISION E.—FEND off Fentanyl Act.

(6) DIVISION F.—Rebuilding Economic Prosperity and Opportunity for Ukrainians Act.

(7) DIVISION G.—Other Matters.

(8) DIVISION H.—Protecting Americans from Foreign Adversary Controlled Applications Act.

(9) DIVISION I.—Protecting Americans' Data from Foreign Adversaries Act of 2024.

(10) DIVISION J.—SHIP Act.

(11) DIVISION K.—Fight CRIME Act.

(12) DIVISION L.—MAHSA Act.

(13) DIVISION M.—Hamas and Other Palestinian Terrorist Groups International Financing Prevention Act.

(14) DIVISION N.—No Technology for Terror Act.

(15) DIVISION O.—Strengthening Tools to Counter the Use of Human Shields Act.

(16) DIVISION P.—Illicit Captagon Trafficking Suppression Act.

(17) DIVISION Q.—End Financing for Hamas and State Sponsors of Terrorism Act.

(18) DIVISION R.—Holding Iranian Leaders Accountable Act.

(19) DIVISION S.—Iran-China Energy Sanctions Act of 2023.

(20) DIVISION T.—Budgetary Effects.

### SEC. 2. REFERENCES.

Except as expressly provided otherwise, any reference to "this Act" contained in any division of this Act shall be treated as referring only to the provisions of that division.

H. R. 815—61

Fusion Development Strategy programs of the People's Republic of China, including the following:

(1) A brief summary of each such identified field and its relevance to the military power and national security of the People's Republic of China.

(2) The implications for the national security of the United States as a result of the leadership or dominance by the People's Republic of China in each such identified field and associated supply chains.

(3) The identification of at least 10 entities domiciled in, controlled by, or directed by the People's Republic of China (including any subsidiaries of such entity), involved in each such identified field, and an assessment of, with respect to each such entity, the following:

(A) Whether the entity has procured components from any known United States suppliers.

(B) Whether any United States technology imported by the entity is controlled under United States regulations.

(C) Whether United States capital is invested in the entity, either through known direct investment or passive investment flows.

(D) Whether the entity has any connection to the People's Liberation Army, the Military-Civil Fusion program of the People's Republic of China, or any other state-sponsored initiatives of the People's Republic of China to support the development of national champions.

(c) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Affairs of the House of Representatives;

(2) the Committee on Armed Services of the House of Representatives;

(3) the Committee on Foreign Relations of the Senate; and

(4) the Committee on Armed Services of the Senate.

# DIVISION H—PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

### SEC. 1. SHORT TITLE.

This division may be cited as the "Protecting Americans from Foreign Adversary Controlled Applications Act".

### SEC. 2. PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.

(a) IN GENERAL.—

(1) PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.—It shall be unlawful for an entity to distribute, maintain, or update (or enable the distribution, maintenance, or updating of) a foreign adversary controlled application by carrying out, within the land or maritime borders of the United States, any of the following:

A-58

H. R. 815—62

(A) Providing services to distribute, maintain, or update such foreign adversary controlled application (including any source code of such application) by means of a marketplace (including an online mobile application store) through which users within the land or maritime borders of the United States may access, maintain, or update such application.

(B) Providing internet hosting services to enable the distribution, maintenance, or updating of such foreign adversary controlled application for users within the land or maritime borders of the United States.

(2) APPLICABILITY.—Subject to paragraph (3), this subsection shall apply—

(A) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(A), beginning on the date that is 270 days after the date of the enactment of this division; and

(B) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(B), beginning on the date that is 270 days after the date of the relevant determination of the President under such subsection.

(3) EXTENSION.—With respect to a foreign adversary controlled application, the President may grant a 1-time extension of not more than 90 days with respect to the date on which this subsection would otherwise apply to such application pursuant to paragraph (2), if the President certifies to Congress that—

(A) a path to executing a qualified divestiture has been identified with respect to such application;

(B) evidence of significant progress toward executing such qualified divestiture has been produced with respect to such application; and

(C) there are in place the relevant binding legal agreements to enable execution of such qualified divestiture during the period of such extension.

(b) DATA AND INFORMATION PORTABILITY TO ALTERNATIVE APPLICATIONS.—Before the date on which a prohibition under subsection (a) applies to a foreign adversary controlled application, the entity that owns or controls such application shall provide, upon request by a user of such application within the land or maritime borders of United States, to such user all the available data related to the account of such user with respect to such application. Such data shall be provided in a machine readable format and shall include any data maintained by such application with respect to the account of such user, including content (including posts, photos, and videos) and all other account information.

(c) EXEMPTIONS.—

(1) EXEMPTIONS FOR QUALIFIED DIVESTITURES.—Subsection (a)—

(A) does not apply to a foreign adversary controlled application with respect to which a qualified divestiture is executed before the date on which a prohibition under subsection (a) would begin to apply to such application; and

A-59

H. R. 815—63

(B) shall cease to apply in the case of a foreign adversary controlled application with respect to which a qualified divestiture is executed after the date on which a prohibition under subsection (a) applies to such application.

(2) EXEMPTIONS FOR CERTAIN NECESSARY SERVICES.—Subsections (a) and (b) do not apply to services provided with respect to a foreign adversary controlled application that are necessary for an entity to attain compliance with such subsections.

(d) ENFORCEMENT.—

(1) CIVIL PENALTIES.—

(A) FOREIGN ADVERSARY CONTROLLED APPLICATION VIOLATIONS.—An entity that violates subsection (a) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $5,000 by the number of users within the land or maritime borders of the United States determined to have accessed, maintained, or updated a foreign adversary controlled application as a result of such violation.

(B) DATA AND INFORMATION VIOLATIONS.—An entity that violates subsection (b) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $500 by the number of users within the land or maritime borders of the United States affected by such violation.

(2) ACTIONS BY ATTORNEY GENERAL.—The Attorney General—

(A) shall conduct investigations related to potential violations of subsection (a) or (b), and, if such an investigation results in a determination that a violation has occurred, the Attorney General shall pursue enforcement under paragraph (1); and

(B) may bring an action in an appropriate district court of the United States for appropriate relief, including civil penalties under paragraph (1) or declaratory and injunctive relief.

(e) SEVERABILITY.—

(1) IN GENERAL.—If any provision of this section or the application of this section to any person or circumstance is held invalid, the invalidity shall not affect the other provisions or applications of this section that can be given effect without the invalid provision or application.

(2) SUBSEQUENT DETERMINATIONS.—If the application of any provision of this section is held invalid with respect to a foreign adversary controlled application that satisfies the definition of such term pursuant to subsection (g)(3)(A), such invalidity shall not affect or preclude the application of the same provision of this section to such foreign adversary controlled application by means of a subsequent determination pursuant to subsection (g)(3)(B).

(f) RULE OF CONSTRUCTION.—Nothing in this division may be construed—

(1) to authorize the Attorney General to pursue enforcement, under this section, other than enforcement of subsection (a) or (b);

**A-60**

H. R. 815—64

(2) to authorize the Attorney General to pursue enforcement, under this section, against an individual user of a foreign adversary controlled application; or

(3) except as expressly provided herein, to alter or affect any other authority provided by or established under another provision of Federal law.

(g) DEFINITIONS.—In this section:

(1) CONTROLLED BY A FOREIGN ADVERSARY.—The term "controlled by a foreign adversary" means, with respect to a covered company or other entity, that such company or other entity is—

(A) a foreign person that is domiciled in, is headquartered in, has its principal place of business in, or is organized under the laws of a foreign adversary country;

(B) an entity with respect to which a foreign person or combination of foreign persons described in subparagraph (A) directly or indirectly own at least a 20 percent stake; or

(C) a person subject to the direction or control of a foreign person or entity described in subparagraph (A) or (B).

(2) COVERED COMPANY.—

(A) IN GENERAL.—The term "covered company" means an entity that operates, directly or indirectly (including through a parent company, subsidiary, or affiliate), a website, desktop application, mobile application, or augmented or immersive technology application that—

(i) permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content;

(ii) has more than 1,000,000 monthly active users with respect to at least 2 of the 3 months preceding the date on which a relevant determination of the President is made pursuant to paragraph (3)(B);

(iii) enables 1 or more users to generate or distribute content that can be viewed by other users of the website, desktop application, mobile application, or augmented or immersive technology application; and

(iv) enables 1 or more users to view content generated by other users of the website, desktop application, mobile application, or augmented or immersive technology application.

(B) EXCLUSION.—The term "covered company" does not include an entity that operates a website, desktop application, mobile application, or augmented or immersive technology application whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews.

(3) FOREIGN ADVERSARY CONTROLLED APPLICATION.—The term "foreign adversary controlled application" means a website, desktop application, mobile application, or augmented or immersive technology application that is operated, directly or indirectly (including through a parent company, subsidiary, or affiliate), by—

(A) any of—

(i) ByteDance, Ltd.;

**A-61**

H. R. 815—65

(ii) TikTok;

(iii) a subsidiary of or a successor to an entity identified in clause (i) or (ii) that is controlled by a foreign adversary; or

(iv) an entity owned or controlled, directly or indirectly, by an entity identified in clause (i), (ii), or (iii); or

(B) a covered company that—

(i) is controlled by a foreign adversary; and

(ii) that is determined by the President to present a significant threat to the national security of the United States following the issuance of—

(I) a public notice proposing such determination; and

(II) a public report to Congress, submitted not less than 30 days before such determination, describing the specific national security concern involved and containing a classified annex and a description of what assets would need to be divested to execute a qualified divestiture.

(4) FOREIGN ADVERSARY COUNTRY.—The term "foreign adversary country" means a country specified in section 4872(d)(2) of title 10, United States Code.

(5) INTERNET HOSTING SERVICE.—The term "internet hosting service" means a service through which storage and computing resources are provided to an individual or organization for the accommodation and maintenance of 1 or more websites or online services, and which may include file hosting, domain name server hosting, cloud hosting, and virtual private server hosting.

(6) QUALIFIED DIVESTITURE.—The term "qualified divestiture" means a divestiture or similar transaction that—

(A) the President determines, through an interagency process, would result in the relevant foreign adversary controlled application no longer being controlled by a foreign adversary; and

(B) the President determines, through an interagency process, precludes the establishment or maintenance of any operational relationship between the United States operations of the relevant foreign adversary controlled application and any formerly affiliated entities that are controlled by a foreign adversary, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing.

(7) SOURCE CODE.—The term "source code" means the combination of text and other characters comprising the content, both viewable and nonviewable, of a software application, including any publishing language, programming language, protocol, or functional content, as well as any successor languages or protocols.

(8) UNITED STATES.—The term "United States" includes the territories of the United States.

**SEC. 3. JUDICIAL REVIEW.**

(a) RIGHT OF ACTION.—A petition for review challenging this division or any action, finding, or determination under this division

**A-62**

H. R. 815—66

may be filed only in the United States Court of Appeals for the District of Columbia Circuit.

(b) EXCLUSIVE JURISDICTION.—The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over any challenge to this division or any action, finding, or determination under this division.

(c) STATUTE OF LIMITATIONS.—A challenge may only be brought—

(1) in the case of a challenge to this division, not later than 165 days after the date of the enactment of this division; and

(2) in the case of a challenge to any action, finding, or determination under this division, not later than 90 days after the date of such action, finding, or determination.

# DIVISION I—PROTECTING AMERICANS' DATA FROM FOREIGN ADVERSARIES ACT OF 2024

### SEC. 1. SHORT TITLE.

This division may be cited as the "Protecting Americans' Data from Foreign Adversaries Act of 2024".

### SEC. 2. PROHIBITION ON TRANSFER OF PERSONALLY IDENTIFIABLE SENSITIVE DATA OF UNITED STATES INDIVIDUALS TO FOREIGN ADVERSARIES.

(a) PROHIBITION.—It shall be unlawful for a data broker to sell, license, rent, trade, transfer, release, disclose, provide access to, or otherwise make available personally identifiable sensitive data of a United States individual to—

(1) any foreign adversary country; or

(2) any entity that is controlled by a foreign adversary.

(b) ENFORCEMENT BY FEDERAL TRADE COMMISSION.—

(1) UNFAIR OR DECEPTIVE ACTS OR PRACTICES.—A violation of this section shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)).

(2) POWERS OF COMMISSION.—

(A) IN GENERAL.—The Commission shall enforce this section in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this section.

(B) PRIVILEGES AND IMMUNITIES.—Any person who violates this section shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act.

(3) AUTHORITY PRESERVED.—Nothing in this section may be construed to limit the authority of the Commission under any other provision of law.

(c) DEFINITIONS.—In this section:

(1) COMMISSION.—The term "Commission" means the Federal Trade Commission.

A-63