## 24-34

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

◆◆

SAMANTHA ALARIO; HEATHER DIROCCO; CARLY ANN GODDARD;
ALICE HELD; DALE STOUT; TIKTOK INC.,

*Plaintiffs-Appellees,*

— v.—

AUSTIN KNUDSEN, in his official capacity as
Attorney General of the State of Montana,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA,
THE HON. DONALD W. MOLLOY, DISTRICT JUDGE

## BRIEF OF *AMICUS CURIAE*
## COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION
## IN SUPPORT OF PLAINTIFFS-APPELLEES

STEPHANIE JOYCE
COMPUTER & COMMUNICATIONS
  INDUSTRY ASSOCIATION
25 Massachusetts Avenue NW,
  Suite 300C
Washington, D.C. 20001
(202) 838-3173

*Attorney for Amicus Curiae*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* states as follows:

The Computer & Communications Industry Association (CCIA) is a trade association operating as a 501(c)(6) non-profit, non-stock corporation organized under the laws of Virginia. CCIA has no parent corporation and no publicly held corporation owns 10% or more of its stock.

/s/ *Stephanie A. Joyce*
Stephanie A. Joyce

May 6, 2024

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT.............................................................. i

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF *AMICUS CURIAE* .......................................................1

INTEREST OF *AMICUS CURIAE* ..........................................................1

INTRODUCTION ...............................................................................2

SUMMARY OF ARGUMENT ...............................................................6

ARGUMENT ....................................................................................6

I.  THE FIRST AMENDMENT PROTECTS APP STORES' EDITORIAL DECISIONS. ...........................................................................6

    A.  App Stores Are Entitled To First Amendment Protection. ...................7

    B.  Digital Apps Engage in Expressive Content When They Exercise Editorial Judgment Over Which Applications to Display. .................11

II.  MONTANA'S SB419 VIOLATES APP STORES' FIRST AMENDMENT RIGHTS. ..........................................................................15

CONCLUSION ...............................................................................20

CERTIFICATE OF COMPLIANCE .......................................................21

CERTIFICATE OF SERVICE .............................................................22

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Ark. Educ. Television Comm'n v. Forbes*,
    523 U.S. 666 (1998) ...................................................................9-10

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004) ...................................................................16

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ...................................................................9, 10

*Barrows v. Jackson*,
    346 U.S. 249 (1953) ...................................................................15

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001) ...................................................................9, 19

*Berger v. City of Seattle*,
    569 F.3d 1029 (9th Cir. 2009) ...................................................16

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011) ...................................................................9

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988) ...................................................................9

*Dandridge v. Williams*,
    397 U.S. 471 (1970) ...................................................................15

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) .....................................................12

*e-ventures Worldwide, LLC v. Google, Inc.*,
    188 F. Supp. 3d 1265 (M.D. Fla. 2016) ...................................10

*Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston, Inc.*,
    515 U.S. 557 (1995) .............................................................*passim*

*Langdon v. Google, Inc.*,
    474 F. Supp. 2d 622 (D. Del. 2007) ........................................10

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
466 U.S. 789 (1984) ........................................................... 5

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ...................................................... 7-8, 14

*NetChoice, LLC v. Att'y Gen., Fla.*,
34 F.4th 1196 (11th Cir. 2022) ................................... 10, 12

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) ......................................................... 17

*Riley v. California*,
573 U.S. 373 (2014) ........................................................... 3

*Smith v. Marsh*,
194 F.3d 1045 (9th Cir. 1999) ...................................... 18

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ....................................................... 7, 9

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ........................................................... 9

*United States v. Hansen*,
143 S. Ct. 1932 (2023) ...................................................... 5

*Warth v. Seldin*,
422 U.S. 490 (1975) ......................................................... 15

*Zhang v. Baidu.Com, Inc.*,
10 F. Supp. 3d 433 (S.D.N.Y. 2014) ............................ 10

**Statutes**

Public Law No. 118-50, Protecting Americans from Foreign Adversary Controlled Applications Act (April 24, 2024) ......................... 2

SB384, Consumer Data Privacy Act ........................................ 18

SB384 § 7(1)(a) ................................................................. 19

SB384 § 7(1)(b) ................................................................. 19

SB419 § 1(1) ...................................................................... 20

SB419 § 1(1)(a) ................................................................ 3, 4, 20

SB419 § 1(1)(b) .................................................................. 4, 20

SB419 § 1(2) .......................................................................... 3, 4

SB419 § 1(7)(a) ........................................................................ 4

## Constitutional Provisions

U.S. Const. amend. I ........................................................ *passim*

## Other Authorities

Apple, *App Store*, https://www.apple.com/app-store/ ........................... 12-13

Apple, *App Store Review Guidelines*, https://developer.apple.com/app-
    store/review/guidelines/#safety ........................................... 12

Apple, *Discovery on the App Store and the Mac App Store*,
    https://developer.apple.com/app-store/discoverability/ ........................ 13

Google, *Developer Policy Center*, https://play.google.com/intl/en-
    US/about/developer-content-policy/ ...................................... 11

Google, *Policy Center: App Discovery and Ranking*,
    https://support.google.com/googleplay/android-
    developer/answer/9958766 ................................................ 12

Samsung, *App Distribution Guide*,
    https://developer.samsung.com/galaxy-store/distribution-
    guide.html .............................................................. 13-14

Samsung, *Galaxy Store*, https://galaxystore.samsung.com/apps ................. 14

## STATEMENT OF *AMICUS CURIAE*

This brief was authored entirely by the undersigned counsel and was funded entirely by the *amicus curiae*. No person or party other than *amicus curiae* contributed money to the creation, filing, or service of this brief. All parties have consented in writing to the filing of this brief.

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* the Computer & Communications Industry Association ("CCIA") is an international, not-for-profit association representing a broad cross-section of communications, technology, and internet industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks. CCIA has considerable experience litigating the First Amendment implications of restrictions on online speech, including as co-plaintiff in two federal cases presently before the Supreme Court on petitions for certiorari. *See NetChoice, LLC et al. v. Paxton*, No. 22-555; *NetChoice, LLC et al. v. Moody*, No. 22-277; *Moody v. NetChoice, LLC et al.*, No. 22-393.

1

Several CCIA members, in particular app stores, are expressly regulated by SB419.[1]  Unless SB419 remains enjoined, these companies' core First Amendment rights will be infringed.

CCIA filed a brief *amicus curiae* below with leave of the district court. Nos. 9:23-cv-56-DWM & 9:23-cv-61-DWM, ECF 48.

As the Court is likely aware, on April 24, 2024, President Biden signed Public Law No. 118-50, a package of legislation that includes the Protecting Americans from Foreign Adversary Controlled Applications Act, which will make it unlawful to "distribute, maintain, or update" a "foreign adversary controlled application" – defined to include TikTok – unless it is divested from Bytedance Ltd. by approximately January 19, 2025.  CCIA does not opine here on any aspect of that law, including Congress' intent and justifications for it, whether that law comports with the U.S. Constitution and other federal law, and what effect, if any, that law has on SB419.

## **INTRODUCTION**

The district court was correct in entering the preliminary injunction of SB419, which "imposes a $10,000 penalty on either TikTok or a mobile application store for 'each time that a user accesses TikTok, is offered the ability to access TikTok,

---

[1] TikTok is not a member of CCIA; see list at https://www.ccianet.org/members.

or is offered the ability to download TikTok,'" plus "an additional $10,000 assessment for each day the violation continues." No. 23-cv-56-M-DWM, ECF 113, Opin. and Order at 8-9 (Nov. 30, 2023) (quoting SB419 § 1). SB 419 "implicates traditional First Amendment speech," ECF 113 at 14, not only for "both groups of Plaintiffs," *id*., but also for the intermediaries whose editorial judgment would be harshly punished by these daily-accruing fines.

Software applications on mobile devices, commonly called "apps", are a ubiquitous feature of modern life. Not only do they "offer a range of tools for managing detailed information," *Riley v. California*, 573 U.S. 373, 396 (2014), but they are a critical means of expression. They provide news, entertainment, access to the arts, political information, and health data, and cater to hobbies and interests of all description. "[T]he phrase 'there's an app for that' is now part of the popular lexicon." *Id*.

Through SB419, the State of Montana has singled out one app and one means of expression—TikTok—for banishment. SB419 works in two ways. <u>First</u>, it prohibits TikTok from operating in the State. *See* SB419 §§ 1(1)(a), 1(2). <u>Second</u>, it prohibits app stores[2] from providing even "the option to download the tiktok [*sic*]

---

[2] As quoted above, SB419 uses the term "mobile application store." For economy, CCIA herein uses the term "app store," which refers to any entity that assists consumers in obtaining software applications and may more precisely be described as "software intermediary services."

3

mobile application" "within the territorial jurisdiction of Montana." *Id*. § 1(1)(b).
An app store that does not remove TikTok by January 1, 2024,[3] will be fined $10,000
for each person within Montana who has access to TikTok for every day that TikTok
is available. *Id*. §§ 1(1)(b), 1(2), 1(7)(a). For example, an app store accessible by
100,000 people within Montana will be liable for $1 billion in civil fines for every
day TikTok remains available. By punishing app stores for every person who *could*
access TikTok, even if they never download or use it, SB419 imposes harsher
penalties on app stores than on TikTok itself, which is liable only if people within
Montana actually access or use it, *id*. §§ 1(1)(a), 1(2), 1(7)(a).

Several of CCIA's members provide consumers with software intermediary
services, or app stores, that are subject to SB419. App stores' expressive control is
essential to the flourishing array of experiences that users seek on their devices. Like
a publisher who selects and arranges articles by third-party authors, a bookstore that
selects which books to offer and promote, and a cable operator selecting its
programming, app stores engage in protected speech when they exercise their
editorial discretion about which apps to present, and how. Montana's

---

[3] *Amicus curiae* is not aware whether the State of Montana would attempt, if SB 419 is permitted to go into effect, to impose penalties retroactively.

4

"unprecedented"[4] and severe restriction on what app stores can offer infringes these private companies' First Amendment rights.

CCIA submits this brief to provide the Court with a unique perspective on SB419's unconstitutional restrictions on app stores, which consideration is appropriate given that Plaintiffs lodged an overbreadth challenge to SB419. *See* Br. ISO Consol. Pls.' Mot. for Preliminary Injunction, No. 9:23-cv-00056, ECF 12 at 16-17; Pls.' Mem. of Law ISO Mot. for Preliminary Injunction, ECF 18 at 13-14. The overbreadth doctrine provides that a law is facially invalid when its unconstitutional scope is both real and substantial in relation to any lawful effect. *See United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023). Overbreadth analysis accounts for a law's effects on all parties, including those "not before the Court." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Though the overbreadth doctrine may often turn on "hypotheticals," *Hansen*, 143 S. Ct. at 1947 n.5, in this case it turns on direct, concrete, and explicit effects on many of CCIA's members. To be clear: SB419 gravely infringes app stores' First Amendment rights.

---

[4] Complaint for Injunctive and Declaratory Relief, No. 9:23-cv-00056, ECF 1 at 22 ¶ 53 (quoting Attorney General Knudsen).

## SUMMARY OF ARGUMENT

The First Amendment protects app stores' editorial discretion. Like traditional publishers and distributors of speech, app stores have a First Amendment right to curate the third-party content they provide. The Supreme Court has repeatedly held that the First Amendment protects the exercise of editorial discretion by publishers and distributors of speech. Those principles shield the selection and presentation of articles in a newspaper, books in a bookstore, and broadcast channels in a cable lineup. They also protect app stores' selection of apps.

Montana failed to justify SB419 below and has failed to do so here. Further, even if the purported justifications for SB419 have some merit, the State could have accomplished its goals without imposing massive penalties on app stores. And if the State's asserted interests are not compelling, no basis exists to punish app stores for making TikTok available, and Montana's entire law is facially invalid. Therefore, the Court should affirm the preliminary injunction of SB419.

## ARGUMENT

## I. THE FIRST AMENDMENT PROTECTS APP STORES' EDITORIAL DECISIONS.

The First Amendment protects those who curate, select, and present the speech of others. *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 569-70 (1995) ("the presentation of an edited compilation of speech generated by other persons . . . fall[s] squarely within the core of First Amendment

6

security").  App stores engage in this constitutionally protected expression in three ways: developing standards that govern the types of apps allowed; applying those standards; and curating a user experience that reflects the app store's editorial discretion.

### A.    App Stores Are Entitled To First Amendment Protection.

App stores function like publishers and distributors of third-party speech, because they decide which apps to accept and how to present those apps to users. The First Amendment protects the rights of publishers and distributors to make these "editorial" choices, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974), and to "disseminate" speech, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). App stores warrant the same protection.

The Supreme Court has explained that publishers are "more than a passive receptacle or conduit for news, comment, and advertising" of others.  *Tornillo*, 418 U.S. at 258.  Publishers exercise "editorial control and judgment" over the "choice of material" to present or exclude in their publications.  *Id.*; *see also Hurley*, 515 U.S. at 570.

In *Tornillo*, the Supreme Court invalidated Florida's "right of reply" statute, which punished any newspaper that did not allow political candidates that the paper criticized to publish a reply free of charge.  The statute "fail[ed] to clear the barriers of the First Amendment because of its intrusion into the function of editors."  418

7

U.S. at 258. "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" that state regulation cannot override. *Id.*

In *Hurley*, the Supreme Court again held that editorial discretion is protected by the First Amendment. There, a Massachusetts law required the private organizers of a parade to include gay, lesbian, and bisexual marchers. The Court invalidated that requirement, relying on *Tornillo* to hold that the First Amendment does not "require a speaker to generate, as an original matter, each item featured in the communication" to qualify for protection. 515 U.S. at 570. Just as cable operators "are engaged in protected speech activities even when they only select programming originally produced by others," *id.* (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994)), and just as a newspaper engages in protected speech by compiling its "opinion pages" or undertaking "even the simple selection of a paid noncommercial advertisement for inclusion," *id.* (citing *Tornillo*, 418 U.S. at 258, and *New York Times Co. v. Sullivan*, 376 U.S. 254, 265-66 (1974)), so too does an organizer engage in protected speech when it selects "contingents to make a parade," *id.* Thus, the First Amendment applies fully to publishers who exercise editorial discretion over third-party speech, whether through a newspaper, TV, a parade, or online.

8

"[D]isseminating" the speech of others is equally protected. *Sorrell*, 564 U.S. at 570; *accord Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011). As a long line of precedent establishes, "[w]ether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1; *see Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("disclosing and publishing information") (alterations omitted); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 768 (1988) ("Liberty of circulating is as essential to freedom of expression as liberty of publishing") (alterations omitted); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) ("constitutional guarantee of freedom of the press embraces the circulation of books"). In addition, cable programmers and operators are protected by the First Amendment where they exercise "editorial discretion over which stations or programs to include." *Turner*, 512 U.S. at 636 (internal quotation marks omitted).

First Amendment protection applies equally to app stores, which provide an outlet for third-party speech and thus have constitutional rights independent of the third parties whose speech they disseminate. According to *Hurley*, "a private speaker does not forfeit constitutional protection simply by combining multifarious voices" in a single communication. 515 U.S. at 569. When a broadcaster—public or private—exercises "editorial discretion in the selection and presentation of its programming," that broadcaster engages in "speech activity." *Ark. Educ. Television*

9

*Comm'n v. Forbes*, 523 U.S. 666, 673-674 (1998). And "[a]lthough programming decisions often involve the compilation of speech of third parties, the decisions nonetheless constitute communicative acts." *Id.*; *see also Bantam Books*, 372 U.S. at 64 n.6 (book publishers "are not in the position of mere proxies arguing another's constitutional rights"). The editorial discretion exercised by app stores is no less a protected communicative act than are print publications and broadcasts that present speech.

Applying these principles, courts routinely find that search engines—which curate and present the speech of others—are entitled to First Amendment protection. *See, e.g.*, *e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d 1265, 1274 (M.D. Fla. 2016); *Zhang v. Baidu.Com, Inc.*, 10 F. Supp. 3d 433, 438-40 (S.D.N.Y. 2014); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007). App stores are very like search engines, because they "inevitably make editorial judgments about what information (or kinds of information) to include . . . and how and where to display that information." *Zhang*, 10 F. Supp. 3d at 438. As such, the First Amendment equally protects app stores.

In sum, "[t]ogether, *Tornillo*" and its progeny "establish that a private entity's decisions about whether, to what extent, and in what manner to disseminate third-party created content to the public are editorial judgments protected by the First Amendment." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1212 (11th Cir.

10

2022). Like print publishers, broadcasters, and bookstores, app stores exercise editorial discretion when deciding which third-party applications to make available and how to organize those applications for users. Moreover, as shown in Section B., *infra*, app stores make *different* judgments about how to curate content, which itself demonstrates the protected, expressive nature of app stores' speech.

### B.     Digital Apps Engage in Expressive Content When They Exercise Editorial Judgment Over Which Applications to Display.

App stores' editorial discretion is evident in the wide variety of approaches they take. Like the traditional print editors in *Tornillo* and the cable operators in *Turner*, app stores express themselves by selecting which apps to make available and how to present those apps to users. These editorial decisions, in turn, are based in large measure on the expressive content of the apps themselves.

For example, Google employs several editorial parameters on the third-party content that appears in its Play Store to ensure that its users enjoy "the best user experience possible" in a "safe and secure environment" in which user privacy is protected.[5] The Play Store's content policy rejects apps that contain "content that is harmful or inappropriate" for users, like apps containing "Spam," "Malware,"

_____

[5] Google, *Developer Policy Center*, https://play.google.com/intl/en-US/about/developer-content-policy/ (last visited May 3, 2024).

11

"Privacy, Deception and Device Abuse," or "Inappropriate Content" such as pornography, hate speech, bullying and harassment, and gratuitous violence.

Google also makes expressive judgments in the way it curates the store for its users by organizing and arranging the apps. To "help users discover the right app at the right time," Google ranks and sorts apps based on characteristics including, for example, developers' descriptions of their apps, user feedback, and Google's own editorial judgments.[6] In addition, the Google Play staff "provides curated recommendations to help users find content that is noteworthy and interesting." *Id.* Through this process of selection and presentation, Google offers its users a curated ecosystem produced by Google's expressive judgments.

To take another example, Apple curates its App Store to cultivate a safe and creative platform for users to discover, and developers to share, a wide variety of apps.[7] Apple's editors decide which apps to allow and how to present those apps to users. The Ninth Circuit has described the Apple App Store as a "walled garden" in which "Apple plays a significant curating role." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023); *see also* Apple App Store ("[T]he App Store is more

---

[6] Google, *Policy Center: App Discovery and Ranking*,
https://support.google.com/googleplay/android-developer/answer/9958766
(last visited May 3, 2024)
[7] Apple, *App Store Review Guidelines*,
https://developer.apple.com/app-store/review/guidelines/#safety (last visited May 3, 2024).

than just a storefront — it's an innovative destination focused on bringing you amazing experiences. … Curated by experts. Handpicked for you.").[8]

Beyond selecting which apps to offer, Apple also engages in its own distinct, expressive activity by organizing and suggesting apps to users in unique ways. Apple sorts apps based on categories and keywords selected by developers as well as other factors such as customer behavior, including the number and quality of ratings.[9]  The App Store also features a "Today" tab, which compiles original stories from Apple's editors, "featuring exclusive premieres, new releases, a fresh look at our all-time favorites, an App of the Day, a Game of the Day, and more."  *Id.*  Apple's editors also "shine a light" on apps by creating "curated collections."  *Id.*

As another example, Samsung curates apps in the Galaxy Store to "ensure[]" that they meet Samsung's "high standards of quality."[10]  "Apps must be valuable, entertaining, unique, or informative."  *Id.*  Not only must apps meet multiple requirements, but they are screened for impermissible content and behaviors.  *Id.*  And, like other stores, Samsung employs content-based selection criteria, restricting apps containing sexually explicit content, promoting violence, or presenting

---

[8] Apple, *App Store*, https://www.apple.com/app-store/ (last visited May 3, 2024).
[9] Apple, *Discovery on the App Store and the Mac App Store*, https://developer.apple.com/app-store/discoverability/ (last visited May 3, 2024).
[10] Samsung, *App Distribution Guide*, https://developer.samsung.com/galaxy-store/distribution-guide.html (last visited May 3, 2024).

defamatory or vulgar content. *Id.* Samsung also publishes detailed specifications for advertising on apps offered through the Galaxy Store, and rejects apps from offering "[o]vertly political" advertising, or advertising that contains content "that reasonable public consensus may find to be improper or inappropriate." *Id.* The Galaxy Store incorporates search functionality, designates certain apps as "Editor's Choice" applications, and offers personalized recommendations.[11]

Other app stores, including but not limited to Amazon Appstore and the Microsoft Store, have their own standards, policies, and procedures, resulting in varied content choices and arrangements presented to the app stores' users. To wit, TikTok is not available, for example, on the F-Droid app store. This variety of approaches mirrors the many editorial approaches that are taken in traditional media and by other outlets that disseminate speech.

As these many examples show, app stores are engaged in expressive speech; they accordingly are entitled to the exacting First Amendment scrutiny that *Hurley*, 515 U.S. at 569-70, and *Tornillo*, 418 U.S. at 258, established.

---

[11] Samsung, *Galaxy Store*, https://galaxystore.samsung.com/apps (last visited May 3, 2024).

14

## II.    MONTANA'S SB419 VIOLATES APP STORES' FIRST AMENDMENT RIGHTS.

SB419 eliminates app stores' editorial discretion by banning, on pain of crushing fines, one app from being displayed to users in Montana. *Amicus curiae* respectfully asks the Court to consider this unconstitutional mandate as it applies to app stores—a matter that *amicus curiae* raised but the district court did not reach—in its review of the preliminary injunction.[12]   Should the Court undertake this consideration, *amicus curiae* suggests that strict scrutiny is the proper standard for evaluating SB419 as it pertains to app stores. For even if the State believes that SB419 targets only the data-collection "practices" and "conduct" of Tiktok,[13] that intent is no salve for the app stores that are only and undoubtedly engaged in the expressive conduct of curating online speech.

_____

[12] Federal Courts of Appeals may affirm an order on any ground even if not considered below or identified on appeal by the parties. *Dandridge v. Williams*, 397 U.S. 471, 476 n.6 (1970) (quoting *United States v. Am. Ry. Express Co*., 265 U.S. 425, 435-36 (1924)). Here, none of the Plaintiffs, who are comprised of TikTok and "a group of TikTok users" (ECF 113 at 1) would have Article III standing to challenge SB419 on behalf of app stores. *Barrows v. Jackson*, 346 U.S. 249, 255 (1953) ("Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party."). CCIA, which includes several app stores among its members, is an appropriate voice for these entities and has associational standing to do so. *Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties") (internal citation omitted).
[13] No. 24-34, Appellant's Opening Brief at 24, 25, ECF 9.1 (Mar. 1, 2024).

SB419 prohibits not only the use of, but the very presence of, Tiktok. As Judge Molloy observed, "SB 419 targets one entity," ECF 113 at 14, and it "prevents [TikTok] from 'the presentation of an edited compilation of speech generated by other persons … which, of course, fall squarely within the core of First Amendment security." ECF 113 at 15 (quoting *Hurley*, 515 U.S. at 570). Moreover, he found, SB419 "completely bans a platform where people speak," ECF 113 at 18, and would levy astronomical fines on app stores for displaying the TikTok app—that is, for engaging in the same expressive conduct for which TikTok itself deserves "the First Amendment's protections." ECF 113 at 15. These fines are set at $10,000 for each time someone in Montana is offered the ability to access TikTok, a "social media application that has over 300,000 monthly users in Montana." ECF 113 at 18.

As stated above, SB 419 "targets" one application, ECF 113 at 14, but it also expressly targets app stores based on the identity of and content displayed by that one application. This express intent is properly characterized as a content-based and speaker-based restriction of speech. "A regulation is content-based" if it either "singles out particular content for differential treatment" or "the underlying purpose of the regulation is to suppress particular ideas." *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (citation omitted). This characterization applies even when, as here, one of the aims of the regulation is to protect children. *Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) (law "designed to protect minors from viewing

harmful materials" is necessarily "content-based"). Such regulations warrant strict scrutiny: "strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 166 (2015).

The State was not able to show any interest sufficient to justify its infringement of protected speech.[14] The district court, after due consideration of Montana's two goals "as stated in the Act's preamble and text," ECF 113 at 26, found the State's purported justifications lacking. The preamble first asserts that "'the People's Republic of China is an adversary of the United States and Montana and has an interest in gathering information about Montanans.'" *Id*. at 23 (quoting SB 419, Preamble). But "Montana does not have constitutional authority in the field of foreign affairs." *Id*. at 25. Having no authority to assert that interest, the State's first justification for SB 419 fails immediately.

SB419's preamble then states that "TikTok fails to remove, and may even promote, dangerous content that directs minors to engage in dangerous activities." *Id*. at 23 (quoting SB 419, Preamble). However, "the State did not address this interest in its briefing" to the district court. *Id*. at 25. Before this Court, the State's

---

[14] Save for a bare recitation of the text of SB419 regarding "mobile application stores," ECF 9.1 at 13, the State's brief fails to address both SB 419's restriction on app stores and the First Amendment protections to which app stores are entitled.

brief makes no mention of the statute's intent to protect "minors" nor any citation to the "dangerous activities" clause of the Preamble. Any child-safety objective of SB 419 would thus appear irrelevant to the State's defense.[15]

Similarly unavailing was the State's explanation—which does not appear in the preamble—that "SB 419 bans Tiktok because of its allegedly harmful data-harvesting practices[.]" ECF 113 at 13-14. But the State failed to "provide any evidence to support that argument" below, *id*. at 25, which again raises the question of waiver. Moreover, the State of Montana already has passed SB 384, the Consumer Data Privacy Act, which, as the district court found, "seemingly undermined" the State's argument and rendered its attempted justification "not persuasive." *Id*. at 14.

In its reiteration of this "data privacy" interest before this Court, the State acknowledges that SB 384 governs "all 'data controllers,'" ECF 9.1 at 46 (quoting SB 384 § 5), which term encompasses many more entities than "just social media companies." ECF 9.1 at 46. But the State curiously undersells the protections of SB 384, which does in fact "protect Montanans 'from unsafe data collection practices,'" *id*. at 47, by requiring data controllers to, *inter alia*, "limit the collection of personal

---

[15] Further, there arises the question whether argument in support of this point has been waived. *E.g.*, *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("As a general rule, we will not consider arguments that are raised for the first time on appeal.") (citing *Sofamor Danek Group, Inc. v. Brown*, 124 F. 3d 1179, 1186 n.4 (9th Cir. 1997)).

18

data to what is adequate, relevant, and reasonably necessary," SB 384 § 7(1)(a), and to "establish, implement, and maintain reasonable administrative, technical, and physical data security practices to protect the confidentiality, integrity, and accessibility of personal data[,]" *id*. § 7(1)(b). SB 384 inarguably protects Montanans from "unsafe data practices," which renders SB 419, to the extent it was intended as a privacy statute, superfluous.

The district court thus was forced to conclude that Plaintiffs are likely to "succeed in showing SB419 does not advance an important government interest." ECF 113 at 26. This conclusion necessarily applies to the First Amendment analysis of app store rights. A governmental interest that is not even "important", *id*., let alone compelling, certainly cannot justify the severe treatment to which SB419 will subject app stores.

Not only is SB419 bereft of any sufficient governmental interest, it is not appropriately tailored in its creation of crushing monetary sanctions on app stores. As Judge Molloy reasoned, a State must use "a constitutional scalpel" if it wishes to adopt any regulation affecting protected speech. ECF 113 at 15. But Montana used a lawnmower instead. "The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it," *Bartnicki*, 532 U.S. at 529-30. Montana could have served its stated interests, assuming they are compelling, with Section 1(1) alone: "Tiktok may not operate within the territorial

19

jurisdiction of Montana" and "the operation of Tiktok" is unlawful. SB419 §§ 1(1), 1(1)(a). Montana went too far in reaching for the expression of app stores. SB 419 § 1(1)(b). This attack on app stores' editorial discretion cannot be justified under the constitutional review required for content-based and speaker-based restrictions of speech.

## CONCLUSION

For all these reasons, this Court should affirm the order entering preliminary injunction.

Respectfully submitted,

Dated:  May 6, 2024

By: /s/Stephanie A. Joyce
Stephanie A. Joyce, Esq.
COMPUTER & COMMUNICATIONS
  INDUSTRY ASSOCIATION
25 Massachusetts Avenue, NW
Suite 300C
Washington, DC 20001
Tel. (202) 838-3173
stephaniejoyce@ccianet.org

## <u>CERTIFICATE OF COMPLIANCE</u>

In compliance with Fed. R. App. P. 29(a)(4), I certify that, according to the word-count function of Microsoft Word, the foregoing brief Amicus Curiae contains 4,449 words, which is less than one-half the number of words that Fed. R. App. P. 32(a)(7) generally affords to a party for its principal brief.

_/s/ Stephanie A. Joyce_
Stephanie A. Joyce, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I, Stephanie A. Joyce, hereby certify that on May 6, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 */s/ Stephanie A. Joyce*
Stephanie A. Joyce

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-34

I am the attorney or self-represented party.

**This brief contains** | 4,449 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____ .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Stephanie A. Joyce | **Date** | 6 May 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*